# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

GHASSAN ALASAAD, NADIA
ALASAAD, SUHAIB ALLABABIDI, SIDD
BIKKANNAVAR, JÉRÉMIE
DUPIN, AARON GACH, ISMAIL ABDEL-
RASOUL aka ISMA'IL KUSHKUSH,
ZAINAB MERCHANT, MOHAMMED
AKRAM SHIBLY, MATTHEW WRIGHT,
and DIANE MAYE ZORRI,

       Plaintiffs,

    v.

KEVIN McALEENAN, Acting Secretary of
the U.S. Department of Homeland Security, in
his official capacity; JOHN SANDERS,
Acting Commissioner of U.S. Customs and
Border Protection, in his official capacity; and
MATTHEW T. ALBENCE, Acting Director
of U.S. Immigration and Customs
Enforcement, in his official capacity,

       Defendants.

Civil Action No. 17-cv-11730-DJC

Hon. Denise J. Casper

## Plaintiffs' Statement of Undisputed Material Facts
## In Support of Their Motion for Summary Judgment

Adam Schwartz
Sophia Cope
Saira Hussain
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333 (phone)
(415) 436-9993 (fax)
adam@eff.org
sophia@eff.org
saira@eff.org

Esha Bhandari
Hugh Handeyside
Nathan Freed Wessler
AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
125 Broad Street,
18th Floor
New York, NY 10004
(212) 549-2500 (phone)
(212) 549-2583 (fax)
ebhandari@aclu.org
hhandeyside@aclu.org
nwessler@aclu.org

Jessie J. Rossman
Matthew R. Segal
AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION OF
MASSACHUSETTS
211 Congress Street
Boston, MA 02110
(617) 482-3170 (phone)
(617) 451-0009 (fax)
jrossman@aclum.org
msegal@aclum.org

# **TABLE OF CONTENTS**

I. Defendants' Policies and Practices on Border Searches and Confiscations of Travelers' Electronic Devices ........................................................................................................... 1

   A.   CBP Screening ............................................................................................................ 1

   B.   The CBP Policy .......................................................................................................... 1

   C.   The ICE Policy ........................................................................................................... 3

   D.   Border Screening Databases ....................................................................................... 4

II.   The Frequency of Border Searches and Confiscations of Electronic Devices ..................... 8

   A.   Defendants' Statistical Data ....................................................................................... 8

   B.   Defendants' Statistics Do Not Reflect All Border Searches and Confiscations of Electronic Devices ..................................................................................................... 9

III.   Privacy Implications of Device Searches ......................................................................... 10

   A.   The Sensitivity of Content in Travelers' Devices ................................................... 10

   B.   The Invasiveness of Manual and Forensic Device Searches .................................... 11

   C.   Privacy Risks From Retention of Information ......................................................... 12

IV.   Government Interests ....................................................................................................... 13

   A.   Defendants' Asserted Purposes ............................................................................... 13

   B.   Digital Contraband at the Border ............................................................................ 17

   C.   Lack of Evidence That Defendants' Policies and Practices Are Effective ................ 18

   D.   CBP and ICE Obtain Warrants and Apply a Reasonable Suspicion Standard .............. 18

V.   Plaintiffs' Experiences at the Border ............................................................................... 22

   A.   Past Border Searches of Devices ............................................................................. 22

   B.   Ongoing Retention of Information From Past Device Searches .................................. 28

   C.   Past Device Confiscations ....................................................................................... 29

   D.   Other Recurring Border Scrutiny ............................................................................ 30

   E.   Regular International Travel, Past and Future ......................................................... 31

I.       **Defendants' Policies and Practices on Border Searches and Confiscations of Travelers' Electronic Devices**

A.       **CBP Screening**

1.       U.S. Customs and Border Protection ("CBP") officers conduct primary inspections of every person who crosses the border into the United States at a port of entry. Exh. 13 (CBP 30(b)(6) depo.) at 85:3–12.

2.       During primary inspections, CBP officers must determine whether a traveler seeking entry is admissible to the United States. U.S. citizens are by definition admissible. Lawful permanent residents, with some exceptions, are also by definition admissible. Officers must also determine whether the traveler is carrying goods subject to customs rules, such as prohibited contraband. Exh. 13 (CBP 30(b)(6) depo.) at 35:2–5, 80:4–8, 85:3–12 & errata pages.

3.       If a CBP officer at primary inspection decides that a traveler warrants further screening, the officer will refer the traveler to secondary inspection. Exh. 13 (CBP 30(b)(6) depo.) at 87:6–18.

4.       Some travelers are randomly selected for referral to secondary inspection. Exh. 18 (CBP Briefing for Senate Committee) at Bates 282.

5.       During secondary inspections, when deciding whether to search a traveler's device, CBP officers consider past border searches of electronic devices. Exh. 13 (CBP 30(b)(6) depo.) at 122:4–13.

B.       **The CBP Policy**

6.       CBP's border searches and confiscations of electronic devices are governed by CBP Directive No. 3340–049A, dated January 4, 2018 (the "CBP Policy"). Exh. 19 (CBP 2018 Directive) at § 11, Bates 124.

7.      In an "advanced" or "forensic" search, an officer connects external equipment to a traveler's electronic device, with a wired or wireless connection, in order to access, review, copy, and/or analyze the contents of the device. Exh. 46 (Stipulations) at ¶ 1; Exh. 19 (CBP 2018 Directive) at § 5.1.4, Bates 117; Exh. 20 (ICE Broadcast) at Bates 1266; Exh. 14 (ICE 30(b)(6) depo.) at 54:14–23.

8.      In a "basic" or "manual" search, an officer reviews the content of a traveler's electronic device without using external equipment. Exh. 19 (CBP 2018 Directive) at § 5.1.3, Bates 116; Exh. 14 (ICE 30(b)(6) depo.) at 54:14–55:3.

9.      The CBP Policy allows advanced searches of electronic devices based on either "reasonable suspicion of activity in violation of the laws enforced or administered by CBP" or a "national security concern." Exh. 19 (CBP 2018 Directive) at § 5.1.4, Bates 117.

10.     The CBP Policy allows basic searches of electronic devices without any suspicion. Exh. 19 (CBP 2018 Directive) at § 5.1.3, Bates 116.

11.     The CBP Policy allows officers to retain travelers' electronic devices for on-site or off-site searches, which "ordinarily" should not exceed five days, but can be prolonged with supervisory approval based on "extenuating circumstances." Exh. 19 (CBP 2018 Directive) at §§ 5.4.1–5.4.1.1, Bates 119.

12.     The CBP Policy places no ultimate limit on how long a device can be kept for search. Exh. 13 (CBP 30(b)(6) depo.) at 223:21–224:7.

13.     The CBP Policy permits CBP to retain information from a traveler's device that is related to "immigration, customs, and other enforcement matters," even if there is no probable cause to suspect a violation of law. Exh. 19 (CBP 2018 Directive) at § 5.5.1.2, Bates 121.

14.     The CBP Policy permits officers to share information retained from electronic devices with federal, state, local, and foreign law enforcement agencies. Exh. 19 (CBP 2018 Directive) at § 5.5.1.3, Bates 122.

15.     CBP does not know how long other government entities keep the information they receive from CBP's border searches of electronic devices. Exh. 13 (CBP 30(b)(6) depo.) at 200:2–12.

16.     CBP does not monitor whether other government entities impermissibly retain the information CBP shares from border searches of electronic devices. Exh. 13 (CBP 30(b)(6) depo.) at 203:7–204:3.

### C.     The ICE Policy

17.     U.S. Immigration and Customs Enforcement's ("ICE") border searches and confiscations of electronic devices are governed by ICE Directive No. 7–6.1 (also known as ICE Policy 10044.1), dated August 18, 2009, as superseded in part by an ICE/Homeland Security Investigations ("HSI") Broadcast, dated May 11, 2018 (collectively, the "ICE Policy"). Exh. 21 (ICE 2009 Directive) at Bates 260–69; Exh. 20 (ICE Broadcast) at Bates 1266–67; Exh. 14 (ICE 30(b)(6) depo.) at 149:10–20,187:21–188:2.

18.     The ICE Policy allows advanced searches of electronic devices with reasonable suspicion. Exh. 20 (ICE Broadcast) at Bates 1266–67.

19.     The ICE Policy allows basic or manual searches of electronic devices without any suspicion. Exh. 21 (ICE 2009 Directive) at § 6.1, Bates 261.

