# EXHIBIT 13

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X

GHASSAN ALASAAD, et al.,            )

           Plaintiffs,            ) Civil Action No.

  v.            ) 17-cv-11730-DJC

KIRSTJEN NIELSEN, et al.,            )

          Defendants.            )

--------------------------------X

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

30(b)(6) DEPOSITION OF

UNITED STATES CUSTOMS AND BORDER PROTECTION,

BY AND THROUGH ITS AGENCY REPRESENTATIVE,

RANDY JAMES HOWE

Wednesday, March 6, 2019 - 9:04 a.m.

Reported by:

Cindy L. Sebo, RMR, CRR, RPR, CSR,

CCR, CLR, RSA, LiveDeposition Authorized Reporter

Job no: 24497

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 20

```
 1                      RANDY JAMES HOWE
 2       Purpose.
 3                   (Whereupon, the witness reviews the
 4                    material provided.)
 5                   THE WITNESS:  Okay.                    09:12
 6       BY MR. HANDEYSIDE:
 7            Q.     So the language in the Defendants'
 8       responses to the interrogatories that I asked you
 9       to review tracks closely with the language in the
10       Purpose paragraph in the CBP directive; is that   09:12
11       correct?
12            A.     It's very similar.
13            Q.     Is this language an accurate
14       description of the Government interests that CBP
15       claims are served by conducting border searches of 09:12
16       electronic devices?
17            A.     I don't know if I understand your
18       question.
19            Q.     Let me put it this way:  Are there any
20       Government interests that border searches of       09:12
21       electronic devices serve other than those
22       described in the response to
23       Interrogatory Number 1 or the Purpose paragraph of
24       the CBP directive?
25            A.     Some of these topics are pretty broad: 09:12
```

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 21

1                          RANDY JAMES HOWE

2      customs, immigration, law enforcement.  Some -- I

3      mean, there's -- there's a lot that -- that goes

4      with those.

5            Q.    Well, I'm asking, Is this an accurate      09:13

6      description of the interests that -- the

7      Government interests that are served by searching

8      electronic devices at the border?

9            A.    I think it's accurate, sure.

10           Q.    Are there any other interests that        09:13

11     those searches serve, besides what's set out here

12     in the interrogatory response and the Purpose

13     paragraph in the directive?

14           A.    It's a lengthy document.  It gets in a

15     lot of different areas.  So just to pinpoint one      09:13

16     particular paragraph, I think it's difficult.

17           Q.    So the interrogatory asks for CBP and

18     ICE to identify and describe all of the Government

19     interests that are served by Defendants' policies

20     and practices on border searches of -- border        09:13

21     device searches and confiscations.  And so

22     the answer provides a description of those

23     interests that tracks with this Purpose paragraph.

24                 I am just trying to figure out if

25     there are any others, besides what's listed          09:14

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 32

1                        RANDY JAMES HOWE

2       national security, something else; is that fair?

3            A.    I think that's what I said.

4            Q.    Okay.

5                  Does CBP conduct border searches of        09:25

6       electronic devices for the purpose of gathering

7       intelligence?

8                  MS. EDNEY:  Objection to the extent

9                  it calls for law enforcement privilege

10                 information.                               09:25

11                 But you can try to answer in a

12                 nonprivileged way.

13                 THE WITNESS:  The information --

14                 well, as we're -- we're border security

15                 officers.  We're -- we're interacting with  09:25

16                 travelers as they present themselves

17                 for admission to the U.S., and we want to

18                 be satisfied that individual is admissible

19                 to the U.S. and that they're -- they're

20                 not -- their belongings, their merchandise   09:26

21                 are not coming into the United States

22                 contrary to law.

23                 Searching electronic devices is no

24                 different than checking a traveler's

25                 belongings.  So if during the -- the          09:26

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 33

RANDY JAMES HOWE

1

2      process of searching the devices we come

3      across some law enforcement information

4      that's of benefit, then, you know,

5      that -- that could potentially be        09:26

6      retained.

7   BY MR. HANDEYSIDE:

8        Q.      That sounds like a yes.

9               Is one purpose for conducting the

10  searches of electronic devices to essentially    09:26

11  gather intelligence about individuals who are

12  entering the United States?

13              MS. EDNEY:  Objection:

14      mischaracterizing his testimony.

15  BY MR. HANDEYSIDE:                                09:27

16       Q.      I'm just looking for a straight answer

17  for the question.

18       A.      The purpose of our officers is to --

19  in the role at the border is to make a

20  determination of the admissibility of the traveler  09:27

21  and then what's being presented at the border, and

22  in furtherance of that -- that role, that

23  obligation, is to make that determination.  If in

24  the process of -- of making that determination, we

25  come across law enforcement information, that's     09:27

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 35

                          RANDY JAMES HOWE

1

2           A U.S. citizen is automatically

3     admissible; isn't that right?

4           A.    If we're satisfied that they're U.S.

5     citizen, they're admissible, but -- yes.          09:28

6           Q.    So -- so a U.S. citizen for whom

7     admissibility is not in question, does CBP then

8     have an interest in gathering information about

9     that citizen using a -- a border search of an

10    electronic device, even if there's no suspicion of  09:29

11    any violation of the law?

12          MS. EDNEY:  Objection to the extent

13              it calls for law enforcement sensitive

14              information.

15          THE WITNESS:  The officers have an          09:29

16              obligation to -- to make a determination,

17              if we're talking about U.S. citizens, that

18              they're admissible to the United States

19              and that anything that's being presented

20              at the time that they're applying for     09:29

21              admission is admissible to the U.S.,

22              that's not being brought in contrary to

23              law.

24              So they could be bringing

25              contraband.  They could be involved in    09:29

Page 44

1                        RANDY JAMES HOWE

2      belongings, by potential law enforcement sensitive

3      information that we have on that individual to

4      make a determination whether or not that person is

5      admissible and whether or not their belongings and    09:38

6      merchandise that they're bringing in is of concern

7      to -- to CBP.

8          Q.    Okay.  But based on this answer and

9      based on the description of the purpose for the

10     device searches that's in the CBP directive, is it    09:38

11     fair to say that CBP conducts electronic device

12     searches at the border partly for the purpose of

13     conducting risk assessments?

14         A.    If we do search somebody's electronic

15     device or search their luggage or anything that we    09:38

16     do to make that determination, the officer

17     determination, that's a part of the function.

18         Q.    And is it then fair to say that CBP

19     conducts border searches of electronic devices at

20     least partly for the purpose of sharing              09:39

21     information with other elements of the

22     Federal Government responsible for analyzing

23     terrorist threat information?

24             MS. EDNEY:  Objection to the extent

25         it calls for law enforcement sensitive            09:39

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 45

                        RANDY JAMES HOWE

1

2       information.

3               THE WITNESS:  The determinations

4       that we make on those individuals, if

5       there's information that we've determined          09:39

6       is of law enforcement value -- and it

7       could be sensitive, I guess -- but if

8       there's law enforcement value related to

9       what we do -- customs, immigration, other

10      violations of law -- and it has been               09:39

11      gathered at that point, then it could be

12      shared.

13              MR. HANDEYSIDE:  I'll ask the court

14      reporter to mark this document as

15      CBP Deposition Exhibit 5.                          09:39

16                      -  -  -

17              (CBP Deposition Exhibit Number 5,

18               Privacy Impact Assessment for the

19               TECS System: Platform

20               DHS/CBP/PIA-021, August 12, 2016,         09:39

21               marked for identification, as of

22               this date.)

23                      -  -  -

24      BY MR. HANDEYSIDE:

25          Q.    Are you familiar with this document?     09:40

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 46

1                     RANDY JAMES HOWE

2          A.     I don't recall if this was in the

3     materials that were provided to -- and I don't

4     know if I read this before.

5          Q.     This is -- this is actually publicly     09:40

6     available document.  And as you can see, it's the

7     Privacy Impact Assessment for the TECS System

8     Platform dated August 12th, 2016.

9              And, briefly, what is TECS?

10         A.     TECS is our main law enforcement          09:40

11    system that we use to perform our role.

12         Q.     And at times, information that is

13    derived from border searches of electronic devices

14    is maintained in TECS; is that correct?

15             MS. EDNEY:  Objection to the extent         09:41

16         it calls for law enforcement privilege.

17             THE WITNESS:  Yeah, one more time on

18         the question.

19    BY MR. HANDEYSIDE:

20         Q.     At times, information that is derived     09:41

21    from border searches of electronic devices is

22    maintained in TECS; is that accurate?

23             MS. EDNEY:  Same objection.

24             THE WITNESS:  Any search that we do

25         of electronic device is recorded within        09:41

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 47

```
 1                    RANDY JAMES HOWE
 2         TECS, in -- in electronic media portion
 3         of -- of TECS.
 4    BY MR. HANDEYSIDE:
 5         Q.    Okay.  If you could turn to Page 3, at    09:41
 6    the bottom there, in describing the TECS platform,
 7    the exhibit says, The TECS platform is the
 8    underlying infrastructure designed to facilitate
 9    the maintenance and sharing of law enforcement,
10    inspection, intelligence gathering and operational   09:41
11    records among the TECS user community.
12              Is that a description of -- is that an
13    accurate description, in your mind, of how TECS is
14    used?
15         A.    I think so, yes.                          09:42
16         Q.    And part of that purpose for TECS is
17    intelligence gathering-related?
18         A.    That's what it says.
19         Q.    So information derived from border
20    searches of electronic devices that is maintained   09:42
21    in TECS will at least partly be used for TECS's
22    purposes, right, which is partly intelligence
23    gathering; is that correct?
24              MS. EDNEY:  Objection: vague.
25              THE WITNESS:  I think it's an              09:42
```

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 48

1                     RANDY JAMES HOWE

2            offshoot of it.  The intent is to make

3            that determination on the traveler, but if

4            there is law enforcement beneficial

5            information that is retained, then it          09:42

6            would be shared through intelligence

7            gathering.

8      BY MR. HANDEYSIDE:

9            Q.     Going back to Exhibit 2, the

10     interrogatory response.  And we've already read     09:42

11     this part, but the response to Interrogatory 1

12     states that CBP uses border searches of electronic

13     devices to ensure compliance with customs,

14     immigration and other laws that Defendants are

15     authorized to enforce and administer.  And that's   09:43

16     the middle paragraph.

17            What are these other laws that CBP is

18     authorized to enforce and administer?

19            A.     We're responsible for enforcing

20     hundreds of laws from -- from other organizations,  09:43

21     other law enforcement, so agriculture laws, FDA,

22     you know.  So as products or things that enter

23     into the U.S., that's a part of our -- our role on

24     behalf of those other agencies.

25            Q.     Do the other laws include tax laws?    09:43

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 57

                          RANDY JAMES HOWE

1

2    BY MR. HANDEYSIDE:

3         Q.     So if CBP suspects that one individual

4    might be engaged in some violation of the law, can

5    CBP search the devices of that person's traveling          09:52

6    companions for evidence related to that potential

7    violation?

8         A.     It's a difficult hypothetical.

9    Depending upon the circumstances and the totality

10   of the circumstances, the judgment and the                 09:52

11   information that the officer has, it's --

12   it's -- it's a hypothetical.  I just -- that's

13   difficult to -- to say yes or no.

14        Q.     Does CBP have the authority to do

15   that?                                                       09:53

16        A.     We have the authority to search any

17   person that presents themself at the border.

18        Q.     Including for the purpose of

19   identifying potential evidence of someone else's

20   crime?                                                      09:53

21             MS. EDNEY:  Objection: speculative.

22             THE WITNESS:  Yeah, I think you're

23        just rewording your initial question.