20.     When CBP turns an electronic device over to ICE for a search, ICE policy applies. Exh. 21 (ICE 2009 Directive) at § 6.2, Bates 261; Exh. 19 (CBP 2018 Directive) at § 2.7, Bates 114.

21.     The ICE Policy allows agents to take and retain travelers' electronic devices for on-site or off-site searches. Exh. 21 (ICE 2009 Directive) at § 8.1(4), Bates 263. The ICE Policy states that such searches should "generally" be completed within 30 days, but can be prolonged with supervisory approval. *Id*. at § 8.3(1), Bates 263–64.

22.     The ICE Policy permits ICE to retain information from travelers' devices that are "relevant to immigration, customs, and other law enforcement matters." Exh. 21 (ICE 2009 Directive) at § 8.5(1)(b), Bates 266.

23.     The ICE Policy states that copies of information from travelers' devices that are "determined to be of no relevance to ICE" must be destroyed, and the destruction must be documented. Exh. 21 (ICE 2009 Directive) at § 8.5(1)(e), Bates 267.

24.     The ICE Policy permits ICE to share information retained from electronic devices with federal, state, local, and foreign law enforcement agencies. Exh. 21 (ICE 2009 Directive) at § 8.5(1)(c), Bates 266.

**D.      Border Screening Databases**

**1.      CBP's TECS**

25.     TECS is CBP's main database. Exh. 13 (CBP 30(b)(6) depo.) at 46:9–11. It facilitates the maintenance and sharing of law enforcement records. *Id.* at 47:5–15.

26.     TECS includes information about prior encounters between CBP officers and travelers at the U.S. border. Exh. 13 (CBP 30(b)(6) depo.) at 119:7–17.

27.     TECS includes "lookouts" created by CBP or other government agencies. Exh. 13 (CBP 30(b)(6) depo.) at 98:20–99:7; Exh. 14 (ICE 30(b)(6) depo.) at 211:14–22.

28.     A "lookout" is an alert about a traveler or vehicle that is entered into a database by CBP, ICE, or another law enforcement agency. Exh. 13 (CBP 30(b)(6) depo.) at 97:5–11; Exh. 14 (ICE 30(b)(6) depo.) at 205:2–23; Exh. 22 (CBP 2018 PIA) at Bates 177.

29.     At primary inspection, CBP officers query TECS to identify "lookouts" and recent border crossings. Exh. 13 (CBP 30(b)(6) depo.) at 85:14–86:24, 93:12–19.

30.     If a traveler has a "lookout," the primary inspection CBP officer will refer the traveler to secondary inspection. Exh. 13 (CBP 30(b)(6) depo.) at 101:25–102:12; Exh. 14 (ICE 30(b)(6) depo.) at 206:19–207:19. A CBP officer may also refer the traveler to ICE. Exh. 14 (ICE 30(b)(6) depo.) at 205:2–23, 207:22–208:3, 209:6–210:2.

31.     "Lookouts" can be a reason why some travelers are subjected to border searches of their electronic devices. Exh. 13 (CBP 30(b)(6) depo.) at 103:15–104:2, 208:5–10.

32.     "Lookouts" last as long as CBP deems them pertinent. Exh. 13 (CBP 30(b)(6) depo.) at 101:19–23.

33.     CBP officers use TECS to document border searches of electronic devices. Exh. 13 (CBP 30(b)(6) depo.) at 90:15–21, 119:18–21. This includes the officers' reasons for search, *id.* at 125:19 –126:18, 151:5–11, and information the officers discover that they deem of law enforcement benefit, *id.* at 169:19–21. *See also* Exh. 22 (CBP 2018 PIA) at Bates 186.

34.     During secondary inspections, CBP officers consider information in TECS, including information about prior border screenings. Exh. 13 (CBP 30(b)(6) depo.) at 117:7–119:21.

35.     When ICE agents are deciding whether to conduct a border search of an electronic device, they have access to information in TECS. Exh. 14 (ICE 30(b)(6) depo.) at 90:24–92:5.

### 2.     CBP's Automated Targeting System

36.     CBP's Automated Targeting System ("ATS") uses "rules" to conduct risk assessments that "flag[]" certain travelers for "additional inspection." Exh. 13 (CBP 30(b)(6)

depo.) at 107:7–25. *See also id.* at 104:11–14, 106:8–16; Exh. 23 (CBP 2017 ATS PIA) at Bates 997, 999, 1003.

37. When assessing risk, ATS uses information from TECS. Exh. 13 (CBP 30(b)(6) depo.) at 107:22–25. *See also* Exh. 23 (CBP 2017 ATS PIA) at Bates 1000.

38. ATS provides CBP officers with access to dozens of other government databases. Exh. 23 (CBP 2017 ATS PIA) at Bates 997–99.

39. If ATS flags a traveler, then a CBP officer conducting a primary inspection must refer the traveler to secondary inspection. Exh. 13 (CBP 30(b)(6) depo.) at 109:4–13.

40. If an advanced search of an electronic device yields information that a CBP officer deems of law enforcement benefit, then the officer will copy it into ATS. Exh. 13 (CBP 30(b)(6) depo.) at 104:18–105:2; Exh. 22 (CBP 2018 PIA) at Bates 184, 186; Exh. 23 (CBP 2017 ATS PIA) at Bates 1034; Exh. 27 (DHS OIG 2018 Report) at Bates 975.

41. ATS stores copies of data from travelers' devices, not officers' narrative descriptions of that data. Exh. 13 (CBP 30(b)(6) depo.) at 190:10–19.

42. ATS stores copies of data from travelers' devices for 15 years or "the life of the law enforcement matter," whichever is longer. Exh. 23 (CBP 2017 ATS PIA) at Bates 1037.

43. ATS may use the information copied from a traveler's device to flag the traveler for heightened screening in the future. Exh. 13 (CBP 30(b)(6) depo.) at 114:10–18, 115:12–25; Exh. 22 (CBP 2018 PIA) at Bates 184; Exh. 23 (CBP 2017 ATS PIA) at Bates 1034.

44. When ICE agents decide whether to conduct a border search of an electronic device, they have access to ATS. Exh. 14 (ICE 30(b)(6) depo.) at 99:4–10.

### 3.     ICE's Investigative Case Management

45.     ICE operates a database called Investigative Case Management ("ICM"). Exh. 14 (ICE 30(b)(6) depo.) at 163:20–164:4.

46.     ICM contains (a) "reports of investigation," and (b) "subject records," which identify people and things that are connected to investigations. Exh. 14 (ICE 30(b)(6) depo.) at 164:13–165:8.

47.     ICM contains nearly all of ICE's case information. Exh. 14 (ICE 30(b)(6) depo.) at 160:3–13.

48.     When ICE agents decide whether to conduct border searches of electronic devices, they have access to ICM information. Exh. 14 (ICE 30(b)(6) depo.) at 164:5–12.

49.     ICM information that can be relevant to whether to conduct a border search of an electronic device includes prior encounters between ICE and travelers at the border, including whether travelers were subjected to device searches. Exh. 14 (ICE 30(b)(6) depo.) at 166:13–168:14.

50.     If an ICE agent conducts a border search of an electronic device, they may use an ICM report of investigation to store information about what they found. Exh. 14 (ICE 30(b)(6) depo.) at 169:10–22. ICM contains an agent's descriptions of data in a traveler's device, but not the data itself. *Id.* at 172:5–14. This may include, for example, a "verbatim transcript of a conversation," or a "summary" of a conversation or a photograph. *Id.* at 172:15–174:11.

51.     ICM information about the contents of travelers' devices can be relevant to whether to conduct a future border search of an electronic device. Exh. 14 (ICE 30(b)(6) depo.) at 174:12–24.

## II.     The Frequency of Border Searches and Confiscations of Electronic Devices

### A.     Defendants' Statistical Data

52.     CBP conducted the following total number of border searches of electronic

devices during each fiscal year ("FY") from 2012 through 2018:

- FY 2012: 5,085
- FY 2013: 5,709
- FY 2014: 6,029
- FY 2015: 8,503
- FY 2016: 19,051
- FY 2017: 30,524
- FY 2018: 33,295

Exh. 46 (Stipulations) at ¶ 13.

53.     CBP conducted the following number of basic searches of electronic devices at

the border during each fiscal year from 2012 through 2018:

- FY 2012: 3,182
- FY 2013: 3,561
- FY 2014: 4,314
- FY 2015: 6,618
- FY 2016: 16,914
- FY 2017: 27,701
- FY 2018 (through September 15, 2018): 28,429[1]

Exh. 26 (Defs. Interrog. Responses) at #6.