24        It's difficult for me to -- hypothetical

25        situation, to speculate.                               09:53

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 58

                    RANDY JAMES HOWE

1

2    BY MR. HANDEYSIDE:

3        Q.    I'm asking about CBP's authority, and

4    you've been designated to -- to testify on -- on

5    these subjects.                                    09:53

6            So CBP's authority, as you're

7    testifying, to conduct border searches of

8    electronic devices -- does that authority include

9    conducting those searches to identify potential

10   evidence of someone else's crime?                  09:54

11           MS. EDNEY:  Objection:

12           argumentative.

13           THE WITNESS:  Hypothetical questions

14           are difficult to speculate what the answer

15           is.  I mean, it's based on the totality     09:54

16           and the circumstances, the information

17           that the officer has in front of them and

18           the -- what they're dealing with, the

19           issue at hand.  It's hard to say.

20   BY MR. HANDEYSIDE:                                 09:54

21       Q.    Are there instances in which that has

22   happened?

23       A.    There may have.

24       Q.    Is there a policy that would prevent

25   such a search?                                     09:54

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 59

1                    RANDY JAMES HOWE

2              MS. EDNEY:  Objection: vague.

3              THE WITNESS:  We know that officers

4         can search phones, with no suspicion, as

5         part of the border search authority, just      09:54

6         as a part of their role and -- and making

7         their determination of admissibility of

8         the people and what they're bringing in.

9              So that's a -- that's a part of it.

10   BY MR. HANDEYSIDE:                                   09:55

11        Q.    What about if CBP has concerns about

12   an individual's admissibility to the United

13   States?  Can CBP conduct searches of the

14   electronic devices of the family and friends of

15   that individual to determine that individual's      09:55

16   admissibility?

17        A.    Difficult hypothetical, but

18   potentially.

19        Q.    Is there any part of the policy that

20   would prevent CBP from doing that?                  09:55

21        A.    We have the authority to search

22   electronic devices.  It's well founded, so . . .

23        Q.    Even if those family and friends are

24   U.S. citizens?

25        A.    Again, depending on the totality and     09:56

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 60

                    RANDY JAMES HOWE

1    the circumstances, there may be instances where

2    U.S. citizens have their phone searched.

3         Q.     In order to identify evidence related

4    to the admissibility of someone else?          09:56

5         A.     It's a hypothetical.  It's difficult

6    to -- to -- to know for sure in that case, but

7    based on the facts of that case, the officer has

8    to make their judgment whether or not it's better

9    informed.                                       09:56

10              MR. HANDEYSIDE:  I'll ask the court

11              reporter to mark this document as

12              CBP Deposition Exhibit 6.

13                        -  -  -

14              (CBP Deposition Exhibit Number 6,     09:56

15              Privacy Impact Assessment Update

16              for CBP Border Searches of

17              Electronic Devices

18              DHS/CBP/PIA-008(a), January 4,

19              2018, Bates stamped Defs. 0174        09:56

20              through Defs. 0195, marked for

21              identification, as of this date.)

22                        -  -  -

23              THE WITNESS:  Thanks.

24

25

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 62

                              RANDY JAMES HOWE
1

2      border is to identify digital content that is of

3      itself unlawful; is that right?

4           A.     Or information, yes.

5           Q.     Meaning digital contraband,                  09:58

6      essentially; is that fair?

7           A.     Sure.

8           Q.     So child pornography would be one

9      example of digital content that is of itself

10     unlawful; is that correct?                               09:58

11          A.     Sure.

12          Q.     Are there other examples of digital

13     content that is always or almost always unlawful?

14          A.     It could be information indicating

15     that they're involved in unlawful activity.             09:58

16          Q.     What kind of information would be --

17     of that sort would be always or almost always

18     unlawful?

19          A.     Well, evidence of being involved in

20     drug smuggling, weapons smuggling, human               09:59

21     smuggling.

22          Q.     Okay.  As you said, those are all

23     evidence, right?

24                 The content itself, though, would not

25     necessarily be unlawful; is that fair?                 09:59

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 63

1           RANDY JAMES HOWE

2           MS. EDNEY:  Objection: vague; and, I

3       believe, mischaracterizes his testimony.

4   BY MR. HANDEYSIDE:

5       Q.    I'm just trying to understand.          09:59

6             So you identified evidence in

7   your answer.  I'm trying to find out what are the

8   other things that are like child pornography that

9   are unlawful of themselves, you're not allowed to

10  have that content.                                 09:59

11      A.    It could be information of national

12  security concerns, so information of perhaps

13  supporting terrorism or involved in terrorist

14  acts.

15      Q.    So -- so for these purposes, let's --   10:00

16  let's define "unlawful content" as -- as any

17  content that of itself violates customs laws.

18            Does that help?

19      A.    Was that a question?

20      Q.    I'm trying to -- I'm trying to          10:00

21  identify what kinds of content itself on the

22  device cannot be brought into the United States

23  aside from child pornography.

24      A.    I think I just replied, with evidence

25  of terrorism.                                      10:00

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 64

RANDY JAMES HOWE

1

2      Q.    So, again, evidence of itself is not

3   contraband; is that right?

4            MS. EDNEY:  Objection: argumentative

5       and vague.                                    10:00

6   BY MR. HANDEYSIDE:

7      Q.    I'm trying to distinguish between

8   what's evidence and what's unlawful of itself,

9   like child pornography.

10           MS. EDNEY:  Also, objection because    10:00

11      it calls for a legal conclusion.

12           THE WITNESS:  I'm not following

13      what -- where you're going.

14  BY MR. HANDEYSIDE:

15     Q.    So when I've asked about things like    10:00

16  child pornography that you're not allowed to have

17  on your phone, you've responded by answering that

18  there's evidence related to terrorism, evidence

19  related to other possibly unlawful activities.

20           That evidence, though, of itself is     10:01

21  not contraband; is that right?

22     A.    When you're comparing it to

23  pornography, I guess not.

24     Q.    Okay.

25           So -- and I'm not -- I'm not trying to  10:01

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 65

```
1                    RANDY JAMES HOWE
2   argue.  I just want to be precise about what it is
3   that CBP might be looking for on a device, aside
4   from child pornography, that of itself is illegal.
5   There's evidence, and then there's illegal        10:01
6   content.
7            So are there any other examples like
8   child pornography that you can think of that are
9   illegal of themselves?
10       A.    I keep coming back to terrorism, that    10:01
11  information that they committed a terrorist act is
12  unlawful.
13       Q.    Okay.  So if they committed a
14  terrorist act, that's unlawful.
15            A picture of it on a phone reflecting     10:02
16  that -- the picture of itself wouldn't be
17  unlawful, would it?
18            MS. EDNEY:  Objection: calls for a
19       legal conclusion, also to the extent it's
20       asking for law enforcement sensitive          10:02
21       information.
22            MR. HANDEYSIDE:  The witness is a
23       law enforcement officer.  He's designated
24       to testify on behalf of the law
25       enforcement agency.                            10:02
```

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 66

1                       RANDY JAMES HOWE

2     BY MR. HANDEYSIDE:

3          Q.    I'm wondering if a picture reflecting

4     possible terrorist act of itself is illegal.

5          A.    It's an unlawful act.  It's -- it's        10:02

6     strong information.

7          Q.    Certainly.

8                Information that of itself is not

9     contraband, correct?

10         A.    Contraband in the sense of being           10:02

11    counterterrorism, related to counterterrorism,

12    terrorism.

13         Q.    So evidence or information related to

14    the unlawful act of terrorism?

15         A.    Yes.                                        10:02

16         Q.    Okay.

17               MR. HANDEYSIDE:  I'll ask the court

18          reporter to mark as CBP Deposition

19          Exhibit 7, this document.

20                     -  -  -                               10:03

21               (CBP Deposition Exhibit Number 7,

22                 Defendants' Objections and

23                 Responses to Plaintiffs' Second Set

24                 of Requests for Production and

25                 Plaintiffs' Third Set of                 10:03

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 68

1                       RANDY JAMES HOWE

2      electronic devices that can -- it conducts yield

3      contraband, essentially.

4                 MS. EDNEY:  Objection to the

5             vagueness.                                10:04

6                 THE WITNESS:  I'm just reading what

7             the statement says.  And the question

8             again.

9      BY MR. HANDEYSIDE:

10           Q.    So CBP cannot say how many of the    10:04

11     searches of electronic devices it conducts at the

12     border yield actual digital contraband; is that

13     accurate?

14           A.    Yes.

15           Q.    Nor can it say how many of the       10:05

16     searches yield what CBP would consider evidence of

17     criminal activity; is that right?

18           A.    I think we have a -- we have

19     difficulty in producing those metrics and

20     capturing, yes.                                  10:05

21           Q.    So why hasn't CBP tracked the number

22     of device searches that have yielded digital

23     contraband?

24           A.    I believe that we didn't have

25     the necessary adjustments to the -- to the system  10:05

Page 75

1                    RANDY JAMES HOWE

2    BY MR. HANDEYSIDE:

3         Q.    Okay.

4               And I understand that the response

5    says that the decision to conduct a border search    10:12

6    of an electronic device rests exclusively with

7    CBP.

8               I'm wondering, though, do other

9    agencies -- can they request that CBP conduct a

10   border search of an electronic device?              10:12

11              MS. EDNEY:  Objection to the extent

12         it calls for law enforcement privilege

13         information.

14              But you can answer.

15              THE WITNESS:  My same answer is        10:13

16         that -- as a part of our role in informing

17         us to be able to -- to do that search --

18         rests with us -- the authority to make

19         that decision; so it's all part of the

20         process.                                    10:13

21   BY MR. HANDEYSIDE:

22        Q.    And understanding that CBP makes the

23   decision, does it take requests to do so?

24              MS. EDNEY:  Objection: same

25         objection, law enforcement privilege.       10:13

Page 76

1                    RANDY JAMES HOWE

2              THE WITNESS:  Yeah, the information

3         that's being gathered by the officer from

4         the other agency helps us make that

5         decision.                                    10:13

6    BY MR. HANDEYSIDE:

7         Q.    When CBP mentions "information

8    provided by other law enforcement agencies," do

9    those other law enforcement agencies include state

10   and local law enforcement agencies?              10:13

11        A.    We're informed by a host of state,

12   local and Federal law enforcement.

13        Q.    So information from state and local

14   can be, again, part of that totality of the -- of

15   the circumstances or information that CBP uses to   10:14

16   make decisions about whether to search electronic

17   devices at the border?

18              MS. EDNEY:  Objection to the extent

19         it calls for law enforcement privilege.

20              But you can answer.                    10:14

21              THE WITNESS:  Yeah, the information

22         that we have from these other law

23         enforcement agencies informs the officer

24         to make that determination.  It's all a

25         part of the process.                        10:14

Page 77

1                    RANDY JAMES HOWE

2     BY MR. HANDEYSIDE:

3          Q.     Does information from foreign

4     government also inform CBP's decisions, at times,

5     to conduct border searches of electronic devices?    10:14

6               MS. EDNEY:  Objection to the extent

7          it calls for law enforcement privilege

8          information.

9               But you can answer.

10              THE WITNESS:  I'm not sure exactly     10:14

11         what I can say that's not law enforcement

12         privilege, other than to say that I know

13         we have information-sharing agreements

14         with some countries.

15    BY MR. HANDEYSIDE:                                 10:15

16         Q.     Okay.  The response identifies "other

17    law enforcement agencies."

18              Are there other agencies that are not

19    law enforcement agencies that provide information

20    that CBP benefits from in determining whether to   10:15

21    search electronic devices?

22              MS. EDNEY:  Objection to the extent

23         it calls for law enforcement privilege

24         information.