54.     CBP conducted the following number of advanced searches of electronic devices

at the border during each fiscal year from 2012 through 2018:

- FY 2012: 2,285
- FY 2013: 2,444
- FY 2014: 1,921
- FY 2015: 2,090
- FY 2016: 2,394
- FY 2017: 2,685
- FY 2018 (through September 15, 2018): 3,485

---

[1] Federal fiscal years begin on October 1 and end on September 30 of the following year. *See* https://www.senate.gov/reference/glossary_term/fiscal_year.htm.

Exh. 26 (Defs. Interrog. Responses) at #6.

55.     CBP conducted the following number of confiscations of travelers' electronic

devices after they left ports of entry during each fiscal year from 2012 through 2018:

- FY 2012: 8
- FY 2013: 36
- FY 2014: 32
- FY 2015: 21
- FY 2016: 131
- FY 2017: 200
- FY 2018 (through September 15, 2018): 172

Exh. 26 (Defs. Interrog. Responses) at #6.

**B.      Defendants' Statistics Do Not Reflect All Border Searches and Confiscations
of Electronic Devices**

56.     ICE does not maintain records of the number of basic searches of electronic

devices that it conducts. Exh. 46 (Stipulations) at ¶ 14.

57.     ICE agents may conduct basic searches of electronic devices. Exh. 29 (DHS 2009

PIA) at Bates 224.

58.     ICE does not maintain records of the number of times it detains electronic devices

after travelers leave ports of entry. Exh. 14 (ICE 30(b)(6) depo.) at 330:2–10.

59.     CBP determines the number of border searches of electronic devices in a given

period by calculating the number of closed or completed Electronic Media Reports ("EMRs").

Exh. 26 (Defs. Interrog. Responses) at #11. EMRs are sometimes called "IOEMs." Exh. 13 (CBP

30(b)(6) depo.) at 201:7–9.

60.     CBP officers sometimes do not complete EMRs after conducting border searches

of electronic devices. Exh. 27 (DHS OIG 2018 Report) at Bates 973, 978; Exh. 13 (CBP 30(b)(6)

depo.) at 248:18–249:9.

61.     For example, on August 28, 2017, CBP officers searched the smartphone they

seized from Plaintiff Nadia Alasaad's bag. Exhs. 15 & 16 (Answer and Complaint) at ¶¶ 73–74,

76. Defendants have no records, including EMRs, documenting that search. Exh. 26 (Defs. Doc.

Responses) at #17.

62.     When CBP officers do not fill out EMRs for border searches of electronic

devices, those searches are not included in CBP's calculation of the total number of searches for

that period. Exh. 26 (Defs. Interrog. Responses) at #11; Exh. 13 (CBP 30(b)(6) depo.) at 251:3–

15.

### III.     Privacy Implications of Device Searches

#### A.     The Sensitivity of Content in Travelers' Devices

63.     Electronic devices carried by travelers, such as smartphones or laptops, can

contain a very large volume of information. Exh. 13 (CBP 30(b)(6) depo.) at 161:25–162:3; Exh.

14 (ICE 30(b)(6) depo.) at 212:21–213:3.

64.     Travelers carry electronic devices that contain many different kinds of

information, such as photos, contacts, emails, and text messages, and the devices may reveal

such things as prescription information, information regarding employment, travel history, and

browsing history. Exh. 13 (CBP 30(b)(6) depo.) at 161:21–24, 164:3–13, 167:12–17, 191:10–14;

Exh. 14 (ICE 30(b)(6) depo.) at 213:5–8.

65.     A CBP training document describes border searches of electronic devices as "very

sensitive." Exh. 31 (Pilot Program for CBP 2018 Directive) at Bates 143.

66.     ICE recognizes that electronic devices have the capacity to "store sensitive

information." Exh. 29 (DHS 2009 PIA) at Bates 231.

**B.      The Invasiveness of Manual and Forensic Device Searches**

67.      Basic searches can access content from allocated space physically resident on an electronic device that is accessible using the native operating system of the device, including but not limited to its native graphical user interface and/or touchscreen. Exh. 46 (Stipulations) at ¶ 2.

68.      Basic searches can extend to any allocated file or information that is resident on the device and accessible using the device's native operating system. Exh. 46 (Stipulations) at ¶ 4.

69.      Separate from the primary content stored on them, some electronic devices may also store data related to that content, such as the date and time associated with the content, usage history, sender and receiver information, or location data. That content may be revealed during a basic search, depending on the type of device, the operating system, the relevant settings, and the applications used to create and/or maintain the data. Exh. 46 (Stipulations) at ¶ 5.

70.      When conducting a basic search, officials are able to use the native search functions in the native operating system of the device, such as a key word search tool, if there is one. Exh. 46 (Stipulations) at ¶ 3.

71.      A device's internal search tools can be used to search for particular words and images. Exh. 14 (ICE 30(b)(6) depo.) at 214:24–216:10, 216:25–217:4, 218:9–20, 219:16–221:11.

72.      Depending on the equipment, procedures, and techniques used, advanced searches of electronic devices are generally capable of revealing everything a basic search may reveal. Exh. 46 (Stipulations) at ¶ 6.

73.      An advanced search of an electronic device, depending on the equipment, procedures, and techniques used, may be capable of revealing deleted or other data in

unallocated storage space and password-protected or encrypted data. Exh. 46 (Stipulations) at ¶ 8. *See also* Exh. 13 (CBP 30(b)(6) depo.) at 298:3–17.

74.    An advanced search of an electronic device may be able to copy all information physically resident on the device or may be limited to only certain files, depending on the search equipment, procedures, and techniques used. Exh. 46 (Stipulations) at ¶ 12. *See also* Exh. 13 (CBP 30(b)(6) depo.) at 205:13–23.

75.    If information from the internet is cached on a device, such as web-based email, and the device is disconnected from the internet, border officers can still search the cached information. Exh. 14 (ICE 30(b)(6) depo.) at 222:9–223:15; Exh. 13 (CBP 30(b)(6) depo.) at 186:2–24.

76.    Some CBP officers may have accessed cloud-based content during searches of electronic devices, even after issuance of an April 2017 memorandum requiring that officers disable network connectivity prior to search, because more than one-third of EMRs lacked a statement confirming that the device's data connection had been disabled. Exh. 27 (DHS OIG 2018 Report) at Bates 979–980.

## C.    Privacy Risks From Retention of Information

77.    To the extent consistent with applicable system of records notices, ICE and CBP can retain information from a device in any of their record keeping systems when an electronic device search reveals information officers deem relevant to immigration, customs, or other laws enforced by the Department of Homeland Security. Exh. 46 (Stipulations) at ¶ 10.

78.    ICE generally stores information from travelers' devices in ICE's Investigative Case Management System, and the rules for that database do not limit storage of this information, beyond the requirement of relevance to immigration, customs, or other law enforcement matters. Exh. 14 (ICE 30(b)(6) depo.) at 323:16–324:4, 326:18–327:4.

79.     After a border search of an electronic device, the information contained on the device may be shared with other federal agencies for law enforcement and intelligence purposes. Exh. 13 (CBP 30(b)(6) depo.) at 44:18–45:12, 198:20–199:5; Exh. 30 (ICE 2007 Memorandum) at Bates 1265.

80.     After a border search of an electronic device, information retained in the TECS database may be shared with other agencies outside of DHS, including local, state, and foreign governments. Exh. 13 (CBP 30(b)(6) depo.) at 83:18–84:17; 198:11–19.

## IV.     Government Interests

### A.     Defendants' Asserted Purposes

81.     CBP and ICE assert authority to conduct warrantless or suspicionless border searches of electronic devices to enforce hundreds of federal laws. Exh. 19 (CBP 2018 Directive) at Bates 115; Exh. 22 (CBP 2018 PIA) at Bates 189; Exh. 14 (ICE 30(b)(6) depo.) at 28:4–6.