25              But if you can answer.                   10:15

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 80

1                          RANDY JAMES HOWE

2          A.     If we're satisfied they're American,

3      U.S. citizen, yes.

4          Q.     And, essentially, the same is true for

5      lawful permanent residents?                          10:17

6                 They're admissible to the

7      United States, by definition; is that right?

8          A.     By definition.

9          Q.     So is determining the intentions of a

10     U.S. citizen upon entry a valid purpose for a        10:17

11     border search of that citizen's electronic

12     device?

13         A.     Can you restate the question?

14         Q.     Is determining the intentions of a

15     U.S. citizen upon entry to the United States a       10:17

16     valid purpose for conducting a border search of

17     that citizen's electronic device?

18         A.     Their intention of entering the

19     United States?

20         Q.     What they're intending to do upon        10:18

21     entry, when they get here.

22         A.     Well, they're applying for admission,

23     so it's pretty clear what they're intending.

24         Q.     Is -- is it a valid purpose for

25     conducting a border search to decide or figure out   10:18

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 83

1                    RANDY JAMES HOWE

2         A.    We're focused on the individual and

3    what they're bringing into the United States.

4         Q.    Okay.

5              MR. HANDEYSIDE:  Maybe now is a good        10:20

6         time for a break.

7              THE WITNESS:  It sounds good.

8              MR. HANDEYSIDE:  Ten minutes?

9              MS. EDNEY:  Sure.

10                       -  -  -                            10:20

11             (Whereupon, a recess was taken from

12               10:20 a.m. to 10:33 a.m.)

13                       -  -  -

14             MS. EDNEY:  Before we start again,

15        we'd like to make one clarification            10:33

16        regarding a question you asked earlier.

17             Mr. Howe.

18             THE WITNESS:  You asked about

19        agencies that provide information in TECS,

20        the law enforcement agencies, and I was        10:33

21        thinking for law enforcement purpose, so I

22        didn't recall -- obviously, FDA, USDA,

23        Consumer Product Safety -- you know, that

24        type of -- those agencies, nonlaw

25        enforcement, they may have information in       10:33

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 84

1                    RANDY JAMES HOWE

2           TECS.

3    BY MR. HANDEYSIDE:

4           Q.     I see.

5           A.     I just wanted to clarify that.        10:33

6           Q.     Thank you.

7                  Just a quick follow-up.

8                  So those agencies do contribute

9    information to TECS?

10          A.     We have arrangements with -- with some    10:33

11   agencies to have -- to be able to put information

12   in TECS.

13          Q.     And some -- at least some parts of

14   those agencies will also, then, have access to

15   TECS?                                                   10:34

16          A.     Yes, with certain limitations, I'm

17   sure.

18          Q.     Okay.

19                 I'd like to move on to Topic 7.  If

20   you go back to Exhibit 1, the notice of              10:34

21   deposition, and review Topic 7.

22                 (Whereupon, the witness reviews the

23                  material provided.)

24                 THE WITNESS:  Okay.

25

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

1                    RANDY JAMES HOWE

2     BY MR. HANDEYSIDE:

3          Q.     Just briefly, what is the role of a

4     CBP officer at primary inspection?

5          A.     The primary officer or the CBP officer     10:34

6     is the individual that will interact with every

7     single traveler as they present themselves, so

8     it's their role to quickly and efficiently make

9     that determination on that traveler, whether or

10    not they're admissible to the United States and    10:34

11    what they're presenting is not coming in contrary

12    to law or there's no contraband, et cetera.

13         Q.     I see.

14                 And when CBP officers at primary

15    encounter travelers seeking to enter the           10:35

16    United States, they run queries in the TECS

17    system; is that right?

18         A.     Every traveler that we interact with,

19    we collect their documentation.  So we look at

20    their passports.  We do query our database.        10:35

21         Q.     Meaning TECS?

22         A.     Yes.

23         Q.     And -- and the queries of TECS will

24    yield some information about the traveler,

25    including past travel information; is that          10:35

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 86

1                     RANDY JAMES HOWE

2     accurate?

3          A.     It will -- the primary officer will

4     see whether or not there's any recent crossing

5     history, so whether or not they crossed into the      10:35

6     United States recently and where they crossed.

7     That's the only information that's presented to --

8     to the -- to the officers as far as the traveler,

9     if we're just talking about the traveler.

10                 If they're in a vehicle and a land      10:36

11    border environment, there might be information

12    about the registration of the vehicle.

13         Q.     Okay.  So I think you said that the

14    officer views recent travel information.

15                 Is that -- was that accurate?      10:36

16         A.     Recent crossing information, so the

17    mere fact that they crossed into the United States

18    and where and when.

19         Q.     Okay.  And what do you -- and by

20    "recent," can you provide any further detail about      10:36

21    what constitutes "recent"?

22         A.     I think it's set for six months, over

23    the last six months, or it might be 12 months.

24    It's one of those type of periods.

25         Q.     Okay.  And is -- is that something      10:36

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 87

                          RANDY JAMES HOWE

1

2      that -- that information generated for the officer

3      at primary by -- automatically, or does the

4      officer have to enter information in order to

5      access that information?                              10:36

6          A.      If we're just talking about the

7      crossing information, it just appears on the

8      screen.

9          Q.      And are there any limits on the

10     authority of CBP officers at primary to refer        10:37

11     travelers to secondary?

12         A.      Any limits?

13         Q.      Right.

14         A.      Well, that officer's responsibility is

15     to make that quick and efficient determination.      10:37

16     If they're unable to do so in a reasonable amount

17     of time, we have secondary inspection, really is

18     kind of a comanagement extension of -- of primary.

19             So it's really just an extension of

20     what the primary officer started and wasn't able     10:37

21     to accomplish in a short period of time.

22             You have to rapidly make those

23     decisions.  You know, a million people a day

24     enter the United States, so we have to do that

25     quickly.                                              10:37

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 90

1                          RANDY JAMES HOWE

2        process.  So the TECS system, which is what the

3        primary officer uses -- that TECS is also in

4        secondary.  It's a secondary module of -- of TECS,

5        so it all is interconnected.  So the primary        10:39

6        officer -- if we're referring somebody, the

7        secondary officer would bring up that referral

8        and then indicate in the secondary portion of

9        TECS what occurred in that secondary inspection.

10            Q.    Okay.  But is it correct to say that     10:40

11       every time someone is referred to secondary,

12       there will be a record in TECS that reflects

13       that?

14            A.    Yes.

15            Q.    And if a traveler's electronic device    10:40

16       was searched during secondary inspection, there's

17       also a TECS record that reflects that -- that

18       device search?

19            A.    Every single device search that's

20       completed is recorded in TECS in an electronic     10:40

21       media subset of secondary.

22            Q.    Okay.  And so when the CBP officer at

23       primary conducts those TECS queries, do those

24       queries yield records that reflect the prior

25       referrals to secondary inspection for a traveler?   10:40

Page 93

1              RANDY JAMES HOWE

2         MS. EDNEY:  Objection:

3      mischaracterizes his testimony.

4         THE WITNESS:  I gave you a very,

5      very unique situation.  Whether or not      10:43

6      it's ever been done, I don't know, and

7      certainly not something that's out of the

8      norm.

9   BY MR. HANDEYSIDE:

10        Q.    Okay.  So the -- let me ask a       10:43

11   different way.

12        The CBP officers at primary -- is

13   their access to TECS limited while they're in that

14   function at primary, other than the exception that

15   you just described?                            10:44

16        A.    Yes, extremely limited, just whether

17   or not there's any lookouts in the system

18   potentially for that traveler and any recent

19   crossing history.

20        Q.    Okay.  And that's a limitation that is  10:44

21   technical; the -- the system does not permit them

22   to access the other parts of TECS when they're in

23   that role?

24        A.    It's more than technical.  It's -- it

25   might be technical.  That's why I said I -- I      10:44

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 97

                        RANDY JAMES HOWE

1       primary officer.

2              I'm not -- I don't know if that's

3       happened before.

4              Q.    Okay.  Looking at the same page there,    10:48

5       what's a lookout?

6              A.    It would be an alert in the system

7       that -- either entered by CBP or potentially other

8       law enforcement agencies of information of a

9       traveler or on a vehicle.  It could be a stolen      10:48

10      vehicle; it could be a lookout.

11             Q.    Okay.  This page here, the same page,

12      Defs. 177, Footnote 8 says, As part of processing

13      individuals at the border, DHS/CBP conducts

14      prearrival and predeparture TECS queries, which      10:49

15      include checks against lookouts such as wants and

16      warrants, watch list matches, et cetera.

17             What is a want in this context?

18             A.    Somebody who's wanted for a -- by a

19      law enforcement entity.                               10:49

20             Q.    Other than someone for whom there's

21      already a warrant been issued?

22             A.    I'm not following what you're asking.

23             Q.    If someone's wanted --

24             A.    It would be a lookout.                    10:49

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 98

1                    RANDY JAMES HOWE

2        Q.     -- wanted for what?

3               For questioning, I guess?

4               MS. EDNEY:  Objection: hypothetical.

5               THE WITNESS:  Somebody could have      10:49

6           committed murder; somebody could have

7           robbed a bank.

8     BY MR. HANDEYSIDE:

9        Q.     Sure.

10              In which case, there would be a        10:49

11    warranty pending, probably, correct?

12              I'm trying to understand what's the

13    difference between a want and a warrant.

14              MS. EDNEY:  If you know.

15              THE WITNESS:  Yeah, I don't -- I        10:50

16          think it's the same thing, to warrant

17          somebody who's wanted for committing a

18          crime.

19    BY MR. HANDEYSIDE:

20       Q.     Okay.  Who can create wants -- or I'm   10:50

21    sorry -- lookouts?

22              MS. EDNEY:  Objection.

23              If you know.

24              THE WITNESS:  Anybody that has that

25          authority within TECS.  So for CBP, if     10:50

Page 99

```
 1                     RANDY JAMES HOWE
 2          somebody had violated -- violated the
 3          terms and conditions of a previous
 4          mission, we would potentially be on the
 5          lookout.                               10:50
 6                Other law enforcement agencies could
 7          have lookouts.
 8     BY MR. HANDEYSIDE:
 9          Q.    Okay.  I'm sorry to keep jumping
10     around here --                              10:50
11          A.    I'm fine.
12          Q.    -- if you could turn to Exhibit 5,
13     which was the TECS platform privacy impact
14     assessment.
15                If you could turn to Page 12, and 10:51
16     there's a heading there that says Lookout Records
17     Services.  And the second paragraph there --
18     sorry.  The second sentence in that paragraph
19     says, A TECS lookout record may be created by CBP
20     or other TECS partner agencies.             10:51
21                What are partner agencies for the
22     purpose of this lookout records?
23                MS. EDNEY:  I'm going to object to
24          the extent it's calling for law
25          enforcement information.               10:51
```

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 101

1                      RANDY JAMES HOWE

2    agencies, which are apparently listed on Page 41

3    in this appendix, when referring to the lookout

4    records services, it refers to TECS partner

5    agencies.  And maybe you don't know.              10:53

6              I'm just wondering if there's a reason

7    for the difference there, if the TECS partner

8    agencies for lookout purposes are different.

9         A.    I don't know, but they seem to be one

10   and the same.                                      10:53

11        Q.    Okay.  Do lookouts last for any

12   particular amount of time?

13             MS. EDNEY:  Objection to the extent

14        it calls for law enforcement privilege

15        information.                                  10:53

16             But answer, if you can.

17             THE WITNESS:  Again, the question.

18   BY MR. HANDEYSIDE:

19        Q.    Do lookouts last for any particular

20   amount of time?                                    10:53

21             MS. EDNEY:  Same objection.

22             THE WITNESS:  I would say they last

23        as long as there's pertinence.

24   BY MR. HANDEYSIDE:

25        Q.    And does the presence of a lookout in   10:53

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 102

1                    RANDY JAMES HOWE

2      an individual's TECS record cause that person to

3      be referred to secondary inspection?