82.     CBP's asserted purposes in conducting warrantless or suspicionless border searches of electronic devices include general law enforcement, *i.e.*, finding potential evidence of illegal activity beyond violations of immigration and customs laws. Exh. 26 (Defs. Interrog. Responses) at #1 ("[B]order searches of electronic devices are conducted in furtherance of … law enforcement[] and homeland security responsibilities and to ensure compliance with … other laws that Defendants are authorized to enforce and administer. … They are a crucial tool for detecting evidence relating to terrorism and other national security matters… They can also reveal information about financial and commercial crimes …."). *See also* Exh. 19 (CBP 2018 Directive) at § 1, Bates 113; Exh. 13 (CBP 30(b)(6) depo.) at 20:19–21:9, 32:23–33:6; Exh. 33 (CBP "Tear Sheet") at Bates 163 ("domestic law enforcement"); Exh. 23 (CBP 2017 ATS PIA) at Bates 1034 ("other enforcement matters") & 1035 ("other laws enforced by CBP"); Exh. 27 (DHS OIG 2018 Report) at Bates 975 ("any violation of laws"), 981 ("law enforcement-related

13

information"), 982 (use of "new technologies to commit crimes"); Exh. 34 (CBP Written Statement for the Record for Senate Homeland Security Committee, July 11, 2018) at Bates 277 (use of "new technologies to commit crimes"); Exh. 35 (CBP Instructor Guide—P180C) at Bates 1279.

83.     ICE's asserted purposes for warrantless or suspicionless border searches of electronic devices include general law enforcement, *i.e.*, finding potential evidence of illegal activity beyond violations of immigration and customs laws. Exh. 26 (Defs. Interrog. Responses) at #1; Exh. 21 (ICE 2009 Directive) at § 4, Bates 261 ("other Federal laws at the border"); Exh. 30 (ICE 2007 Memorandum) at Bates 1264 ("anything that may be evidence of a crime"); Exh. 14 (ICE 30(b)(6) depo.) at 35:15–17, 36:23–37:5, 40:10–20.

84.     ICE asserts that agents may conduct a warrantless or suspicionless border search of the electronic device of a traveler:

a.     Who is suspected of violating tax laws, to find emails reflecting the tax law violations. Exh. 14 (ICE 30(b)(6) depo.) at 29:4–8, 31:5–12.

b.     Who is suspected of hiding assets in bankruptcy, to find emails reflecting the hiding of assets. *Id.* at 33:4–22.

c.     Who is an executive of a company suspected of criminally dumping toxins into a river, to find emails reflecting the illegal dumping. *Id*. at 31:14–23, 32:2–8.

d.     Who is suspected of violating consumer protection laws, to find evidence reflecting the consumer protection law violations. *Id*. at 32:10–33:2.

e.     Who is suspected of money laundering, to find emails or other evidence reflecting money laundering, including the creation of corporations and accounts and the structuring of deposits. *Id*. at 41:3–42:13.

85.     CBP and ICE's asserted purposes in conducting warrantless or suspicionless border searches of electronic devices include finding potential evidence of customs violations, including evidence of importing or exporting contraband, in contrast to finding contraband itself. Exh. 26 (Defs. Interrog. Responses) at #1 ("detecting evidence relating to . . . human and bulk cash smuggling, contraband, and child pornography"); Exh. 13 (CBP 30(b)(6) depo.) at 62:19–21; Exh. 35 (CBP Instructor Guide—P180C) at Bates 1279 ("evidence related to . . . [h]uman/cash smuggling" and "[n]arcotics and contraband"); Exh. 36 (ICE/HSI Priority Requests) at Bates 93 (". . . if an individual is encountered smuggling methamphetamine . . . a border search would be conducted on his devices for co-conspirators").

86.     CBP and ICE's asserted purposes in conducting warrantless or suspicionless border searches of electronic devices include intelligence gathering. Exh. 13 (CBP 30(b)(6) depo.) at 46:24–47:3, 47:16–48:7; Exh. 23 (CBP 2017 ATS PIA) at Bates 1003, 1034; Exh. 30 (ICE 2007 Memorandum) at Bates 1265 ("intelligence interest[s]").

87.     CBP's decisions to conduct warrantless or suspicionless border searches of electronic devices are informed by information or requests from other government agencies. Exh. 26 (Defs. Interrog. Responses) at #17 ("CBP decisions to perform border searches of electronic devices benefit from information provided by other law enforcement agencies"); Exh. 13 (CBP 30(b)(6) depo.) at 75:8–76:5, 76:11–25, 77:13–14, 83:18–84:12; Exh. 37 (CBP Briefing for Senate Committee) at Bates 288 ("CBP coordinates with FBI").

88.     ICE's decisions to conduct warrantless or suspicionless border searches of electronic devices are informed by information or requests from other government agencies. Exh. 26 (Defs. Interrog. Responses) at #17. *See also* Exh. 14 (ICE 30(b)(6) depo.) at 189:9–190:21, 191:18–192:3. These agencies include the Bureau of Alcohol, Tobacco, Firearms and

Explosives, Internal Revenue Service, Secret Service, Federal Bureau of Investigation, State

Department, state and local police departments and county sheriffs, and foreign law enforcement

agencies. Exh. 14 (ICE 30(b)(6) depo.) at 194:13–201:25.

89.   CBP asserts it may conduct warrantless or suspicionless border searches of

electronic devices when the subject is someone other than the traveler. Exh. 13 (CBP 30(b)(6)

depo.) at 57:3–17 (another person's crime), 58:6–59:9 (same), 59:11–60:10 (another person's

admissibility).

90.   ICE asserts that warrantless or suspicionless border searches of electronic devices

may be conducted when the subject of interest is someone other than the traveler. This includes:

a.   When the traveler is a U.S. citizen and ICE is seeking information about a

suspected undocumented immigrant. Exh. 14 (ICE 30(b)(6) depo.) at 64:18–65:19.

b.   When the traveler is a reporter who is known to have had contact with a

suspected terrorist, where there is no suspicion that the reporter engaged in wrongdoing. Exh. 14

(ICE 30(b)(6) depo.) at 56:25–58:14. *See also id.* at 74:14–75:6.

c.   When the traveler is a journalist or a scholar with foreign sources who are

of interest to the U.S. government. Exh. 14 (ICE 30(b)(6) depo.) at 75:14–25.

d.   When the traveler is business partners with someone who is under

investigation for tax fraud. Exh. 14 (ICE 30(b)(6) depo.) at 50:15–51:4.

e.   When the traveler is a family member of a person under investigation, in

conjunction with other factors. Exh. 14 (ICE 30(b)(6) depo.) at 130:16–131:3.

91.   CBP and ICE conduct warrantless or suspicionless border searches of electronic

devices to advance pre-existing investigations. Exh. 35 (CBP Instructor Guide—P180C) at Bates

1281 ("ongoing INVESTIGATIONS"); Exh. 26 (Defs. Interrog. Responses) at #16 ("the

16

potential for that search to further a particular investigation"); Exh. 14 (ICE 30(b)(6) depo.) at

193:2–15; Exh. 29 (DHS 2009 PIA) at Bates 222.

**B.**   **Digital Contraband at the Border**

92.   Child pornography is primarily transferred into the United States via the internet.

Exh. 14 (ICE 30(b)(6) depo.) at 297:9–12.

93.   ICE considers few things to be digital contraband: child pornography, malware,

information that cannot lawfully be exported, and unreported digital currency. Exh. 14 (ICE

30(b)(6) depo.) at 37:25–38:24, 39:3–19.

94.   CBP cannot identify any type of digital contraband beyond child pornography.

Exh. 13 (CBP 30(b)(6) depo.) at 62:8–66:15.

95.   Digital data can be posted, shared, or transmitted via the internet and stored on an

electronic device. Exh. 46 (Stipulations) at ¶ 9.

96.   Defendants are aware that digital contraband may in certain circumstances be

accessible from the United States via the internet. Exh. 26 (Defs. Interrog. Responses) at #5.

97.   ICE acknowledges that child pornography can enter or be viewed in the United

States via the internet in many ways:

a.   By viewing content on servers located outside the United States. Exh. 14

(ICE 30(b)(6) depo.) at 286:5–13.

b.   As email attachments. *Id*. at 286:15–19.

c.   As text messages. *Id*. at 286:20–25.

d.   Via live streaming. *Id*. at 288:20–289:7.

e.   Via a listserv or chat group. *Id*. at 289:20–24.

f.   Via the Dark Web. *Id*. at 290:7–9.

98.     When Defendants confiscate digital contraband at the border, they either (a) cannot determine whether that digital contraband is already present in the United States, or (b) can determine, through a method known as "hashing," that the digital contraband is already present in the United States. Exh. 14 (ICE 30(b)(6) depo.) at 299:5–24.

### C.     Lack of Evidence That Defendants' Policies and Practices Are Effective

99.     CBP and ICE do not know how many warrantless or suspicionless border searches of electronic devices uncover digital contraband. Exh. 26 (Defs. Interrog. Responses) at #13; Exh. 13 (CBP 30(b)(6) depo.) at 68:10–14; Exh. 14 (ICE 30(b)(6) depo.) at 44:25–45:7.