4                    MS. EDNEY:  Objection to the extent

5               it calls for law enforcement privilege        10:53

6               information.

7                    But you can answer, if you can.

8                    THE WITNESS:  If there's -- if

9               there's a lookout requiring a referral to

10              secondary that would -- that's what the        10:54

11              primary officer sees, then they would be

12              referred.

13     BY MR. HANDEYSIDE:

14          Q.    I see.

15               So are there different kinds of              10:54

16     lookouts, then, some requiring referral and some

17     not requiring referral?

18                    MS. EDNEY:  Objection to the extent

19              it calls for law enforcement privilege

20              information.                                  10:54

21               You can answer, if you can.

22                    THE WITNESS:  I think it's the same

23              answer.

24     BY MR. HANDEYSIDE:

25          Q.    When a person has been -- been         10:54

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 103

1                         RANDY JAMES HOWE

2       referred to secondary inspection because of a

3       lookout, is it likely that the officers, then, in

4       secondary will search that individual's electronic

5       devices?                                          10:54

6                 MS. EDNEY:  Objection to the extent

7             it calls for law enforcement and asking a

8             hypothetical.

9                 THE WITNESS:  It depends upon what

10            the lookout is for.  If this is a lookout    10:54

11            due to a previous agriculture violation,

12            there may not be a need, depending upon

13            the totality of the circumstances.

14      BY MR. HANDEYSIDE:

15            Q.    Are lookouts one reason why some       10:55

16      individuals experience border searches of

17      electronic devices on more than one occasion?

18                MS. EDNEY:  Objection to the extent

19            it calls for law enforcement information.

20                THE WITNESS:  Yeah.  The officers        10:55

21            that conduct secondary and perform border

22            searches do that on the basis of the

23            totality of the circumstances of the

24            information they have in front of them, so

25            what the traveler is telling us and maybe    10:55

Page 104

1                    RANDY JAMES HOWE

2          some law enforcement information as well.

3    BY MR. HANDEYSIDE:

4          Q.     Okay.  Let's turn to Exhibit 6 again.

5    This is the device search privacy assessment.          10:55

6                 If you could turn to Page 10, which is

7    Bates stamped Defs. 184.  The heading there says

8    Storage of Information Extracted from an

9    Electronic Device in the Automated Targeting

10   System.                                                 10:56

11                What's the automated targeting system?

12         A.     It's a system that CBP uses to kind of

13   do risk assessments of law enforcement information

14   to help us be better informed on travelers.

15         Q.     And so feel free to read this           10:56

16   paragraph, if you need to --

17         A.     Yeah.

18         Q.     -- my understanding is that

19   information from devices that are searched at the

20   border is at least sometimes entered into ATS; is   10:56

21   that accurate?

22         A.     If there's information that -- that

23   has been gathered through a search, through --

24   through an advanced search and there's law

25   enforcement benefit to that information, then it    10:56

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 105

1                     RANDY JAMES HOWE

2      could potentially be stored on ATS.

3          Q.     Okay.

4                  MR. HANDEYSIDE:  I'll ask the court

5          reporter to mark this document as            10:57

6          CBP Deposition Exhibit 8.

7                         -  -  -

8                  (CBP Deposition Exhibit Number 8,

9                  Privacy Impact Assessment for the

10                 Automated Targeting System          10:57

11                 DHS/CBP/PIA-006(e), January 13,

12                 2017, Bates stamped Defs. 0996

13                 through Defs. 1056, marked for

14                 identification, as of this date.)

15                         -  -  -                      10:57

16     BY MR. HANDEYSIDE:

17         Q.     Are you familiar with this document?

18         A.     I believe this was one of the

19     documents I looked at, yes.

20         Q.     So is this the privacy impact         10:57

21     assessment for ATS?

22         A.     Right.

23         Q.     It begins at Bates stamped Defs. 996.

24                If you could just turn to the first

25     page with text.  It's 997.                       10:57

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 106

1              RANDY JAMES HOWE

2              The second sentence there in the

3    Abstract, it says, ATS is the decision support

4    tool that compares traveler, cargo, and conveyance

5    information against law enforcement, intelligence    10:58

6    and other enforcement data using risk-based

7    scenarios and assessments.

8              Is ATS a system that, then, has partly

9    intelligence purposes?

10             MS. EDNEY:  Objection to the extent        10:58

11        it calls for law enforcement privilege.

12             But you can answer.

13             THE WITNESS:  It's a tool that CBP

14        uses to, you know, determine when a

15        traveler's a concern or we should have         10:58

16        increased focused on.

17   BY MR. HANDEYSIDE:

18        Q.    And I think earlier we talked about

19   how part of the purpose for conducting border

20   searches of electronic devices is to conduct risk    10:58

21   assessments.

22             Is ATS the system that conducts those

23   risk assessments?

24        A.    It's a tool that we use.  I mean, the

25   officer -- when we're talking before, we were        10:59

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 107

                         RANDY JAMES HOWE

1

2      talking about the officer looking at the totality

3      of the circumstances, gathering information from

4      the traveler.

5             This is a system or a tool that          10:59

6      will -- will be used as well.

7      Q.    So let's do it this way:  Let's turn

8      to Page 4, Defs. 1000.

9             One function of ATS, then, is to

10     identify some individuals for referral to        10:59

11     secondary inspection?

12     A.    There are some -- some rules that are

13     set up, not really specific to individuals, but

14     based on rules, you know, there may be increased

15     focus on individuals to ensure there's no        10:59

16     concerns.

17     Q.    And depending on whether someone --

18     someone's information meets those rules, that

19     person then could be flagged by ATS for additional

20     inspection?                                       11:00

21     A.    Yes.

22     Q.    In making those risk assessments, does

23     ATS rely on information from TECS?

24     A.    Yeah, TECS is one of the systems that

25     it takes information from.                        11:00

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 109

                         RANDY JAMES HOWE

1    that indicates that we should have a little more

2    scrutiny on that individual.

3         Q.    Okay.  So it signals, then, to the

4    officer at primary inspection to refer the person      11:01

5    to a secondary inspection?

6         A.    Yes.

7         Q.    So if ATS indicates that a traveler

8    should be referred to secondary inspection, does

9    the officer at primary have any discretion in         11:02

10   deciding whether to refer that person?

11        A.    No.  It's a lookout that's -- that

12   informs the primary officer.

13        Q.    Okay.  And if an individual is

14   referred to secondary inspection based on that        11:02

15   ATS-generated lookout, is it more likely, then,

16   that that person's electronic devices will be

17   searched than if the ATS lookout had not been on

18   that file?

19             MS. EDNEY:  Objection based on -- to         11:02

20         the extent it reaches for a law

21         enforcement privilege information.

22             THE WITNESS:  The officers use their

23         training and experience and the totality

24         of the circumstances to decide what            11:02

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 114

1                          RANDY JAMES HOWE

2           it calls for law enforcement privilege.

3                   Answer, if you can.

4                   THE WITNESS:  Could you repeat the

5           question?                                    11:08

6                   I don't know if I can answer it, but

7           I'll try.

8       BY MR. HANDEYSIDE:

9           Q.      Sure.

10                  Does information obtained from border   11:08

11      searches of electronic devices affect how ATS

12      flags individuals for additional scrutiny at the

13      border?

14          A.      I think it could.  If there's law

15      enforcement information in there that's of benefit  11:08

16      to CBP that better informs us of an individual

17      that -- that's of concern, then I'd say,

18      potentially, yes.

19          Q.      Again, turning back to Exhibit 8,

20      which is the ATS PIA, and if you turn to the page   11:08

21      Bates stamped Defs. 1035.

22                  The last full paragraph there that

23      begins with the heading Mitigation -- feel free to

24      read that paragraph silently.

25                  (Whereupon, the witness reviews the     11:09

Page 115

1                    RANDY JAMES HOWE

2                 material provided.)

3                 THE WITNESS:  Okay.

4       BY MR. HANDEYSIDE:

5            Q.    So it seems to me that this paragraph     11:09

6       is describing how information taken from

7       electronic devices that resides in ATS will be

8       used.

9                 Is that fair?

10           A.    Yeah, I felt like this -- well, my        11:09

11      last response described this by the way.

12           Q.    So the information that -- that CBP

13      gets from electronic devices uploads to ATS --

14      it -- it's used then to determine whether to flag

15      that person again or other people in the future?   11:10

16                 MS. EDNEY:  Objection to the extent

17                 it calls for law enforcement privilege

18                 information.

19                 THE WITNESS:  Clarify again, the

20                 information that we do retain that we     11:10

21                 determine to be law enforcement use is

22                 uploaded in ATS that better informs us in

23                 directing our attention to an individual

24                 that may be of concern.

25

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 117

1                         RANDY JAMES HOWE

2              time with some individuals.

3        BY MR. HANDEYSIDE:

4              Q.    Okay.  Moving to secondary inspection

5        now.                                              11:11

6              A.    Yeah.

7              Q.    When an individual has been referred

8        to secondary inspection, CBP officers generally

9        review TECS records related to that person?

10                   MS. EDNEY:  Objection to the extent    11:11

11              it calls for law enforcement privilege

12              information.

13                   THE WITNESS:  Secondary officers are

14              making determination on the passenger

15              right then and there so the -- for the      11:11

16              circumstance that they're presenting

17              themself for admission.

18                   So in preparing to look at this

19              passenger -- this traveler, any previous

20              encounters we've had, any previous          11:12

21              secondary referrals and, you know, the

22              outcomes of those, you know, would be

23              informing that officer to do the

24              inspection.

25

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 118

1                        RANDY JAMES HOWE

2      BY MR. HANDEYSIDE:

3          Q.     Okay.  Is there a policy or a

4      practice, then, of -- let's put it this way:  Is

5      there a policy that CBP officers at secondary        11:12

6      should view TECS records related to individuals?

7          A.     If they're doing complete work, they

8      should be.  They would be better informed on it --

9      about that traveler.  And gathering the totality

10     of the circumstances, they better be informed when  11:12

11     they're about to make this next assessment,

12     because each inspection is unique.  Every time

13     they apply for admission, it's different.

14         Q.     Okay.  And is there a policy regarding

15     what an officer at secondary should do when a       11:12

16     traveler's TECS record reflects one or more prior

17     referrals to secondary inspection?

18         A.     Yeah, it's a hypothetical.  I mean,

19     those other referrals and secondary encounters,

20     depending upon the circumstances and why they're    11:13

21     there -- yeah, it's -- it's case-by-case.

22         Q.     I'm asking if there's a policy, not as

23     a hypothetical.  But is there a policy about what

24     an officer should do when an individual's TECS

25     record reflects one or more prior referrals to      11:13

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 119

1                     RANDY JAMES HOWE

2       secondary inspection?

3            A.    Yeah, I don't get your question.

4            Q.    Is there -- is there -- does CBP tell,

5       you know, officers in secondary that they should    11:13

6       do something.

7                  Is there a course of conduct that

8       they're supposed to take when they review a TECS

9       record and it shows multiple prior referrals to

10      secondary inspection?                               11:13

11           A.    Yeah.  So through the officer's

12      training and experience, they know that they need

13      to be informed about that traveler and use

14      whatever information they have available to them.

15      Looking at previous encounters and looking -- and   11:14

16      reviewing what transcribed informs them to be able

17      to make that decision.

18           Q.    And that includes records related to

19      prior searches of an individual's electronic

20      devices?                                            11:14

21           A.    It could be.

22           Q.    And, again, is there any policy that

23      instructs CBP officers on what to do if they see

24      that an individual's electronic devices have been

25      searched in the past on one or more prior           11:14

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 122

1                    RANDY JAMES HOWE

2        A.     -- of course, they would need

3    supervisory approval.