100.    CBP and ICE do not know how many warrantless or suspicionless border searches of electronic devices uncover potential evidence of criminal activity. Exh. 13 (CBP 30(b)(6) depo.) at 68:15–20; Exh. 14 (ICE 30(b)(6) depo.) at 338:18–24.

101.    CBP does not know how many warrantless or suspicionless border searches of electronic devices result in prosecution or conviction. Exh. 27 (DHS OIG 2018 Report) at Bates 982.

102.    ICE does not know how many warrantless or suspicionless border device searches result in criminal arrests or indictments, or referrals to other law enforcement agencies. Exh. 36 (ICE/HSI Priority Requests) at Bates 93.

### D.     CBP and ICE Obtain Warrants and Apply a Reasonable Suspicion Standard

#### 1.     CBP Obtains Warrants

103.    CBP sometimes conducts searches of electronic devices pursuant to warrants. Exh. 38 (Border Patrol 2018 Digital Forensics Program PIA) at Bates 1130–31.

104.    CBP sometimes applies a probable cause standard for the seizure of an electronic device. Exh. 13 (CBP 30(b)(6) depo.) at 260:11–15.

105.     CBP provides officers written guidance and training on what constitutes probable cause. Exh. 13 (CBP 30(b)(6) depo.) at 260:16–261:16. CBP also provides training on how to obtain warrants. *Id.* at 279:25–280:4.

106.     CBP sometimes obtains warrants for searches of international mail. Exh. 13 (CBP 30(b)(6) depo.) at 267:3–5. Specifically, if the officer has reasonable suspicion that a sealed parcel contains contraband, they may open it, but still need a warrant to read any correspondence. *Id.* at 268:12–25, 270:20–271:7; Exh. 39 (2001 International Mail Handbook) at Bates 1269. Without reasonable suspicion of contraband, CBP needs a warrant to open the mail. Exh. 13 (CBP 30(b)(6) depo.) at 268:12–25; 270:20–271:7; *see also* Exh. 39 (2001 International Mail Handbook) at Bates 1269.

107.     Although CBP must obtain a warrant to read correspondence in international mail, CBP asserts it may read correspondence on an electronic device without any suspicion. Exh. 13 (CBP 30(b)(6) depo.) at 278:14–20.

108.     CBP officers sometimes obtain warrants at the border to conduct:

a.       Involuntary x-ray searches. Exh. 13 (CBP 30(b)(6) depo.) at 262:13–17; Exh. 40 (CBP 2004 Personal Search Handbook) at § 6.h., Bates 1095.

b.       Involuntary body cavity searches. Exh. 13 (CBP 30(b)(6) depo.) at 263:13–15; Exh. 40 (CBP 2004 Personal Search Handbook) at § 8.I.d., Bates 1101.

c.       Prolonged detentions for medical examinations. Exh. 40 (CBP 2004 Personal Search Handbook) at § 2.p., Bates 1076.

109.     CBP's Air and Marine Operations is required to get a warrant before searching an electronic device whenever it is operating outside the border environment. Exh. 13 (CBP

30(b)(6) depo.) at 286:25–287:3, 287:7–12; Exh. 41 (CBP AMO Guidance) at Bates 1169; Exh.

42 (CBP 2017 AMCIT Memorandum) at Bates 1153.

<h3>2.   <u>ICE Obtains Warrants</u></h3>

110.    ICE advises its agents to obtain a warrant "if time permits" and if agents have

"any doubt" concerning whether a warrant is required. Exh. 43 (HSI 2012 Search and Seizure

Handbook) at § 6.3, Bates 1187, § 7.11.4, Bates 1201.

111.    ICE trains agents on how to seek a warrant. Exh. 14 (ICE 30(b)(6) depo.) at

251:4–7, 261:2–10. This training occurs at the ICE academy, on the job, from supervisors and

senior officers, from the local U.S. Attorney's office, and from the Office of the Principal Legal

Advisor.  *Id*. at 261:15–25, 262:9–16, 263:5–14, 263:24–264:15, 264:21–265:8.

112.    ICE's written training materials provide details on how to prepare an affidavit to

establish probable cause for a warrant. Exh. 43 (HSI 2012 Search and Seizure Handbook) at

§ 7.11.4, Bates 1201–02, § 8.2, 1204–05.

113.    ICE policy on international mail requires:

a.      A warrant to search inbound international mail that is sealed and appears

to contain only correspondence. Exh. 44 (MOU Between ICE/HSI and USPS) at § 4.A.3, Bates

1272; Exh. 14 (ICE 30(b)(6) depo.) at 248:5–9.

b.      A warrant to search outbound international mail that is sealed and weighs

less than 16 ounces. Exh. 44 (MOU Between ICE/HSI and USPS) at § 4.B.3, Bates 1273.

c.      A warrant to read correspondence contained in other types of inbound and

outbound international mail. *Id*. at § 4.A.2, § 4.B.2., Bates 1272–73.

d.      Reasonable suspicion of contraband to open a parcel, and a warrant to read

correspondence in that parcel. *Id. See also* Exh. 14 (ICE 30(b)(6) depo.) at 248:10–15.

114.    If an ICE agent opens sealed mail on reasonable suspicion, and it contains correspondence on digital storage media, ICE policy requires a warrant to read that digital correspondence. Exh. 14 (ICE 30(b)(6) depo.) at 249:6–250:10.

115.    ICE agents sometimes obtain warrants at the border to conduct:

    a.    X-ray searches. Exh. 14 (ICE 30(b)(6) depo.) at 259:11–16.

    b.    Involuntary body cavity searches. *Id.* at 260:14–25.

    c.    Detentions that last longer than eight hours. *Id.* at 254:19–255:6, 255:13–21, 256:7–258:3.

### 3.    CBP and ICE Apply the Reasonable Suspicion Standard

116.    Since at least 2015, CBP has had procedures for conducting advanced device searches based on reasonable suspicion. Exh. 13 (CBP 30(b)(6) depo.) at 254:7–14; 256:9–19; Exh. 45 (CBP 2015 Memorandum on *Cotterman*) at Bates 129–30.

117.    CBP officers are accustomed to applying the reasonable suspicion standard for advanced device searches. Exh. 13 (CBP 30(b)(6) depo.) at 259:8–15.

118.    CBP has written guidance and training on reasonable suspicion. Exh. 13 (CBP 30(b)(6) depo.) at 257:11–259:7. ICE provides training to its agents on reasonable suspicion. Exh. 14 (ICE 30(b)(6) depo.) at 279:22–280:8.

119.    ICE policy requires agents at the border to have reasonable suspicion for:

    a.    Strip searches. Exh. 14 (ICE 30(b)(6) depo.) at 278:8–15. *See also* Exh. 43 (HSI 2012 Search and Seizure Handbook) at § 11.1, Bates 1224 (requiring reasonable suspicion for "partial body search[es]").

    b.    X-ray or body cavity searches. Exh. 14 (ICE 30(b)(6) depo.) at 278:18–279:11, 279:13–20; Exh. 43 (HSI 2012 Search and Seizure Handbook) at §10.9, Bates 1219.

     c.     A destructive search of a vehicle or other object. Exh. 43 (HSI 2012 Search and Seizure Handbook) at §11.1, Bates 1224.

## V.    **Plaintiffs' Experiences at the Border**

### A.    **Past Border Searches of Devices**

#### 1.    **Ghassan and Nadia Alasaad**

120.    Plaintiffs Ghassan and Nadia Alasaad are U.S. citizens who reside in Massachusetts and are married to each other. Exh. 1 (G. Alasaad Dec.) at ¶¶ 2–4; Exh. 2 (N. Alasaad Dec.) at ¶¶ 2–4. He works as a limousine driver, and she is a nursing student. Exh. 1 (G. Alasaad Dec.) at ¶ 1; Exh. 2 (N. Alasaad Dec.) at ¶ 1.

121.    On January 12, 2017, they returned by car to the United States at Highgate Springs, Vermont. Exh. 1 (G. Alasaad Dec.) at ¶ 5; Exh. 2 (N. Alasaad Dec.) at ¶ 5. Ghassan Alasaad was traveling with an unlocked Samsung Note smartphone. Exh. 1 (G. Alasaad Dec.) at ¶ 5. Nadia Alasaad was traveling with a locked iPhone 7 smartphone. Exh. 2 (N. Alasaad Dec.) at ¶ 5. CBP officers conducted a manual search of Mr. Alasaad's phone. Exh. 2 (N. Alasaad Dec.) at ¶ 8; Exh. 1 (G. Alasaad Dec.) at ¶ 7; Exhs. 15 & 16 (Answer and Complaint) at ¶ 65. CBP officers later searched Ms. Alasaad's phone. Exh. 47 (EMR) at Bates 337–38, 340.