4        Q.     So for the basic searches, are prior

5    searches of an individual's electronic devices        11:16

6    relevant to whether or not they conduct a search

7    of that individual's devices on that occasion?

8        A.     The officer has to rely on their

9    training, experience and the totality of the

10   circumstances they have before them.  So if we        11:16

11   encountered somebody before and they had child

12   pornography, then I would say, yes, we would be

13   looking at it again.

14       Q.     What if you encountered the individual

15   in the past and they did not have child              11:17

16   pornography, but a search, of course, was

17   nonetheless conducted?

18       A.     Yeah, it's based on the training and

19   experience and totality of the circumstances and

20   what we have before them.  It depends.               11:17

21       Q.     Okay.  We can take a break, if you

22   want; otherwise, we can move on to Topic 1.

23       A.     Yeah, I'm fine.

24              Sure.

25       Q.     Topic 1 is Policies, practices, and      11:17

Page 125

1                          RANDY JAMES HOWE

2        sentence?

3              Q.      I read the second sentence in --

4              A.      Sorry.

5              Q.      -- the second-to-last paragraph.          11:19

6              A.      Okay.  So what's your question?

7              Q.      Are those all valid reasons to conduct

8        a basic search?

9              A.      There are some reasons, sure.

10             Q.      I take it there are others?            11:20

11             A.      Sure.

12             Q.      So this isn't a complete list?

13             A.      No.  This is an OIG report.

14             Q.      Do you know what the source of this

15       list of reasons is?                                 11:20

16             A.      Why they wrote that?

17             Q.      Yeah.

18             A.      I don't know.

19             Q.      Okay.  I take it CBP officers record

20       the reasons justifying a basic search after they    11:20

21       conduct the search; is that right?

22             A.      Part of the process is -- is

23       documenting in TECS, like we said before,

24       electronic medium portion, both the basic and

25       advanced, and the reason -- the information          11:21

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 126

1                          RANDY JAMES HOWE

2      indicating why it led to that type of search is

3      recorded, yes.

4           Q.     Okay.  Are they supposed to record

5      those reasons -- the reasons they conducted the      11:21

6      search, in detail?

7           A.     Yeah, they're supposed to indicate

8      what led them to conduct that search, the

9      information -- you know, what -- yeah, document

10     what led them to do that.                            11:21

11          Q.     Sure.

12                 And I just -- I just want to

13     understand.

14                 You know, they do that in narrative

15     form, or is there, like, a drop-down menu with a     11:21

16     series of approved reasons, or --

17          A.     I believe it's a narrative, a

18     narrative.

19          Q.     Okay.  Let's turn quickly in the same

20     document to Page 990.                                11:21

21                 If you could just review the

22     paragraph -- the paragraphs that start

23     Recommendation 1 and then the paragraph that says

24     Response.

25          A.     Okay.                                    11:22

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 151

1                    RANDY JAMES HOWE

2      how to decide?

3          A.      They're basing on their training and

4      experience and what they do day to day.

5          Q.      Do officers have to record the basis      11:49

6      for the national security concern prior to

7      conducting the search?

8          A.      We talked about this before.  Each and

9      every basic and advanced search is recorded, and

10     the reasoning that led to the search is recorded,    11:49

11     yes.

12         Q.      Right.

13                 And I'm asking if they have to record

14     the basis for the national security concern before

15     they do it.  It sounds like they have to do it       11:49

16     after.

17                 Is there a requirement to -- to record

18     that basis beforehand?

19         A.      It sounds like a mechanical question

20     and the confines of the inspection and the           11:49

21     physical makeup of the secondary office, but they

22     certainly need supervisory approval before they

23     would do it.

24         Q.      Okay.  Nothing requires that they then

25     write down the reason before they conduct the        11:50

Page 161

1                        RANDY JAMES HOWE

2          A F T E R N O O N              S E S S I O N

3                                    (12:45 p.m.)

4                              -  -  -

5                        RANDY JAMES HOWE,                    11:59

6          called for continued examination and, having been

7          previously duly sworn, was examined and testified

8                         further as follows:

9                              -  -  -

10               MR. HANDEYSIDE:  Back on the record.    11:59

11                              -  -  -

12          EXAMINATION (CONTINUED) BY COUNSEL FOR PLAINTIFFS

13                              -  -  -

14      BY MR. HANDEYSIDE:

15          Q.    Let's move on to Topic 2.  And Topic 2   12:45

16      is Policies, practices, and training regarding

17      what kinds of information CBP employees should

18      view, document, or copy when they search

19      electronic devices obtained from travelers at the

20      border.                                              12:46

21               So travelers carry devices that

22      contain many different kinds of information such

23      as photos, contacts or e-mails; is that correct?

24          A.    Correct.

25          Q.    And the devices contain a very large      12:46

Page 162

1                    RANDY JAMES HOWE

2      volume of information; is that right?

3          A.      Some do, sure.

4          Q.      So particularly for manual searches,

5      an officer doesn't have time necessarily to          12:46

6      manually search the entire device; is that right?

7          A.      Correct.

8          Q.      So the officer has to pick and choose

9      which parts of the device to manually search and

10     which ones not to; is that fair?                      12:46

11         A.      Based on the totality of the

12     circumstances and the inspection, yes.

13         Q.      So individual officers have discretion

14     to search whatever kinds of content on the device

15     they choose?                                          12:46

16         A.      No different than the discretion they

17     have to choose what they search in somebody's bag.

18         Q.      So that's a yes?

19         A.      Yes.

20         Q.      So what, if any, instructions does CBP   12:47

21     give to its officers regarding what types of

22     information on a device they should search?

23         A.      Well, the foundation of our program is

24     in our directive so the guidance on -- on the

25     whole policies in the directive.  More               12:47

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 164

1                    RANDY JAMES HOWE

2      versus that?

3          A.    Again, we don't tell officers how to

4      search a bag.  Based on the totality of the

5      circumstances, to -- you know, pre the electronic          12:48

6      age, when we didn't have things on the device,

7      people would travel with information about their

8      employment, personal information, personal photos,

9      maybe prescriptions, things like that.  Officers

10     are trained, based on the totality of the                  12:48

11     circumstances, pre the electronic age, to gather

12     information to satisfy them that something is

13     admissible.

14              So it correlates to the same, from

15     looking at a bag into a phone.  Based on the              12:49

16     totality of the circumstances and where they're

17     going with their questioning, they're going to

18     look into the area -- just like they look in an

19     area of a bag potentially, they're -- they're

20     going to be looking at a specific area in a phone.        12:49

21         Q.    Okay.  Understood.

22              So that's a no, there's nothing that

23     says -- no guidance or -- or particular

24     instruction that says what type of data they

25     should focus on; they get to choose that                  12:49

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 167

1                    RANDY JAMES HOWE

2      will have us look in whatever is resident on the

3      phone.

4           Q.    What about instead of different kinds

5      of information, types of data?  Are there -- are        12:51

6      there kinds of information they're supposed to

7      look for on the phone -- travel history?

8                 Is that something that they're

9      instructed to look at?

10          A.    I'm not sure what you mean by "travel         12:51

11     history" on the phone.

12          Q.    Anything that might reflect someone's

13     travel history, e-mails reflecting ticket

14     reservations?  Is that the kind of information

15     that CBP officers are instructed to look at?            12:51

16          A.    Anything that's on the phone from the

17     boarding pass, to what you just described.

18          Q.    That's -- that includes social and

19     family relationships?

20          A.    Whatever is physically resident on           12:52

21     that phone or that device.

22          Q.    So some devices have internal tools

23     that can automatically search the content of the

24     device; is that correct?

25          A.    I'm not sure what you mean.                   12:52

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 169

1                      RANDY JAMES HOWE

2          A.     There may be.  I'm not sure.

3          Q.     What sources of information would you

4      need to consult in order to -- to find out the

5      answer?                                          12:53

6          A.     I could check with somebody.

7          Q.     Those internal search tools can -- can

8      search content under the device that might not be

9      readily visible, like cached content or metadata;

10     is that right?                                    12:53

11         A.     I'm not sure what either one of those

12     refer to.

13         Q.     Okay.  And so during a basic search,

14     officers will sometimes document the information

15     that they view on an electronic device; is that   12:54

16     right?

17         A.     They may.

18         Q.     How do they do that?

19         A.     If the basic search determine there's

20     some law enforcement-benefited information, it    12:54

21     would be recorded within -- within our systems.

22         Q.     Would -- can they record information

23     verbatim as it sits on the device?

24         A.     Whatever is pertinent that's a law

25     enforcement benefit -- that could be recorded.    12:54

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 186

RANDY JAMES HOWE

1

2      Q.      -- so some people, I think, refer to

3    that as cached content, when you're browsing the

4    Internet, it downloads a certain amount of

5    information, keeps it on the device even though it      01:11

6    just immediately prior had been stored on a remote

7    server somewhere.

8              Are there any limits on searching that

9    kind of content, cached content?

10     A.      We have the ability to search                 01:12

11   whatever's physically resident on the phone.  I'm

12   not familiar with that term.  But if you're saying

13   that's resident on the phone, then it would be

14   searchable.

15     Q.      Okay.  So even if a device is disabled        01:12

16   from network connectivity, it's still possible,

17   isn't it, to, say, scroll through a person's

18   Web-based e-mail that's -- that's on a -- that's

19   in -- you know, like available through the app,

20   the e-mail app; is that true?                           01:12

21     A.      We're able to view whatever is

22   physically resident on the phone, and if it's

23   resident on the phone, then we have that

24   capability.

25     Q.      Let's talk about Topic 9, Policies,           01:12

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 190

1                        RANDY JAMES HOWE

2        that is subject to this limit?

3            A.      I think it's two different things.

4            Q.      So the information that is subject to

5        this limit is only information that's -- that's      01:16

6        data essentially taken from the device itself?

7            A.      That's information that's physically

8        resident on -- on the device that has law

9        enforcement benefit that's retained on ATS.

10           Q.      If somebody wants to simply, you know,   01:17

11       write -- if an officer wants to write down what he

12       or she saw on the device, that's not subject to

13       this -- to this -- to the limit that's set forth

14       here (indicating)?

15           A.      I don't believe there's a narrative      01:17

16       portion of what's saved in ATS, but I don't think

17       so.  I think it's the information that's retained.

18           Q.      Directly from the device?

19           A.      That's law enforcement benefit, yes.

20           Q.      This sentence -- again, it refers to     01:17

21       other enforcement matters.

22                   Can you provide examples of what other

23       enforcement matters would be, aside from

24       immigration and customs?

25           A.      We have a vast mission.                  01:18

Page 191

1                    RANDY JAMES HOWE

2        Counterterrorism is a part of what we do.  So it

3        could be a host of different things.

4              Q.    And so in terms of the types of

5        content, it doesn't matter if it's e-mails?          01:18

6        Photos?  Contacts?  That all -- this applies to

7        all different types of content?

8              A.    I guess I'm confused by your question.

9                    I apologize.

10             Q.    So information -- it could be of any     01:18

11       different kind, correct?  It could be images?

12       E-mails?  Contacts?  Browsing history?

13             A.    Anything that is resident on the

14       device.  It could be anything, yes.

15             Q.    When CBP retains information from        01:19

16       devices, it can do so in one or more systems of

17       records; is that right?

18             A.    Yes.

19             Q.    So each of those systems of records

20       have their own retention periods?                    01:19

21             A.    I'd have to refer to what they are,

22       but I'm sure they're pretty -- pretty descriptive

23       in explaining what they are.

24             Q.    So does CBP then review information in

25       those systems of records to determine whether --     01:19

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 198

1                    RANDY JAMES HOWE

2       hand, the potential violation of law or national

3       security matter.  I mean, it's -- it could be

4       quick; it could be lengthy.