122.    Nadia Alasaad objected to the search of her phone on the ground that she wears a headscarf in public in accordance with her religious beliefs, and she had photos in her phone of herself without a headscarf on and of her daughters that she did not want any CBP officers, especially male officers, to view. Exh. 2 (N. Alasaad Dec.) at ¶¶ 10, 13.

123.    On August 28, 2017, Nadia Alasaad arrived at John F. Kennedy International Airport with her 11-year-old daughter. *Id.* at ¶ 19. Her daughter was traveling with a locked iPhone 6+ smartphone. *Id.* CBP officers searched Nadia Alasaad's handbag, where they found

the smartphone that her daughter was using. *Id.* at ¶ 20; Exhs. 15 & 16 (Answer and Complaint) at ¶ 74. CBP officers searched the phone. Exhs. 15 & 16 (Answer and Complaint) at ¶ 76.

### 2.    Suhaib Allababidi

124.    Plaintiff Suhaib Allababidi is a U.S. citizen who resides in Texas. Exh. 3 (Allababidi Dec.) at ¶¶ 2–3. He owns and operates a business that sells security technology. *Id.* at ¶ 1.

125.    On January 24, 2017, Allababidi returned to Dallas, Texas, after an international trip. *Id.* at ¶ 4; Exhs. 15 & 16 (Answer and Complaint) at ¶ 77. He was traveling with a locked Samsung S7 Edge smartphone and an unlocked iPhone smartphone. Exh. 3 (Allababidi Dec.) at ¶ 4. A CBP officer seized and manually searched Allababidi's unlocked iPhone for at least 20 minutes. *Id.* at ¶ 5. After Allababidi declined to provide the password to his locked Samsung phone, CBP officers confiscated both phones in order to conduct an "examination." *Id.* at ¶ 6; Exhs. 15 & 16 (Answer and Complaint) at ¶¶ 79–80; Exh. 17 (Detention Notice and Custody Receipt) at Pls. Bates 62; *see also* Exh. 47 (Detention Notice and Custody Receipt) at Bates 107.

### 3.    Sidd Bikkannavar

126.    Sidd Bikkannavar is a U.S. citizen and a resident of California. Exh. 4 (Bikkannavar Dec.) at ¶¶ 2–3. He is an optical engineer at NASA's Jet Propulsion Laboratory. *Id.* at ¶ 1.

127.    On January 31, 2017, Bikkannavar flew into Houston, Texas, after an international trip. *Id.* at ¶ 4. He was traveling with a locked Samsung Galaxy Note 5 smartphone. *Id.* CBP officers searched Bikkannavar's phone for 19 minutes. Exh. 47 (EMR) at Bates 621. Afterwards, a CBP officer stated they had used "algorithms" to search the phone. Exh. 4 (Bikkannavar Dec.) at ¶ 12.

### 4.   **Jérémie Dupin**

128.     Jérémie Dupin is a lawful permanent resident who resides in Massachusetts. Exh. 5 (Dupin Dec.) at ¶ 2–3. He is a journalist. *Id.* at ¶ 1.

129.     On December 22, 2016, Dupin flew to Miami, Florida after an international trip. *Id.* at ¶ 4. He was traveling with a locked iPhone 5 smartphone, which he used for his journalism work. *Id.* A CBP Officer conducted a basic search of Dupin's phone for about 15 minutes. Exhs. 15 & 16 (Answer and Complaint) at ¶ 90. *See also* Exh. 47 (EMR) at Bates 689; Exh. 5 (Dupin Dec.) at ¶ 8.

130.     On December 23, 2016, Dupin traveled by bus with his seven-year-old daughter from Montreal to New York City. He carried the same locked iPhone. Exh. 5 (Dupin Dec.) at ¶ 11. At the U.S. border customs checkpoint, a CBP officer took the phone into another room for approximately four hours. *Id.* at ¶¶ 12–15. CBP searched it. Exhs. 15 & 16 (Answer and Complaint) at ¶¶ 94, 96; *see also* Exh. 47 (EMR) at Bates 690–91. An officer periodically returned to ask Dupin questions about the contents of his phone. Dupin. Exh. 5 (Dupin Dec.) at ¶ 15; Exhs. 15 & 16 (Answer and Complaint) at ¶ 96.

### 5.   **Aaron Gach**

131.     Aaron Gach is a U.S. citizen who resides in California. Exh. 6 (Gach Dec.) at ¶¶ 2–3. He is an artist. *Id.* at ¶ 1.

132.     On February 23, 2017, Gach arrived at San Francisco International Airport after an international trip. *Id.* at ¶ 4. Gach traveled with a locked iPhone SE smartphone. *Id.* CBP searched it. Exhs. 15 & 16 (Answer and Complaint) at ¶¶ 102–03; Exh. 47 (EMR) at Bates 714–15.

6.     **Ismail Abdel-Rasoul aka Isma'il Kushkush**

133.     Isma'il Kushkush is a U.S. citizen who resides in Virginia. Exh. 7 (Kushkush

Dec.) at ¶¶ 2–3. He is a freelance journalist. *Id.* at ¶ 1.

134.     On March 18, 2013, Kushkush arrived at Washington Dulles International Airport

after an international trip. Exh. 47 (EMR) at Bates 913. At Washington Dulles, CBP officers

searched Kushkush's Blackberry Bold cell phone, two electronic storage media, and two SIM

cards. *Id*. at Bates 913–14.

135.     On July 30, 2017, Kushkush entered the United States at Highgate Springs,

Vermont, via bus from Canada. Exh. 7 (Kushkush Dec.) at ¶ 14. He was carrying a locked

iPhone 7 smartphone. *Id.* CBP officers conducted a manual search of Kushkush's phone for

about one hour. Exhs. 15 & 16 (Answer and Complaint) at ¶ 117. *See also* Exh. 47 (TECS

records) at Bates 304, 332–33; Exh. 47 (HSI Report of Investigation) at Bates 105.

7.     **Zainab Merchant**

136.     Zainab Merchant is a U.S. citizen who resides in Toronto, Canada. Exh. 8

(Merchant Dec.) at ¶¶ 2–3. She is a writer, graduate student, and the founder and editor of a

media website. *Id.* at ¶ 1.

137.     On March 5, 2017, Merchant arrived at the Toronto airport for a flight to Orlando.

*Id.* at ¶ 4. She traveled with a locked Samsung smartphone. *Id.* CBP searched Merchant's phone.

Exhs. 15 & 16 (Answer and Complaint) at ¶ 135. *See also* Exh. 47 (EMR) at Bates 754. The

search lasted 25 minutes. Exh. 47 (EMR) at Bates 754.

138.     CBP officers questioned her about her religious affiliation and her blog, including

asking her about an article she had written on the blog that described a previous border crossing

experience. Exh. 8 (Merchant Dec.) at ¶ 11.

139.    Merchant was concerned about CBP officers searching her phone because she wears a headscarf in public in accordance with her religious beliefs, and the phone contained pictures of her without her headscarf that she did not want officers to see. *Id.* at ¶ 6.

140.    On April 5, 2018, Merchant arrived in Orlando, Florida, after an international trip. Exh. 8 (Merchant Dec.) at ¶ 14. She carried a locked Samsung Note 8 smartphone. *Id.* CBP officers searched it. Exh. 47 (EMR) at Bates 908.

141.    On July 7, 2018, Merchant arrived in Fort Lauderdale, Florida, after an international trip. Exh. 8 (Merchant Dec.) at ¶ 22. She carried a locked Samsung Note 8 smartphone. *Id.* A CBP officer searched Merchant's phone for about 15 minutes. Exh. 47 (EMR) at Bates 755, 758.

142.    On September 9, 2018, Merchant traveled from Toronto, Ontario, to Orlando, Florida. Exh. 8 (Merchant Dec.) at ¶ 27. She carried a locked Samsung Note 8 smartphone. *Id.* A CBP officer directed Merchant to turn over her smartphone. Merchant told the officer that she did not consent to the search and that her device contained attorney-client privileged communications. *Id.* at ¶ 28. Nonetheless, "CBP conducted a basic search of Ms. Merchant's cell phone," which lasted about ten minutes. Exh. 24 (Email from Marsha Edney, Sept. 20, 2018). *See also* Exh. 47 (EMR) at Bates 759–60. Merchant saw the officer viewing emails and text messages between herself and her lawyer. Exh. 8 (Merchant Dec.) at ¶ 31.