5            Q.     Let's turn back to the policy at        01:27

6       Paragraph 5.5.1.3, just briefly review that.

7                    (Whereupon, the witness reviews the

8                     material provided.)

9                    THE WITNESS:  Okay.

10      BY MR. HANDEYSIDE:                                  01:28

11           Q.     So this policy permits the sharing of

12      information from electronic devices searched at

13      the border with state, local, foreign governments;

14      is that correct?

15           A.     That's what it says.                    01:28

16           Q.     And, in fact, CBP does share

17      information from electronic devices with those

18      other Government entities at times; is that right?

19           A.     We do.

20           Q.     And it says in accordance with          01:28

21      applicable law and policy.

22                    Are there any limits, aside from

23      what's set forth in this policy, on what

24      information retained from devices that CBP

25      searches can be shared with those other agencies?  01:28

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 199

1                    RANDY JAMES HOWE

2        A.    This comes back to what we were

3    talking about before, where if it has law

4    enforcement benefit, it's relevant to a law

5    enforcement concern.                            01:29

6        Q.    Does the policy impose that limit?

7        A.    Does what policy?

8        Q.    This policy, the CBP directive,

9    Exhibit 3.

10       A.    I think the whole policy is -- feeds   01:29

11   into this, yes.

12       Q.    When CBP is deciding what to share,

13   does it have to follow its own internal guidelines

14   about what information can be shared?

15             Does this policy provide those         01:29

16   guidelines?

17       A.    I think you certainly have

18   information-sharing policy within DHS, and I'm

19   sure there are policies with other Government

20   agencies we would be governed by, other Federal   01:30

21   agencies.

22       Q.    So what are those -- what do those

23   policies look like?  Are they, like, a memorandum

24   of understanding?

25       A.    I'm not sure.                          01:30

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 200

1                    RANDY JAMES HOWE

2         Q.     And so does CBP then have any control

3    over how long those other Government entities

4    retain information from electronic device searches

5    that CBP shares with them?                        01:30

6              MS. EDNEY:  Objection.  It is

7           outside the scope, if he doesn't know what

8           other agencies do.

9              THE WITNESS:  Yeah, I'm not sure.

10   BY MR. HANDEYSIDE:                                 01:30

11        Q.     You're not sure?

12        A.     No.

13        Q.     Are there standard procedures for how

14   to retain information from the searches of the

15   devices?                                           01:30

16        A.      It's covered in the directive here

17   (indicating).

18        Q.     Okay.  Let's go back to what I believe

19   we marked as Exhibit 9.  It's the pilot program

20   document.                                          01:31

21        A.     Okay.

22        Q.     Turn to Page 11, which is Bates marked

23   Defs. 183.

24              MS. EDNEY:  143?

25              MR. HANDEYSIDE:  143, yes.              01:31

Page 201

                        RANDY JAMES HOWE
1
2    BY MR. HANDEYSIDE:
3         Q.    I think we talked about electronic
4    media reports.  That's the form in which CBP
5    retains information from device searches?          01:31
6         A.    Yes.
7         Q.    Are electronic media reports the same
8    as IOEMs?
9         A.    Yeah, it's one and the same.
10        Q.    It's one and the same?                   01:31
11              And do the report-making requirements
12   set out here apply to both basic and advanced
13   searches?
14        A.    Yeah, I think we've talked about that.
15   We do an IOEM or electronic media report on both   01:31
16   advanced and basic.
17        Q.    And so these specific protocols on
18   Page Defs. 143 -- they apply to both?
19        A.    I don't know.  I have to read it.
20        Q.    Please.                                  01:32
21              (Whereupon, the witness reviews the
22               material provided.)
23              THE WITNESS:  I think it probably
24          applies to both, sure.
25

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 203

1               RANDY JAMES HOWE

2          MS. EDNEY:  Only if you know.

3          THE WITNESS:  Yeah.  If -- if

4      it's what we're asking them to do to help

5      us, yes, to assist us.                        01:34

6  BY MR. HANDEYSIDE:

7      Q.    So I just want to understand, how does

8  CBP ensure that the copies of the information that

9  that other agency or entity makes are not retained

10  in ways that would not be permissible under this   01:34

11  policy?

12          MS. EDNEY:  Objection to the extent

13      it calls for law enforcement privilege

14      information.

15          THE WITNESS:  It would be up to the      01:35

16      agency, if they were retaining it, to

17      retain it on their own authority beyond

18      their assistance that they provided us.

19  BY MR. HANDEYSIDE:

20      Q.    Does CBP have any means of ensuring    01:35

21  that -- that that -- that they follow -- that

22  they -- that they delete the information when

23  they're supposed to?

24      A.    I'm not aware of any formal

25  arrangement, but they're strong Federal partners,  01:35

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 204

1                       RANDY JAMES HOWE

2      so we would -- we would rely on them to -- to

3      discard it when they didn't have any use for it.

4               MR. HANDEYSIDE:  Let's take a break.

5               MS. EDNEY:  Okay.                    01:35

6                         -  -  -

7               (Whereupon, a recess was taken from

8               1:35 p.m. to 1:55 p.m.)

9                         -  -  -

10              MR. HANDEYSIDE:  Back on the record.   01:55

11     BY MR. HANDEYSIDE:

12         Q.    Just revisiting a topic we had been

13     discussing here before the break, the -- when

14     conducting advanced searches, are there times when

15     CBP makes a full copy of all of the contents of    01:55

16     that device in order to conduct the advanced

17     search?

18         A.    We know we certainly have the

19     capability of doing that.  Our focus is to -- is

20     on the areas that we need to address in order to   01:55

21     complete the inspection, to complete our area of

22     inquiry, so we have the capability of doing that.

23              I don't know if we've -- if we've done

24     that.

25         Q.    Let's look at the OIG report again,    01:56

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 205

1                     RANDY JAMES HOWE

2     Exhibit 4.

3          A.     Okay.

4          Q.     We looked at this earlier.

5                 So, for instance, on Page 981 -- Bates    01:56

6     stamped 981, the bottom paragraph there, During

7     advanced searches, OFO officers connect external

8     equipment to electronic devices and copy

9     information onto a thumb drive.

10                Are you saying that you don't know if    01:57

11    at times they copy all of the information or just

12    some of it?

13         A.     I know that our focus is on whatever

14    area we're focusing on, so we have the capability

15    of searching and copying everything on the device.    01:57

16    We focus on the area that we are -- we need to to

17    address, to resolve what we're looking on.

18                We have the capability of copying all.

19    I don't know if we have --

20         Q.     Is there anything that you're aware of    01:57

21    that would prohibit officers from copying

22    everything onto a device?

23         A.     Not that I'm aware of.

24         Q.     And once made, those copies, you know,

25    what -- what then happens to the copied    01:57

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 208

```
1                      RANDY JAMES HOWE
2    out, then?
3         A.    It's just the recordation of the event
4    in -- in IOEM.  So not actually copying the
5    device, saving it in TECS, no.                    01:59
6         Q.    Not in TECS?
7         A.    No.
8         Q.    Okay.
9               In ATS?  Is it physically uploaded
10   from the device into ATS?                          01:59
11        A.    Only pertinent information that's law
12   enforcement purpose.
13        Q.    Okay.  And then what happens to the
14   information that's on the -- on the device that --
15   from which the information was uploaded?           01:59
16        A.    If there's no law enforcement benefit,
17   then it's destroyed or deleted.
18        Q.    And what about if there is that
19   benefit?  Is it retained on that device as well?
20        A.    No.                                      01:59
21        Q.    So the whole -- all of it is deleted?
22        A.    Yes.
23        Q.    Is there a time period in which
24   that -- that decision has to be made about whether
25   something has law enforcement benefit or not?      02:00
```

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 223

1                           RANDY JAMES HOWE

2      or months on end?

3           A.      Specifics, no.

4           Q.      Are you aware that that's happened?

5           A.      I'm not sure.  Maybe.  I don't know.      02:16

6           Q.      Okay.  For detentions of devices that

7      extend for weeks or months, what kinds of

8      circumstances would justify a detention of that --

9      of that duration?

10               MS. EDNEY:  Objection: asking for a         02:16

11            hypothetical.

12      BY MR. HANDEYSIDE:

13           Q.      Does the policy prohibit the detention

14      of devices for weeks or months on end?

15           A.      I think the guidelines are pretty        02:16

16      clear and the timelines for supervisory review and

17      approval, five-, 15- and seven-day increments, and

18      that will continue until we're satisfied that the

19      border search or -- has been completed and

20      resolved.                                            02:16

21           Q.      So the policy provides for detention

22      of a device for periods that can extend weeks

23      or months; is that correct?

24           A.      Five-, 15- and seven-day increments,

25      that's what the directive says.                      02:17

Page 224

1                    RANDY JAMES HOWE

2          Q.    So those seven-day -- is there an

3     ultimate time limit on how long those increments

4     can continue?

5          A.    I think it's a definite -- I guess I'm    02:17

6     confused by this 21-day reference in 5.4.1.2, but

7     it seems to be indefinite.

8          Q.    What are the kinds of circumstances

9     that could -- that could justify a detention

10    with -- with multiple extensions, lasting weeks    02:17

11    or months?

12               MS. EDNEY:  Objection: it calls for

13          law enforcement sensitive information,

14          also asking for a hypothetical.

15               THE WITNESS:  It could be just          02:17

16          simply to gain access to the device.

17          There could be some specialized technical

18          reason why we can't gain access in order

19          for us to ensure that the border search is

20          completed.  It might be as simple as we      02:18

21          might just -- through technical

22          difficulties just can't gain access.  That

23          might be one.  Asking for specialized

24          assistance from other agencies.  It may

25          take a long period of time to interpret     02:18

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 248

1                        RANDY JAMES HOWE

2       any other reasons why an officer can hold open an

3       EMR for a period beyond the time immediately

4       surrounding that inspection?

5            A.    I can't think of a reason why.          02:50

6            Q.    Okay.  So in order to calculate the

7       number of searches that have happened in a time

8       period, CBP just looks at the number of EMRs,

9       correct?

10           A.    That's what it says.                    02:50

11           Q.    What I'm wondering is, is it safe to

12      say given what the OIG found, the number of border

13      searches of electronic devices that CBP has

14      calculated is going to be low, given that the OIG

15      found that there were times when officers did not   02:50

16      complete the EMRs according to policy?

17           A.    What's the question?

18           Q.    The number -- the total number of --

19      of device searches that CBP has calculated will

20      exclude any searches for which officers didn't     02:51

21      complete EMRs; is that right?

22           A.    I think the audit period from

23      April '16 to July '17 occurred during a time

24      period where we knew that it was time for us to

25      update our policy, and it's -- it was in the       02:51

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 249

                    RANDY JAMES HOWE

1

2    works, obviously, before it was implemented in

3    January of '18, and CBP acknowledges that there

4    were portions of the '09 directive that needed to

5    be updated.  And not only that, the EMR -- -MR          02:51

6    system needed to be updated and refreshed, so

7    there were instances where supervisors provided

8    approval but it wasn't recorded properly.  And

9    narratives were incomplete.

10              So we've addressed many of the things       02:52

11   that were highlighted in this report through this

12   new directive.

13        Q.    Okay.  So the number of searches that

14   CBP calculated that occurred during that period,

15   April 2016 to July 2017, doesn't include             02:52

16   devices -- device searches that occurred for which

17   there wasn't an EMR created; is that right?

18        A.    Restate your question.

19        Q.    So as we've said -- as I think you've

20   said, sometimes officers didn't fill out the EMR     02:52

21   according to policy; is that right?