### 8.    **Akram Shibly**

143.    Mohammed Akram Shibly is a U.S. citizen who currently lives in Los Angeles. Exh. 9 (Shibly Dec.) at ¶¶ 2–3. He is a filmmaker and a graduate student. *Id.* at ¶ 1.

144.    On January 1, 2017, Shibly entered the United States at the Lewiston-Queenston Bridge in New York. *Id.* at ¶ 4. He was carrying a locked iPhone 6+ smartphone. *Id.* A CBP

officer searched it. Exhs. 15 & 16 (Answer and Complaint) at ¶ 140. *See also* Exh. 47 (EMR) at Bates 847, 849. The search lasted 37 minutes. Exh. 47 (EMR) at Bates 847.

### 9.   **Matthew Wright**

145.   Matthew Wright is a U.S. citizen who resides in Colorado. Exh. 10 (Wright Dec.) at ¶¶ 2–3. He is a computer programmer. *Id.* at ¶ 1.

146.   On April 21, 2016, Wright arrived in Denver, Colorado, after an international trip. *Id.* at ¶ 5. Wright was traveling with a locked iPhone 6 smartphone, a locked MacBook Pro laptop, and an unlocked GoPro camera. *Id.* Wright declined a CBP officer's demand to unlock his laptop. As a result, CBP officers confiscated his laptop, phone, and camera. *Id.* at ¶ 6.

147.   "CBP extracted and obtained information from Plaintiff Wright's devices." Exhs. 15 & 16 (Answer and Complaint) at ¶ 155. Specifically, an ICE agent "attempted to image Mr. Wright's laptop with MacQuisition software, and a CBP forensic scientist extracted data from the SIM card in Wright's phone and from his camera." Exhs. 15 & 16 (Answer and Complaint) at ¶ 44. *See also* Exh. 25 (June 6, 2016 CBP email) at Pls. Bates 953; Exh. 47 (HSI Digital Forensic Report) Bates 98.

### 10.   **Diane Maye Zorri**

148.   Diane Maye Zorri is a U.S. citizen who resides in Florida. Exh. 11 (Zorri Dec.) at ¶¶ 2–3. She is a university professor and a former United States Air Force captain. *Id.* at ¶ 1.

149.   On June 25, 2017, Zorri arrived in Miami, Florida, after an international trip. *Id.* at ¶ 4. Zorri was traveling with a MacBook Pro laptop and an iPhone 7 smartphone, both locked. *Id.* CBP searched Zorri's phone for about 45 minutes. Exhs. 15 & 16 (Answer and Complaint) at ¶¶ 121, 124. *See also* Exh. 47 (EMR) at Bates 729, 731.

**B.      Ongoing Retention of Information From Past Device Searches**

150.    Defendants have retained in TECS information its officers observed during the search of the contents of seven Plaintiffs' phones: Ghassan Alasaad, Nadia Alasaad, Bikkannavar, Dupin, Merchant, Shibly, and Zorri. Exh. 26 (Defs. Interrog. Responses) at #10 (Nadia Alasaad, Bikkannavar, Dupin, Merchant, and Zorri); Exh. 47 (TECS records) at Bates 340, 351, 355, 359 (Ghassan Alasaad); Exh. 47 (TECS records) at Bates 340, 351, 355, 359 (Nadia Alasaad); Exh 47 (TECS records) at Bates 691, 711 (Dupin); Exh 47 (TECS records) at Bates 849, 873, 878 (Shibly).

151.    Defendants also have retained information copied from Wright's electronic devices.

a.      The data extracted from Wright's devices was stored on three thumb drives. Exh. 25 (EMR) at Pls. Bates 938.

b.      Two months after CBP returned Wright's devices to him, CBP continued to retain the thumb drives. Exh. 47 (EMR) at Bates 888; Exh. 47 (log of items received by CBP laboratory) at Bates 909; Exh. 28 (Def. Privilege Log of 12/7/18) (describing Bates 909 as "[l]og of items received by CBP laboratory"); Exh. 24 (Email from Marsha Edney, Nov. 21, 2018) (describing Bates 909 as "a log of items received by a law enforcement laboratory, and includes a notation of receipt of thumb drives relating to the inspection of Plaintiff Wright's electronic devices").

c.      DHS policy requires that "a record of the destruction [of information from a traveler's device] is documented in the TECS Report of Investigation (ROI)." Exh. 29 (DHS 2009 PIA), at Bates 228. In both civil discovery in this case and in response to a FOIA request from Wright, CBP and ICE produced no records showing that the data retained on the thumb drives was destroyed. Exh. 12 (Cope Dec.) at ¶¶ 4–5.

C.    **Past Device Confiscations**

1.    **Ghassan and Nadia Alasaad**

152.    CBP officers retained Ghassan and Nadia Alasaad's phones after the Alasaads left the border area on July 12, 2017. Exh. 1 (G. Alasaad Dec.) at ¶ 15; Exh. 47 (EMR) at Bates 340.

153.    Ghassan and Nadia Alasaad had to spend approximately $1,000 to purchase two new phones. Exh. 1 (G. Alasaad Dec.) at ¶ 17; Exh. 2 (N. Alasaad Dec.) at ¶ 17.

154.    Twelve days after Ghassan and Nadia Alasaad crossed the border, CBP officials sent their phones back to them. Exhs. 15 & 16 (Answer and Complaint) at ¶ 72.

155.    Soon after receiving his phone from CBP, Ghassan Alasaad attempted to access certain media files in his WhatsApp application, including videos of his daughter's graduation. The phone displayed the message, "Sorry, this media file doesn't exist on your internal storage." This did not occur prior to CBP's confiscation of the phone. Exh. 1 (G. Alasaad Dec.) at ¶ 19.

2.    **Suhaib Allababidi**

156.    On January 24, 2017, CBP officers detained Allababidi's unlocked iPhone and locked Samsung smartphone after he had been permitted to leave the border area. Exhs. 15 & 16 (Answer and Complaint) at ¶¶ 79–80; Exh. 3 (Allababidi Dec.) at ¶ 6.

157.    CBP officers confiscated Allababidi's unlocked phone even though an officer had already manually searched the phone and returned it to Allababidi. Exhs. 15 & 16 (Answer and Complaint) at ¶¶ 79–80; Exh. 3 (Allababidi Dec.) at ¶¶ 5–6.

158.    Allababidi had to spend more than $1,000 on replacement phones. Exh. 3 (Allababidi Dec.) at ¶ 9.

159.    Allababidi's phones were sent to the "Regional Computer Forensic Lab" on February 15, 2017, and then sent to another location on March 3, 2017. Exh. 47 (Detention Notice and Custody Receipt) at Bates 107.

160.     The unlocked iPhone was returned to Allababidi more than two months after confiscation. Exh. 3 (Allababidi Dec.) at ¶ 7. *See also* Exh. 47 (Detention Notice and Custody Receipt) at Bates 107.

161.     The locked Samsung smartphone was returned to Allababidi on December 13, 2017, more than ten months after confiscation, and just two days before Defendants moved to dismiss in this case. Exh. 3 (Allababidi Dec.) at ¶ 8; Exh. 32 (Defs. Motion to Dismiss) at p. 9.

### 3.     Matthew Wright

162.     CBP officers seized Wright's smartphone, laptop, and GoPro camera on April 21, 2016. Exh. 25 (Detention Notice and Custody Receipt) at Pls. Bates 945.

163.     An officer informed Wright that it might take CBP as long as a year to return his devices to him. Exh. 10 (Wright Dec.) at ¶ 7.

164.     Wright spent $2,419.97 for a new laptop and phone. Exh. 10 (Wright Dec.) at ¶ 8. As a computer programmer, Wright's livelihood depends on these tools. *Id.*

165.     Wright's electronic devices were transferred between CBP and ICE facilities multiple times. Exh. 25 (EMR) at Pls. Bates 936–38.

166.     CBP returned Wright's electronic devices to him after 56 days, on June 16, 2016. Exh. 25 (EMR) at Pls. Bates 938; Exh. 10 (Wright Dec.) at ¶ 9.