22              And if they didn't fill out the EMR

23   according to policy, that search wasn't included

24   in the calculation of the number of -- of device

25   searches that took place in that period; is that     02:53

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 251

                        RANDY JAMES HOWE

1

2        A.      We did.

3        Q.      So I'm just wondering, CBP has a

4    method for tabulating the number of searches of

5    electronic devices that have happened in any given   02:54

6    period.  And to do so, it relies on the electronic

7    media reports; is that right?

8        A.      Correct.

9        Q.      To the extent that officers didn't

10   fill out an electronic media report for a            02:55

11   particular search, those searches won't be

12   included in the final count of the number of

13   searches that occurred; is that right?

14       A.      I'm not sure.  That's a technical

15   question.  One would think that's accurate --        02:55

16       Q.      Okay.

17       A.      -- but, again, our directive is --

18   addressed it.  That's why we came out with the new

19   directive with very clear-cut guidance and the

20   expectations of our officers and our supervisors,    02:55

21   and that's why our -- our electronic media

22   reporting properly formats it in a way that we

23   record things according to policy.

24       Q.      Okay.  And the -- the -- the revision

25   in response to some of the findings in this          02:55

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 254

1                     RANDY JAMES HOWE

2     called "forensic searches" within the jurisdiction

3     of the Ninth Circuit; is that right?

4               MS. EDNEY:  Objection: vague.

5               THE WITNESS:  You just restated the        02:59

6          same thing twice, didn't you?

7               We need reasonable suspicion to do

8          an advanced search, yes.

9     BY MR. HANDEYSIDE:

10         Q.    And that's been the case for some         02:59

11    time.  That predates the current policy as long as

12    those searches are occurring in the jurisdiction

13    of the Ninth Circuit; is that right?

14         A.    That's correct.

15              MR. HANDEYSIDE:  I'll ask the court         02:59

16         reporter to mark this as 13.

17                        -  -  -

18              (CBP Deposition Exhibit Number 13,

19              Memorandum, Bates stamped

20              Defs. 0129 through Defs. 0130,             02:59

21              marked for identification, as of

22              this date.)

23                        -  -  -

24              THE WITNESS:  Thank you.

25

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 256

1                    RANDY JAMES HOWE

2          A.     I do.

3          Q.     And what is it?

4          A.     It's a package to my boss's memo with

5     instructions to the field with the same          03:00

6     information.

7          Q.     Indeed the information appears similar

8     in both of these.

9                 Is it accurate to say that CBP issued

10    this memorandum from Todd Owen and this muster    03:00

11    dated --

12         A.     Yes.

13         Q.     -- 2015 in order to comply with the

14    decision of the Ninth Circuit in the Cotterman

15    case?                                             03:01

16                MS. EDNEY:  Objection: asking for a

17           legal conclusion.

18                THE WITNESS:  That's the instruction

19           here (indicating).

20    BY MR. HANDEYSIDE:                                03:01

21         Q.     Okay.  And CBP also has written

22    guidance on what constitutes reasonable suspicion

23    of conduct in violation of the laws it

24    administers; isn't that right?

25         A.     I think we talked about that earlier.  03:01

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 257

1                    RANDY JAMES HOWE

2        It's covered in the directive.

3             Q.    Aside from what's in the directive --

4        in the directive, are you aware of other guidance

5        that CBP has as to what constitutes reasonable          03:01

6        suspicion?

7                   Let's do this --

8             A.    Yeah.

9             Q.    -- let's just get another exhibit

10       entered.                                                 03:01

11                  MR. HANDEYSIDE:  Mark this as

12             CBP Deposition Exhibit 15.

13                       -   -   -

14                  (CBP Deposition Exhibit Number 15,

15                   Personal Search Handbook, Bates             03:01

16                   stamped Defs. 1057 through

17                   Defs. 1128, marked for

18                   identification, as of this date.)

19                       -   -   -

20                  THE WITNESS:  Thanks.                         03:02

21       BY MR. HANDEYSIDE:

22            Q.    I imagine you're familiar with this.

23            A.    I am.

24            Q.    This is CBP's personal search

25       handbook.  It was produced in this litigation.          03:02

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 258

1                    RANDY JAMES HOWE

2                Starting at Bates stamped

3     Defs. 1057 -- just to be clear, are CBP officers

4     trained on what constitutes reasonable suspicion?

5          A.    I believe they are.                      03:02

6                What page number is that?

7          Q.    We can turn to Page 1067.

8          A.    1067.

9                They talk about facts, essentially.

10         Q.    So this page sets out a definition and   03:02

11    some guidance on what constitutes and what can be

12    considered in determining if there's reasonable

13    suspicion.

14                Is this kind of reasonable

15    suspicion the same reasonable suspicion that CBP    03:03

16    used when it issued this -- the Owen memorandum

17    and this muster in order to comply with the

18    requirements in the Ninth Circuit?

19                MS. EDNEY:  Objection to the extent

20         it's asking for a legal conclusion.  He's      03:03

21         not a lawyer.

22                THE WITNESS:  The definition of a

23         "reasonable suspicion" is one or more

24         articulable facts for both.

25

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 259

1                          RANDY JAMES HOWE

2     BY MR. HANDEYSIDE:

3          Q.     So that's the same if it's in the

4     personal search context or if it's in the device

5     search context?                                        03:03

6          A.     Reasonable suspicion is reasonable

7     suspicion.

8          Q.     Okay.  And are CBP officers accustomed

9     to applying the reasonable suspicion standard for

10    these purposes?                                        03:03

11         A.     For which purposes?

12         Q.     For conducting personal searches or

13    for conducting device searches where that standard

14    is necessary.

15         A.     Yes.                                       03:04

16         Q.     Has CBP had any difficulty applying

17    that standard in order to conduct some personal

18    searches or to conduct some device searches?

19              MS. EDNEY:  Objection: vague.

20              THE WITNESS:  I don't know -- I            03:04

21         don't know what your question is.

22    BY MR. HANDEYSIDE:

23         Q.     Have CBP officers had difficulty

24    determining whether reasonable suspicion exists?

25         A.     I don't know what you mean by            03:04

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 260

1                    RANDY JAMES HOWE

2       "difficulty."

3            Q.     Have issues emerged within the CBP

4       workforce in applying the reasonable suspicion

5       standard in order to conduct these kinds of              03:04

6       searches?

7            A.     Either you do or you don't.  You

8       either have the reasonable suspicion or you don't.

9            Q.     Okay.  Relatively straightforward?

10           A.     I think so.                                  03:04

11           Q.     CBP also sometimes applies a probable

12      cause standard for -- for the seizure and

13      retention of an electronic device; is that

14      correct?

15           A.     Correct.                                     03:05

16           Q.     And, similarly, CBP has written

17      guidance on what constitutes probable cause?

18           A.     Yes.

19           Q.     If you could turn to Exhibit 15, Bates

20      stamped 1109.                                            03:05

21                  Is this CBP's definition of "probable

22      cause"?

23           A.     Yes.

24           Q.     And are CBP officers trained on what

25      constitutes probable cause?                             03:05

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 261

                        RANDY JAMES HOWE

1

2        A.      Yes.

3        Q.      What does that training entail?

4        A.      They learn that at the foundation of

5    their training at our Field Operations Academy,      03:06

6    how to establish reasonable suspicion, personal

7    search -- I'm sorry -- probable cause.  It's all

8    part of the -- rudimentary part of their training,

9    and also on the personal search.

10        Q.      Okay.  Is there a specific training      03:06

11   module that's -- that's focused on these

12   thresholds: reasonable suspicion, probable cause?

13        A.      I'm sure there is, yes.

14        Q.      And are there written materials

15   that -- that address those requirements?            03:06

16        A.      Yes.

17        Q.      And CBP also obtains warrants under

18   some circumstances; is that right?

19        A.      Very -- yeah, we have the authority,

20   very infrequently applied.                          03:06

21        Q.      And are -- do you know which specific

22   circumstances might entail CBP officers obtaining

23   warrants?

24              MS. EDNEY:  Objection: outside the

25        scope.                                          03:07

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 262

1                    RANDY JAMES HOWE

2              THE WITNESS:  It's all in the

3         personal search, but if you -- if you --

4    BY MR. HANDEYSIDE:

5         Q.    Okay.  Just quickly -- I've noted a        03:07

6    few -- let's look at Defs. 1076.

7              Are prolonged detentions for medical

8    examinations one circumstance in which CBP may

9    seek a warrant?

10        A.    The policy outlines a procedure where       03:07

11   it may be needed, correct.

12        Q.    Okay.  And let's look at 1095.

13             Are involuntary X-rays another

14   situation in which CBP may seek a warrant?

15        A.    Again, we have the authority to do          03:08

16   that if -- and it's -- it's provided for in our

17   policy.

18        Q.    And does CBP sometimes actually do --

19   actually does seek warrants for involuntary

20   X-rays?                                                03:08

21             MS. EDNEY:  Objection: asking a

22        hypothetical.

23   BY MR. HANDEYSIDE:

24        Q.    I'm asking if they do sometimes, not

25   hypothetically.                                        03:08

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 263

                    RANDY JAMES HOWE

1

2         A.      Yeah, I think we have that authority,

3    but in preparing for this deposition, I haven't

4    been able to identify one instance where we've got

5    a Court order for either: involuntary X-ray or --    03:08

6         Q.      Okay.

7         A.      -- yeah, so you said earlier that

8    prolonged detentions, you needed a Court order.

9                 Didn't you say that earlier?

10                I think that may be an error.           03:09

11        Q.      Prolonged detentions for medical

12   exams.

13        A.      So an involuntary X-ray or an

14   involuntary body cavity are the two situations

15   where we would need a Court order, not for a         03:09

16   prolonged detention.  A prolonged detention is

17   just supervisory approval and reasonable

18   suspicion.

19        Q.      Okay.  If we turn to Page 1076.  The

20   paragraph above Section q there, you know, says,     03:09

21   The ICE duty agent and/or the CBP prosecution

22   officer shall advise the U.S. Attorney's Office of

23   the detention.  If the AUSA believes that probable

24   cause has been established, the ICE duty agent

25   and/or the CBP prosecution officer will work with    03:09

Page 267

1                          RANDY JAMES HOWE

2          A.     I don't know.

3          Q.     CBP also obtains warrants for some

4    searches of international mail; is that right?

5          A.     They're required to, correct.          03:13

6                 MR. HANDEYSIDE:   I'll ask the court

7             reporter to mark this as CBP Deposition

8             Exhibit 16.

9                          -  -  -

10                (CBP Deposition Exhibit Number 16,      03:13

11                   International Mail Operations and

12                   Enforcement Handbook, marked for

13                   identification, as of this date.)

14                         -  -  -

15   BY MR. HANDEYSIDE:                                   03:13

16         Q.     Are you familiar with this document?

17         A.     I am.

18         Q.     What is it?

19         A.     It's an International Mail Operations

20   Enforcement Handbook, some guidance for the U.S.     03:13

21   Customs Service, but I guess it's still binding on

22   how to handle letter class mail.

23         Q.     That was my next question.  It's still

24   in force?

25         A.     Yes.                                    03:14

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 268

1                    RANDY JAMES HOWE

2        Q.    And the second page there, in the

3   middle paragraph under Letter Class Mail

4   Screening -- I'm sorry -- the paragraph below

5   that, the handbook states, Except in cases where    03:14

6   the sender or the addressee has given written

7   consent, a search warrant shall be obtained before

8   any correspondence is read, seized, or referred to

9   another agency.

10            Is that right?                            03:14

11       A.    That's what it says.

12       Q.    So CBP obtains warrants when they want

13   to access written correspondence that's being sent

14   internationally?

15       A.    That's what's provided for in policy,   03:14

16   but if we have reason to believe that in that

17   letter class mail there's some type of contraband

18   or -- or concern, we don't need a warrant to open

19   it to gain access to the contraband.  And to read

20   it, we would.                                      03:15

21       Q.    Okay.  So if there's no indication

22   that the letter includes any contraband, even to

23   open it, the policy requires that CBP obtain a

24   warrant; is that right?