### D.     Other Recurring Border Scrutiny

167.     Eight Plaintiffs have been subjected to recurring secondary inspections during border crossings. Exh. 47 (TECS records) at Bates 338, 348, 350–51, 362–367 (six of Ghassan Alasaad); Exh. 47 (TECS records) at Bates 338, 350, 363–64 (three of Nadia Alasaad); Exh. 47 (TECS records) at Bates 586–88, 590, 592–95, 600, 602–04, 606, 608–620 (nine of Allababidi); Exh. 47 (TECS records) at Bates 678, 680–82, 684–85, 688 (seven of Bikkannavar); Exh. 47 (TECS records) at Bates 704–05, 707–13 (six of Dupin); Exh. 47 (TECS records) at Bates 319–

322, 324–25, 327, 329–30, 332–35, 913–15 (eight of Kushkush); Exh. 47 (TECS records) at

Bates 817, 819–22, 824–26, 828–30, 832, 834, 836–39, 841–45 (eight of Merchant); Exh. 47

(TECS records) at Bates 868, 870, 880, 884–85 (four of Shibly).

168.    Seven Plaintiffs are subjected to recurring bag searches at the border. Exh. 47

(TECS records) at Bates 348, 365–66 (three of Ghassan Alasaad); Exh. 47 (TECS records) at

Bates 348, 910–11 (two of Nadia Alasaad); Exh. 47 (TECS records) at Bates 395–96, 593, 602–

03 (three of Allababidi in 2017 alone); Exh. 47 (TECS records) at Bates 709–10, 713 (three of

Dupin); Exh. 47 (TECS records) at Bates 299, 306, 915 (three of Kushkush); Exh. 47 (TECS

records) at Bates 766, 824–26, 828, 830, 832, 838–39, 843, 845 (six of Merchant); Exh. 47

(TECS records) at Bates 868, 875, 880 (three of Shibly).

### E.    Regular International Travel, Past and Future

#### 1.    Ghassan and Nadia Alasaad

169.    Ghassan Alasaad has returned to the United States from an international trip at

least 13 times since January 1, 2013. Exh. 1 (G. Alasaad Dec.) at ¶ 22. Nadia Alasaad has done

so at least 15 times during this period. Exh. 2 (N. Alasaad Dec.) at ¶ 27.

170.    Ghassan and Nadia Alasaad intend to continue traveling internationally for

personal reasons, and will carry electronic devices with them when they do so. Exh. 2 (N.

Alasaad Dec.) at ¶¶ 26, 28; Exh. 1 (G. Alasaad Dec.) at ¶¶ 21, 23. For example, in the summer of

2019, they intend to travel to Egypt, Jordan, and/or Turkey. Exh. 1 (G. Alasaad Dec.) at ¶ 24;

Exh. 2 (N. Alasaad Dec.) at ¶ 29. Likewise, during the summer of 2019, Nadia Alasaad may

travel to Canada. Exh. 2 (N. Alasaad Dec.) at ¶ 30.

#### 2.    Suhaib Allababidi

171.    Allababidi has returned to the United States from an international trip at least

seven times since January 1, 2013. Exh. 3 (Allababidi Dec.) at ¶ 12.

172.     Allababidi intends to continue traveling internationally for business and personal reasons, and will carry electronic devices with him when he does so. *Id.* at ¶¶ 11, 13. For example, he has reserved flights to Turkey in May and home in July of this year, and he may visit China later this year. *Id.* at ¶¶ 14–15.

### 3.     Sidd Bikkannavar

173.     Bikkannavar has returned to the United States from an international trip at least 36 times since January 1, 2013. Exh. 4 (Bikkannavar Dec.) at ¶ 17.

174.     Bikkannavar intends to continue traveling internationally for personal reasons, and will carry electronic devices with him when he does so. Exh. 4 (Bikkannavar Dec.) at ¶¶ 16, 18. For example, he plans to take eight international trips by September 2020 to participate in solar car races and related activities. *Id.* at ¶ 19.

### 4.     Jérémie Dupin

175.     Dupin has returned to the United States from an international trip at least 21 times since January 1, 2013. Exh. 5 (Dupin Dec.) at ¶ 19.

176.     Dupin intends to continue traveling internationally for business and personal reasons, and will carry electronic devices with him when he does so. *Id.* at ¶¶ 18, 20. For example, he intends to visit his daughter in Canada. *Id.* at ¶ 21. Also, as a journalist, he intends to travel to Haiti in May or June of 2019, and he may travel to Venezuela later this year. *Id.* at ¶ 22.

### 5.     Aaron Gach

177.     Gach has returned to the United States from an international trip at least seven times since January 1, 2013. Exh. 6 (Gach Dec.) at ¶ 14.

178.    Gach intends to continue traveling internationally for business and personal reasons, and will carry electronic devices with him when he does so. *Id.* at ¶¶ 13, 15. For example, he has purchased airline tickets to Germany in June and home in July. *Id.* at ¶ 16.

### 6.    Isma'il Kushkush

179.    Kushkush has returned to the United States from an international trip at least eight times since January 1, 2013. Exh. 7 (Kushkush Dec.) at ¶ 22.

180.    Kushkush intends to continue traveling internationally for his journalism and for personal reasons, and will carry electronic devices with him when he does so. *Id.* at ¶¶ 21, 23.

### 7.    Zainab Merchant

181.    Merchant has returned to the United States from an international trip at least 12 times since January 1, 2013. Exh. 8 (Merchant Dec.) at ¶ 35.

182.    Merchant intends to continue traveling internationally for professional and personal reasons, and will carry electronic devices with her when she does so. *Id.* at ¶¶ 34, 36. For example, from now through May 2020, she plans to periodically travel from her current residence in Canada to her university in Boston in order to complete graduate studies. *Id.* at ¶ 37.

### 8.    Akram Shibly

183.    Shibly has returned to the United States from an international trip at least 18 times since January 1, 2013. Exh. 9 (Shibly Dec.) at ¶ 18.

184.    Shibly plans to continue traveling internationally for business and personal reasons, and will carry electronic devices with him when he does so. *Id.* at ¶¶ 17, 19.

### 9.    Matthew Wright

185.    Wright has returned to the United States from an international trip at least 22 times since January 1, 2013. Exh. 10 (Wright Dec.) at ¶ 16.

186.     Wright plans to continue traveling internationally for personal reasons, and will carry electronic devices with him when he does so. *Id.* at ¶¶ 15, 17.

187.     Wright attends ultimate Frisbee tournaments outside the United States regularly, and has attended a tournament in Portugal in June or July each year for the past five years. Wright's brother lives in Scotland, and it is common for him to take at least one trip a year to visit him there or elsewhere in Europe. Wright also has a group of friends who enjoy travel and Wright typically plans a trip or two abroad each year. *Id.* at ¶ 17. Wright has booked plane tickets for one international trip from June 24, 2019 through July 1, 2019. *Id.* at ¶ 18.

### 10.     Diane Maye Zorri

188.     Zorri has returned to the United States from an international trip at least 10 times since January 1, 2013. Exh. 11 (Zorri Dec.) at ¶ 11.

189.     Zorri plans to continue traveling internationally for professional and personal reasons, and will carry electronic devices with her when she does so. *Id.* at ¶¶ 10, 12. For example, it is significantly possible that Zorri will travel to Italy in June or July 2019, and Zorri has tentative plans to attend conferences in Europe in June and November 2019. *Id.* at ¶¶ 13–14.

DATED:  April 30, 2019

Respectfully submitted:

Adam Schwartz*               */s/Esha Bhandari*        Jessie J. Rossman
Sophia Cope*                 Esha Bhandari*            BBO #670685
Saira Hussain*               Hugh Handeyside*          Matthew R. Segal
ELECTRONIC FRONTIER          Nathan Freed Wessler*     BBO #654489
FOUNDATION                   AMERICAN CIVIL            AMERICAN CIVIL
815 Eddy Street              LIBERTIES UNION           LIBERTIES UNION
San Francisco, CA 94109      FOUNDATION                FOUNDATION OF
(415) 436-9333 (phone)       125 Broad Street,         MASSACHUSETTS
(415) 436-9993 (fax)         18th Floor                211 Congress Street
adam@eff.org                 New York, NY 10004        Boston, MA 02110

| | | |
|---|---|---|
| sophia@eff.org | (212) 549-2500 (phone) | (617) 482-3170 (phone) |
| saira@eff.org | (212) 549-2583 (fax) | (617) 451-0009 (fax) |
| | ebhandari@aclu.org | jrossman@aclum.org |
| | hhandeyside@aclu.org | msegal@aclum.org |
| | nwessler@aclu.org | |

*Admitted *pro hac vice*
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on April 30, 2019, a copy of the foregoing was filed electronically via the Court's ECF system, which effects service upon counsel of record.

/s/ *Esha Bhandari*
Esha Bhandari