25       A.    That's what the policy is.               03:15

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 270

1                    RANDY JAMES HOWE

2    BY MR. HANDEYSIDE:

3        Q.    I think you just identified the

4    requirement as if it's solely correspondence and

5    there's no indication that there's merchandise in     03:17

6    there, CBP can't open it without a warrant?

7              MS. EDNEY:  I'm going to object that

8         you're asking him to -- to talk about a

9         statute, that he's not an attorney, and

10        he -- I don't know if he's recently --           03:17

11             THE WITNESS:  I've never read this

12        before, but based on what I see here, it's

13        pretty clear.

14   BY MR. HANDEYSIDE:

15       Q.    Okay.  So your understanding of the         03:17

16   requirements for accessing international mail, if

17   CBP opens it on belief that there's merchandise in

18   there, CBP officers can't read the -- read any

19   correspondence without a warrant?

20       A.    If reasonable suspicion believes            03:17

21   there's contraband in the letter class mail, we

22   can open it, seize the contraband.  In order to --

23   to read it, the letter, if there's -- if there is

24   indeed a letter -- often it's just a vessel for

25   the contraband -- we would need a warrant.            03:17

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 271

1                          RANDY JAMES HOWE

2          Q.     And -- and, again, if there's no basis

3     for opening it on suspicion that there's

4     merchandise or contraband in there, you have to

5     get a warrant just to open it?                    03:18

6          A.     That's what the policy is -- the

7     policy, yes.

8          Q.     Are -- are only some CBP officers

9     deployed in monitoring or processing international

10    mail?                                              03:18

11                Is that something that only some CBP

12    officers do, or is that a function that most

13    line-level officers do?

14         A.     There are officers that work in

15    seaports, and they work in seaports.  There are   03:18

16    officers that work in land borders; they work at

17    land borders.  There are officers that work in

18    airports, and they work in airports.  There's

19    people -- officers who work in mail facilities;

20    they work in mail facilities.                      03:18

21         Q.     So the ones that work in the mail

22    facilities, they handle the international mail?

23         A.     That's where they work.

24         Q.     Right?

25                What about -- is -- is this issue one  03:18

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 278

1                          RANDY JAMES HOWE

2       BY MR. HANDEYSIDE:

3            Q.     Here's my question -- here's my

4       question:  So CBP has to get a warrant to open

5       international mail if he wants to read the mail?      03:24

6                   I think we've established that.

7                   MS. EDNEY:  I'm going to object that

8              that's very generalized.  We're talking

9              about at the border.

10                  Ask him the direct question.            03:25

11      BY MR. HANDEYSIDE:

12           Q.     So if CBP has to get a warrant to read

13      international mail -- I just want to be sure.

14                  CBP has to get a warrant if it's -- if

15      it's international mail, but a similar               03:25

16      correspondence, if encountered on an individual's

17      electronic device, can be -- can be read without

18      any suspicion at all; is that right?

19           A.     I think that's accurate, what you

20      said.  But, again, our concern is generally on the  03:25

21      contraband that's reasonably -- reasonably suspect

22      to be in that -- that first-class letter mail, and

23      we would open that letter or that -- that envelope

24      to get at the narcotics.

25                  Actually following through with --      03:25

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 279

1                      RANDY JAMES HOWE

2      with a warrant, I have unable to -- to document

3      that we've done that.  And we might work with

4      other agencies, like ICE, HSI, and they may --

5      they may pursue that, but it's not something          03:26

6      that at that stage we're that concerned about.

7      We've intercepted and interdicted the contraband,

8      and often what we will -- what we found is those

9      letters are just a vessel or a sham to get the

10     contraband in.                                        03:26

11             So there's nothing there of value.

12         Q.     Okay.  So when CBP decides it needs to

13     get a warrant for one purpose or the other, be it

14     in the context of international mail or in the

15     context of screening travelers at the border, what   03:26

16     are the procedures that CBP follows when it does

17     so?

18         A.     Again, it's not something we regularly

19     do.  And I'm unable to document us doing that

20     recently, but I'm sure we would be working with      03:27

21     other law enforcement entities, such as HSI under

22     ICE, and working with them to prepare the

23     documentation to justify a warrant.  But we

24     haven't had that necessity.

25         Q.     Are the procedures that officers are      03:27

Page 280

1                    RANDY JAMES HOWE

2     to follow in those situations -- are they written

3     down?

4          A.    They must be.  There's some training.

5          Q.    Where would they be written down?      03:27

6          A.    I'm not sure.  Again, it's practically

7     not done.

8          Q.    And who did you consult in preparing

9     for today's deposition to determine if warrants

10    have been sought by CBP officers in the context we   03:27

11    just discussed?

12         A.    Entities here at our headquarters here

13    in Washington.

14         Q.    Which entities?

15         A.    Container -- CCS -- what's the acronym    03:28

16    for? -- there's an acronym that handles -- there's

17    an office that handles that type of activity.

18         Q.    There's an office that handles

19    oversights of obtaining warrants?

20         A.    No, international mail facilities and     03:28

21    our mail facilities.

22         Q.    Does that entity have procedures in

23    place, presumably written procedures, for

24    obtaining warrants in those circumstances?

25         A.    Oversight from -- from that office;       03:28

Page 286

1                          RANDY JAMES HOWE

2         specific to obtaining warrants?

3              A.    I think I just have to check with --

4         with a few different offices -- I'm not sure who

5         officer training involved -- but maybe just to see    03:58

6         if we do have formal modules that do address it.

7              Q.    Given that this was one of the topics,

8         we'd appreciate a follow-up on that topic.

9                    Before the break, we were talking

10        about obtaining warrants, and I just want to          03:58

11        clarify something.

12                   Does CBP sometimes obtain warrants to

13        search electronic devices?

14             A.    I guess I'm confused.

15                   I don't think so.                           03:58

16             Q.    Well, let's -- the reason I'm asking

17        is, if you look at the device search policy,

18        Exhibit 3, at Page 2, the top paragraph there, the

19        sentence there that -- kind of towards the bottom

20        of that top paragraph that starts after the           03:58

21        parenthetical says, This directive does not limit

22        CBP's authority to conduct other lawful searches

23        of electronic devices, such as those performed

24        pursuant to a warrant.

25                   And I'm wondering if you're aware of        03:59

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 287

1                     RANDY JAMES HOWE

2      instances in which CBP does perform electronic

3      device searches pursuant to a warrant.

4           A.     I'm not aware.

5           Q.     Is there any information or system --    03:59

6           A.     Okay.

7                  Yes -- I'm thinking CBP outside of

8      Office of Field Operations, so other entities,

9      other components: Border Patrol, Air and Marine.

10     There may be instances where they're functioning    03:59

11     outside the -- the border environment where they

12     may need a warrant, but that's not within OFO.

13          Q.     I see.

14                 And do those offices have procedures

15     in place, then, for obtaining warrants to search    03:59

16     electronic devices?

17          A.     I don't know firsthand, but those

18     components do have that authority, and they do --

19     sometimes their mission brings them away from the

20     border, so I would assume that they have training.   03:59

21          Q.     Okay.  Going back to our discussion of

22     envelopes that are being sent through

23     international mail, if an envelope contains, say,

24     a thumb drive on which there's correspondence,

25     does CBP need a warrant in order to access the      04:00

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 298

1                     RANDY JAMES HOWE

2      BY MR. HANDEYSIDE:

3          Q.     Okay.  Just a couple more here.

4                 During the course of conducting an

5      advanced search of an electronic device, CBP is        04:10

6      able to retrieve information that the user may

7      have deleted; is that correct?

8          A.     Anything that's physically resident on

9      the device, we have access to.  So if that

10     includes deleted files and it's physically on the      04:10

11     device, then we would have access to it.

12         Q.     Okay.  And that's consistent with

13     CBP's policy?

14         A.     We can refer to the directive again,

15     but I think it specifies that anything that's          04:10

16     physically resident on the device, we would have

17     access to.

18         Q.     Okay.  Just to clarify, Exhibit 15,

19     the personal search handbook --

20         A.     Yeah.                                        04:11

21         Q.     -- this is still operative?

22         A.     It hasn't been changed, no.

23         Q.     It says July 2004.

24                This is the operative guidance for

25     personal searches?                                     04:11

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 302

1                            E R R A T A

2      WITNESS:   RANDY JAMES HOWE

3      DATE:      March 6, 2019

4      CAPTION:   Alasaad, et al. v. Nielsen, et al.

5      PAGE   LINE    REASON FOR CHANGE:
                      Change to: "CBP is not generally enforcing federal income tax at the border."
6      49     7       Customs officers have the authority to collect Customs duties, taxes, fees,
                      interest, and other charges, see 19 CFR 22.1, and are federal law enforcement
                      officers authorized to enforce federal law in accordance with 19 USC § 1589a.
                      Revision for clarification/accuracy.
7      PAGE   LINE    REASON FOR CHANGE:
                      Change to: "By definition, an alien lawfully admitted for permanent residence
8      80     8       in the United States is not regarded as seeking an admission into the United
                      States for purposes of the immigration laws unless he or she meets one of the
                      criteria set forth in 8 U.S.C. § 1101(a)(13)(C)." In accordance with 8 U.S.C.
9      PAGE   LINE    REASON FOR CHANGE:
                      1101(a)(13)(C), there are certain circumstances in which a lawful permanent
10     ____   ____    resident is treated as an arriving alien seeking admission and subject to the
                      grounds of inadmissibility. See Matter of Pena, 26 I&N Dec. 613 (BIA 2015).
                      Revision for clarification/accuracy.
11     PAGE   LINE    REASON FOR CHANGE:

12     136    4       "technical" to "tactical"; transcription error

13     PAGE   LINE    REASON FOR CHANGE:

14     141    14      "ordinance" to "or advanced"; transcription error

15     PAGE   LINE    REASON FOR CHANGE:

16     214    23      Delete "advanced"; Revision for clarification/accuracy

17     PAGE   LINE    REASON FOR CHANGE:

18     224    5       "a definite" to "indefinite"; transcription error

19     PAGE   LINE    REASON FOR CHANGE:

20     241    12      Add "or national security concern." Revision for clarification/accuracy.

21     PAGE   LINE    REASON FOR CHANGE:

22     243    2       Include at end of response: "...the traveler. The form that is provided to the
                      traveler is the 6051D form and a copy of that form is retained by CBP."
23                    Revision for clarification/accuracy.

24     4/5/19
       DATE                              RANDY JAMES HOWE

25

DISTRICT OF COLUMBIA:  ss
SUBSCRIBED AND SWORN TO BEFORE ME
THIS 15th DAY OF April 2019        TransPefect Legal Solutions
                                   212-400-8845 - Depo@TransPerfect.com
NOTARY PUBLIC
My Commission Expires June 14, 2022

KATARI L. PENTORA
NOTARY
PUBLIC
My Comm Exp
Jun 14, 2022
DISTRICT OF COLUMBIA

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

Page 303

1              ACKNOWLEDGMENT OF WITNESS

2

3          I, _RANDY J. Howe_ , do

4      hereby certify that I have read the foregoing

5      pages, 1 to 299, and that the same is a correct

6      transcription of the answers given by me to the

7      questions therein propounded, except

8      for the corrections or changes in form or

9      substance, if any, noted in the attached errata

10     sheet.

11

12

13     _4/15/19_              _[signature]_

14     DATE                           SIGNATURE

15

16

17

18     Subscribed and sworn to before me

19     this _15th_ day of _April_ , 20_19_.

20

21         My Commission expires:

22     _June 14, 2022_

23

24     _[signature]_

25            Notary Public