# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------X

GHASSAN ALASAAD, et al.,        )

       Plaintiffs,        )

 v.                             ) Civil Action No.

KIRSTJEN NIELSEN, et al.,    ) 17-cv-11730-DJC

      Defendants.        )

----------------------------X

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER

30(B)(6) DEPOSITION OF

UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,

BY AND THROUGH ITS AGENCY REPRESENTATIVE,

DAVID LEE DENTON

Thursday, March 7, 2019 – 8:59 a.m.

Reported by:

Cindy L. Sebo, RMR, CRR, RPR, CSR,

CCR, CLR, RSA, LiveDeposition Authorized Reporter

Job no: 24498

1                       DAVID LEE DENTON

2               Could you tell me what are these other

3      laws?

4          A.     I can tell you that ICE has very broad

5      jurisdiction, and we enforce over 400 laws          09:16

6      relating to border crimes.

7          Q.     What kinds of laws are those that

8      don't fall into the heading of customs,

9      immigration, law enforcement and homeland

10     security?                                            09:16

11         A.     I think most laws would fall under

12     those categories.  I'm not sure I have any

13     specific examples of laws outside of those

14     categories.

15         Q.     Are you aware of laws that are not         09:16

16     among these other laws that justify border device

17     searches?

18         A.     I can't think of any offhand right

19     now.

20         Q.     So suppose, hypothetically, that           09:17

21     someone in the Government suspected a traveler

22     violating tax laws.

23               Would it be appropriate for an SA --

24     let me pause there.

25               When I say "SA," you'll know I mean         09:17

1                    DAVID LEE DENTON

2      ICE special agent?

3           A.    Yes.

4           Q.    Would it be appropriate for an SA to

5      conduct a border device search of a traveler who        09:17

6      is suspected of violation of the tax laws in order

7      to find, for example, e-mails reflecting his tax

8      code violations?

9                 MR. DREZNER:  I'll object on the

10               basis of speculation.                          09:17

11                MR. SCHWARTZ:  Let me just pause

12               there.

13                I appreciate, Mr. Drezner, that your

14               objection has been concise and not a

15               speaking objection.  That's -- that's         09:17

16               absolutely right.  And throughout this

17               deposition, you know, you should ask --

18               excuse me -- you should make whatever

19               objections you feel are appropriate.

20                I will just observe for the record          09:17

21               that I think "asks for speculation" is not

22               a sound objection here.  This is an

23               interrogatory topic about the Government's

24               rules and purposes and how those rules

25               work.  And we have a high-level, ranking      09:18

1                    DAVID LEE DENTON

2           record.)

3                   -  -  -

4           MR. DREZNER:  Same objection.

5           THE WITNESS:  It certainly could be        09:19

6       appropriate if we were working a joint

7       investigation with the Internal Revenue

8       Service.  And in that -- in the

9       furtherance of that investigation, we

10       would conduct a border search of a           09:19

11       traveler to seek that information and

12       evidence.

13   BY MR. SCHWARTZ:

14       Q.    So how about pollution laws?  For

15   example, there might be a law that makes it a     09:19

16   crime for a business to dump toxins into a river.

17   And suppose that an SA had reason to think that a

18   company executive was carrying a device that

19   contained e-mails that were discussing this

20   intentional toxic spill.                          09:20

21           Would that be an issue that it would

22   be appropriate for an SA to conduct a border

23   device search?

24           MR. DREZNER:  Objection:

25       speculative.                                  09:20

1                    DAVID LEE DENTON

2              THE WITNESS:  I believe, in a case

3         like that, we would be working with the

4         Environmental Protection Agency or another

5         agency entitled to enforce that law, and        09:20

6         we would be entitled to conduct a border

7         search to look for evidence of those

8         violations.

9    BY MR. SCHWARTZ:

10        Q.    The same question, but let's say          09:20

11   consumer protection.  There's laws about companies

12   telling the truth about their product in a terms

13   of service.

14              And if a Government investigator

15   thought that the company was lying about the        09:20

16   actual project -- product, would it be appropriate

17   for an SA to conduct a border device search to

18   find evidence of this violation of the consumer

19   protection laws?

20              MR. DREZNER:  Objection:                   09:20

21         speculative.

22              THE WITNESS:  I believe it would be

23         appropriate.  And I know that we enforce a

24         variety of trade laws and would certainly

25         be interested in violations of -- of trade     09:21

                      DAVID LEE DENTON

1

2        in the areas of fraud.

3   BY MR. SCHWARTZ:

4        Q.    So how about bankruptcy laws?  Suppose

5   that the Government suspected that one person was      09:21

6   hiding assets from the Government in the context

7   of bankruptcy, and the SA thought that in

8   conducting a border device search, they might

9   find e-mails reflecting those -- that hiding of

10  assets.                                                09:21

11            Would that be an appropriate scenario

12  for an SA to conduct a border device search?

13            MR. DREZNER:  Objection:

14        speculative.

15            THE WITNESS:  I believe, in that             09:21

16        situation, similar to the -- the first

17        hypothetical, we would be working in --

18        jointly with the IRS on that type of

19        investigation.  And if there were a joint

20        investigation, we would certainly be            09:21

21        entitled to conduct that border search and

22        look for that type of evidence.

23  BY MR. SCHWARTZ:

24        Q.    All right.  I'd like to go back to

25  Exhibit 2, which is the Defendants' First Set of      09:22

1                           DAVID LEE DENTON

2      terrorism and other national security matters,

3      human and bulk cash smuggling, contraband and

4      child pornography.  They can also reveal

5      information -- I'll come back to that phrase --      09:23

6      they can also reveal information about financial

7      and commercial crimes, such as those relating to

8      copyright, trademark and export control

9      violations, closed quote.

10                  Other than my little insertions, did I   09:23

11     read that correctly?

12          A.    Yes, sir.

13          Q.    So does ICE assert an interest --

14     excuse me -- a -- strike that.

15                  Is detection of evidence a legitimate    09:23

16     purpose by ICE in conducting a border device

17     search?

18                  MR. DREZNER:  Objection: vague.

19     BY MR. SCHWARTZ:

20          Q.    Let me pause there.                        09:23

21                  MR. SCHWARTZ:  What aspect of

22             that -- and, again, I appreciate your

23             concise answer -- objection -- what was

24             vague about the question that I just

25             asked?                                        09:24

1                    DAVID LEE DENTON

2              MR. DREZNER:  I'm entitled to make

3         objections when we think there's a

4         relevant objection to be made.  Your

5         question was vague.                        09:24

6              I don't know what -- could you

7         repeat the question?

8              MR. SCHWARTZ:  Cindy, could you read

9         the question back?

10                    -  -  -                         09:24

11              (Whereupon, the court reporter read

12               back the pertinent part of the

13               record.)

14                    -  -  -

15              MR. DREZNER:  Do you want me to       09:24

16         explain?

17              MS. EDNEY:  You don't need to.

18              MR. DREZNER:  I didn't think so.

19              MR. SCHWARTZ:  You certainly have no

20         obligation to explain.                     09:24

21    BY MR. SCHWARTZ:

22         Q.    So, Mr. Denton?

23         A.    I believe detection of evidence is,

24    yes, a valid interest.

25         Q.    Okay.  And how about revealing       09:25

1                    DAVID LEE DENTON

2    information about potential crimes?  Is that a

3    valid purpose of conducting a border device

4    search?

5         A.    I believe it is.                    09:25

6         Q.    Okay.

7               So is some information that is on a

8    device, like a phone or a laptop, itself criminal

9    contraband?

10        A.    It could be.                         09:25

11        Q.    So what is an example of information

12   on an electronic device that could be illegal

13   contraband?

14        A.    So if -- any pictures of sexual

15   activity with a child, by themselves, would be    09:25

16   contraband.

17        Q.    Okay.  So you just referenced

18   sexual -- I think sexual pictures of a child?

19        A.    Correct.

20        Q.    Okay.  So if I say "child             09:25

21   pornography," you'll know that I mean sexual

22   images of a child that are a violation of our

23   nation's child pornography laws?

24        A.    Yes, sir.

25        Q.    Okay.  So is child pornography an     09:26

1                    DAVID LEE DENTON

2       example of a digital file on a device that is,

3       itself, illegal contraband?

4            A.    Yes, sir.

5            Q.    Okay.  What other examples do you know    09:26

6       of files that are, in and of themselves,

7       violations of law?

8            A.    On a laptop, there might be malware

9       exploits that are intended to be injected into

10      U.S. commerce.  I believe that would also be a      09:26

11      violation of law.

12           Q.    Could you just say, you know, two

13      sentences or so about what a malware exploit is?

14           A.    A malware exploit would be software

15      that was designed to be inserted into devices       09:26

16      within the United States in order to cause a

17      ransomware attack, a denial of service attack,

18      other -- to retrieve information that -- that

19      would be unauthorized to have.

20                 So there are any number of different      09:27

21      types of malware.  Some of them could be

22      destructive, some of them could be designed to

23      gain information, but many of them would be

24      illegal to -- to possess.

25           Q.    So far, you've identified child          09:27

1                    DAVID LEE DENTON
2      pornography and malware exploits.
3                    Are you aware of any other examples of
4      digital files that are, themselves, illegal
5      contraband?                                        09:27
6           A.     I believe that, in particular, on the
7      export side, there are many -- there could be
8      documents that would be -- or would contain
9      information that was not allowed to be exported,
10     you know, confidential information from the        09:27
11     Government or from companies that are conducting
12     research in technical areas.  And those might
13     violate export laws.
14          Q.     So you've talked about information
15     that is illegal to be exported under our nation's  09:28
16     export laws such that the information itself on a
17     computer would be illegal contraband; is that
18     fair?
19          A.     Yes, sir.
20          Q.     Okay.  And is there kind of a concise  09:28
21     term that you might use to describe that category
22     of digital contraband, something -- a phrase akin
23     to child pornography or malware exploits?
24          A.     I think the phrase you just used,
25     "digital contraband," would work well.             09:28

1                     DAVID LEE DENTON

2          Q.     Okay.  So other than the three

3     examples you've given now -- the child

4     pornography, the export -- the export control

5     violation and the malware exploit -- are you aware     09:28

6     of any other examples of digital information on a

7     traveler's device that, of itself, would be

8     illegal contraband?

9          A.     That's all I can think of right now.

10         Q.     Okay.  Now, does the Government have       09:29

11    an interest in discovering information on a

12    travel's device that goes beyond these three

13    categories of illegal contraband?

14         A.     Yes.

15         Q.     Okay.  And so that would be the           09:29

16    evidence of crime and information about crime that

17    we talked about earlier that's reflected in the

18    Defendants' answers to the Plaintiffs'

19    interrogatories, correct?

20         A.     Yes, sir, correct.                        09:29

21         Q.     So could you give some examples of

22    digital evidence that the Government has a

23    legitimate purpose in seeking out that it is

24    not -- that is not itself digital contraband?

25         A.     Yes, sir.  Digital evidence would be      09:29

1                    DAVID LEE DENTON

2      anything indicating criminal activity.  And so,

3      for instance, there could be evidence of money

4      laundering resident on a device.

5                    And referring back to your previous        09:30

6      question, in fact, there could be -- like, within

7      certain financial applications, there could be

8      currency in excess of $10,000, which wouldn't be

9      allowed to be exported without being properly

10     reported.                                                09:30

11                   But, in particular, we do a lot of

12     money laundering investigations.  And so that

13     would be an investigation of evidence being

14     resident on the device within various applications

15     and contacts that we would look for.                     09:30

16        Q.    So an example of the legitimate

17     pursuit of information about crime that is not

18     itself contraband would be information about money

19     laundering?

20        A.    Yes, sir.                                       09:30

21        Q.    So what would be an example of

22     information in a device about money laundering

23     that investigator might hope to find?  Would it

24     be, like, an e-mail that says, you know, Dear

25     somebody, This is how we're going to get away with      09:31

1                         DAVID LEE DENTON

2       money laundering?

3               A.      It could be.  That would be very nice

4       if we had such an e-mail.  But more likely, it

5       would be evidence of structuring of deposits, you      09:31

6       know, different accounts that were -- that were

7       being used, evidence of different corporations

8       that were being formed for the purpose of evading

9       currency requirements.

10                      And so there could be a lot of         09:31

11      different things that you might look for on -- on

12      a device in order to gain evidence of money

13      laundering.

14              Q.      So are there any limits on the

15      Government's interest in conducting a border          09:31

16      device search for the purpose of finding evidence

17      of crime, as opposed to criminal contraband

18      itself?

19              A.      I believe all of our searches -- we

20      attempt to be -- to conduct them in a reasonable      09:32

21      manner and to search for evidence of the crime

22      we're particularly interested in in that

23      situation.

24              Q.      So you have described a reasonable

25      manner limitation.                                     09:32

1                       DAVID LEE DENTON

2          Q.     So if it's possible to answer this,

3     what is the frequency that office -- that SAs are

4     conducting border device searches to find

5     contraband as opposed to the frequency that            09:33

6     they're doing these border device searches to find

7     evidence of crime?

8          A.     You know --

9                 MR. SCHWARTZ:  I'm sorry.  One

10          moment.                                           09:34

11                (Counsel confer.)

12     BY MR. SCHWARTZ:

13          Q.     Just to be clear here, this question

14     is directed at the pursuit, as opposed to the

15     results.                                               09:34

16                So I'm just going to repeat the

17     question.

18                What is the frequency that border

19     device searches are being conducted by SAs for the

20     purpose of finding digital contraband, as opposed     09:34

21     to the frequency that their purpose is to find

22     evidence of a crime?

23          A.     We don't aggregate our statistics to

24     elucidate that difference.

25          Q.     So parallel question:  What is the        09:34

1                    DAVID LEE DENTON

2      frequency that special agents, in conducting a

3      border device search, find digital contraband

4      compared to the frequency that they find evidence

5      of crime?                                        09:35

6          A.     We also do not aggregate our border

7      device search statistics in that manner.

8          Q.     So why doesn't the Government maintain

9      statistics about the pursuit of -- strike that.

10             Why doesn't the Government maintain      09:35

11      statistics on the frequency that they find digital

12      contraband, as opposed to evidence of crime?

13          A.     I believe that evidence would be

14      recorded in a report of investigation, but it

15      would not be aggregated statistically and         09:35

16      separated out.  It would require manual effort to

17      go into reports of investigation associated with

18      particular border searches in order to retrieve

19      that information.

20          Q.     So does the Government assert that its  09:36

21      interest in searching a -- or conducting a border

22      device search in order to find evidence of crime

23      extends not just to the person who was suspected

24      of the crime but to another person who is not

25      suspected of crime but who might, nonetheless,    09:36

Page 50

1              DAVID LEE DENTON

2              MR. DREZNER:  Objection.  This is

3          speculative.

4              THE WITNESS:  Another example could

5          be travelers coming into the                09:42

6          United States, and one of them is

7          suspected of being a -- a narcotics

8          smuggler, and part of his method of

9          smuggling might be to use other people

10         along with him and -- as -- as internal      09:42

11         carriers or as -- as people that would be

12         able to provide cover for his crimes.

13 BY MR. SCHWARTZ:

14     Q.    So let me give an example.

15             So suppose there is someone traveling    09:43

16 by themself, and they are known to be business

17 partners with someone who's under investigation

18 for tax fraud.

19             Could the SAs conduct a border device

20 search on this traveler in order to find evidence   09:43

21 of the tax crime that his partner is suspected of?

22             MR. DREZNER:  Objection:

23         speculative.

24             THE WITNESS:  If the agent believes

25         that or has reasonable suspicion that       09:43

1                    DAVID LEE DENTON
2           there would be evidence on that device, I
3           think they would be authorized to -- to
4           search it.
5                (Sotto voce between co-counsel.)          09:43
6                MR. DREZNER:  Can we take a break at
7           this point?
8                MR. SCHWARTZ:  Sure.
9                MR. DREZNER:  Sorry.
10                        -  -  -                          09:45
11                (Whereupon, a recess was taken from
12                 9:45 a.m. to 9:56 a.m.)
13                        -  -  -
14                THE WITNESS:  I would like to make a
15           couple of clarifications on -- on previous   09:56
16           testimony.
17      BY MR. SCHWARTZ:
18           Q.    Please.
19           A.    First, regarding the reasonable
20      suspicion standard, that is for forensic          09:56
21      examinations and does not cover manual
22      examinations, per our guidance.
23                But practically speaking, we're going
24      to be already -- already have a case or be
25      investigating anybody that -- that we do a border 09:57

1                    DAVID LEE DENTON

2    BY MR. SCHWARTZ:

3        Q.    Okay.  So I think you just said that

4    for almost all search -- some significant number,

5    whatever you said, of searches, because you're an        10:00

6    investigative agency, you're going to have

7    reasonable suspicion, correct?

8        A.    Yes, sir.

9        Q.    Okay.  But if you did not have

10   reasonable suspicion and your SA wanted to conduct       10:00

11   a basic search, they would not need reasonable

12   suspicion to conduct that basic search?

13       A.    Yes, sir.

14       Q.    Okay.  I guess while -- so this is a

15   good time, I think, to talk about of the meaning       10:01

16   of the words "basic search" and "advanced search."

17             Can you tell me what those words mean

18   to ICE?

19       A.    We would say a manual search is one

20   where you don't connect any external equipment to       10:01

21   the -- to the device in order to retrieve the

22   data, and then we would call it a "forensic

23   search" if you do connect such a device.

24       Q.    Okay.  So the dichotomy is between a

25   search of the device with the device itself versus       10:01

1                    DAVID LEE DENTON

2     a search of the device using a second device?

3          A.     Yes, sir.

4          Q.     Okay.  And the former category is

5     called "basic"?                                     10:01

6          A.     We would call it a "manual search."

7          Q.     So is there a difference between a

8     manual search and a basic search?

9          A.     When you say "a basic search," I'm not

10    sure what you're referring to.                      10:02

11         Q.     Okay.  So the term that you are using

12    today on behalf of ICE to talk about a search

13    where you don't need reasonable suspicion is a

14    "manual search."

15         A.     Yes, sir.                               10:02

16         Q.     Okay.  And, likewise, the kind of

17    search where you do need reasonable suspicion,

18    because you're using the Government's -- or ICE's

19    device to retrieve information from the traveler's

20    device, the term that you're using for that kind   10:02

21    of search is what?

22         A.     A "forensic search."

23         Q.     A "forensic search."

24                And are you familiar with the term

25    "advanced search"?                                  10:02

1                    DAVID LEE DENTON

2          A.     I believe that's the term that CBP

3     uses in their policy.

4          Q.     Okay.  But the terminology that ICE --

5     that you are using today on behalf of ICE is a          10:02

6     "forensic search" and a "manual search"?

7                    MR. DREZNER:  Objection: asked and

8          answered.

9                    THE WITNESS:  Yes, sir.

10    BY MR. SCHWARTZ:                                         10:02

11         Q.     Okay.

12                   Okay.  So we're going to continue in

13    the discussion of the Government's purposes for

14    conducting searches.

15                   I think we've had a valuable detour to    10:03

16    talk about manual versus forensic searches and the

17    different factual predicate for conducting them,

18    but now I want to get back into the Government's

19    purposes.

20                   We were talking about searching one       10:04

21    person because of suspicion that they had evidence

22    relevant to the possible crimes of another person,

23    correct?

24         A.     Yes, sir.

25         Q.     Okay.  So what about a reporter who is       10:04

1                      DAVID LEE DENTON

2    known to have had contact with a suspected

3    terrorist?  And there is no suspicion about the

4    reporter being a terrorist, but there is suspicion

5    that the reporter's device might contain                10:04

6    information about the terrorist.

7              Does the Government have a legitimate

8    purpose in conducting a border device search of

9    the journalist's device?

10             MR. DREZNER:  Objection:                       10:04

11        speculative.

12             Again, I'll clarify he's only

13        answering on behalf of ICE; and law

14        enforcement privilege.

15             But you can answer, if you're able           10:05

16        to.

17             MR. SCHWARTZ:  And thank you for the

18        clarification.  I keep saying

19        "Government," and I mean ICE.  And I will

20        get that straight.                                 10:05

21             THE WITNESS:  Yes, sir, I believe if

22        the agent has reasonable suspicion that

23        the device would contain evidence relating

24        to terrorist activity, we would have an

25        interest in searching it.  Yes, sir.               10:05

1                    DAVID LEE DENTON

2    BY MR. SCHWARTZ:

3         Q.    So if the SAs had no evidence of

4    crime, but they did have suspicion that the

5    journalist had contact with a terrorist, and the    10:05

6    SAs want to conduct a basic search, they, in fact,

7    would need no reasonable suspicion, correct?

8         A.    Correct.

9         Q.    In that scenario, would the Government

10   have a legitimate purpose in conducting the          10:05

11   no-suspicion search of the device of the

12   journalist?

13             MR. DREZNER:  Objection: vague.

14             THE WITNESS:  I believe they could.

15   BY MR. SCHWARTZ:                                      10:06

16        Q.    So I want to go back to Exhibit 2 for

17   a moment, which is, again, the Government's

18   answers to the first set of interrogatories.  We

19   were looking at it on Page 2 and a paragraph in

20   the middle that begins, As made clear.               10:06

21             As made clear in two rules, border

22   searches of electronic devices are conducted in

23   furtherance of customs, immigration, law

24   enforcement and homeland security

25   responsibilities.                                     10:06

Page 64

1                    DAVID LEE DENTON

2     a suspicion that a particular person was an

3     undocumented immigrant?  And so the ERO

4     deportation officer calls the SA, says, You've got

5     someone at the border; I think they're a suspected   10:13

6     undocumented immigrant.  Can you conduct a border

7     device search?

8                    While the SA has the ultimate power to

9     decide whether or not to conduct the border device

10    search, the SA would take that information from      10:13

11    the ERO officer into account in deciding whether

12    to conduct the border device search, correct?

13                   MR. DREZNER:  Objection: speculative

14         and to scope.

15                   THE WITNESS:  I believe that's         10:13

16         correct, yes.

17    BY MR. SCHWARTZ:

18         Q.    So slightly different scenario:

19    There's a person at the border who's a

20    United States citizen, and the ERO deportation      10:13

21    officer knows that U.S. citizen is associated with

22    a suspected undocumented immigrant.

23                   And the ERO deportation officer calls

24    the SA and says, We would like you to search the

25    device of this U.S. citizen because we think it      10:13

 1                    DAVID LEE DENTON

 2    contains evidence of the undocumented status of

 3    the person we're investigating.

 4              While the SA has ultimate power to

 5    decide whether or not to do a border device          10:14

 6    search, they would take into account the

 7    information they got from the ERO deportation

 8    officer in deciding whether to conduct a border

 9    device search, correct?

10              MR. DREZNER:  Objection:                    10:14

11         speculative.  And I'm going to make a

12         standing objection that these questions

13         are outside the scope, and so his answers

14         are not binding.

15              But you can answer, to the extent           10:14

16         you're able.

17              THE WITNESS:  I believe that the

18         special agent would take that into

19         consideration, yes.

20    BY MR. SCHWARTZ:                                      10:14

21         Q.    And just --

22              MR. SCHWARTZ:  You have done your

23         job of making your objection in a concise

24         manner, and I thank you for that.

25              For the record, the Plaintiffs' view        10:14

1                    DAVID LEE DENTON

2            THE WITNESS:  Those, and possibly

3        others.

4    BY MR. SCHWARTZ:

5        Q.    So what others?                      10:25

6            MR. DREZNER:  Same objection.

7            THE WITNESS:  I -- I can't think of

8        any off the top of my head, but I don't

9        want to preclude cooperation with any

10        U.S. Government element.                   10:25

11    BY MR. SCHWARTZ:

12        Q.    I understand the clarification.  Thank

13    you.

14            So pursuant to these interests of

15    the -- of ICE in conducting border device searches   10:25

16    for national security, for homeland security, for

17    terrorism threat analysis, can ICE search a

18    journalist's reports on national security issues?

19            MR. DREZNER:  Objection:

20        speculative.                               10:26

21            THE WITNESS:  I believe in a border

22        search environment, if we had suspicion

23        that there would be evidence of a crime on

24        there, then -- then I believe, yes, we

25        could.                                     10:26

1                    DAVID LEE DENTON

2    BY MR. SCHWARTZ:

3        Q.    And, likewise, you could do a basic

4    search on that journalist with no suspicion,

5    correct?                                          10:26

6        A.    Yes.

7        Q.    How about a journalist or a scholar

8    whose sources of their work are foreigners who are

9    of interest to the Government in a terrorist

10   investigation?  The Government -- or strike        10:26

11   that -- ICE asserts an interest in searching them

12   in order to find -- let me start that -- that

13   question again.

14            Suppose there's a journalist or a

15   scholar with foreign sources who are of interest   10:27

16   to the Government and that journalist or scholar

17   presents at the U.S. border.

18            ICE asserts that the special agents

19   could search them for -- in order to find

20   information about the foreigner that they are      10:27

21   investigating, correct?

22            MR. DREZNER:  Objection --

23        objection: vague and speculative.

24            THE WITNESS:  If we had an

25        investigative interest, then, yes.            10:27

1                         DAVID LEE DENTON

2              access, depending on the nature of their

3              role within the Agency and their capacity

4              as investigators.

5    BY MR. SCHWARTZ:                                    10:47

6         Q.     Just clearing up a few things.  I

7    believe that you used the word "TECS" in answering

8    your question.

9         A.     Yes.

10        Q.     Is TECS a acronym that is spelled      10:47

11   T-E-C-S?

12        A.     Yes, sir.

13        Q.     Okay.  What is TECS?

14        A.     The acronym, as I understand it,

15   stands for the Treasury Enforcement Communications  10:48

16   System.  It was originally formed by the

17   U.S. Customs Service.

18              And it is -- the acronym may have

19   changed definition since CBP is not under the

20   Treasury Department anymore, so I'm not positive    10:48

21   about the acronym.  But it's generally the system

22   that CBP officers use to place information about

23   travelers.

24        Q.     And ICE special agents who are

25   deciding whether to conduct a border device search  10:48

1                    DAVID LEE DENTON

2    generally have access to the TECS system, correct?

3                    MR. DREZNER:  Objection based on

4         privilege.

5                    You can answer, if you're able to do          10:48

6         so.

7                    THE WITNESS:  They could receive

8         information from CBP about TECS or they

9         could have access themselves.

10   BY MR. SCHWARTZ:                                             10:48

11        Q.    And as a general matter, an SA who

12   wants access to TECS can get it either directly or

13   through CBP?

14        A.    CBP grants the access, as far as I'm

15   aware.                                                       10:49

16        Q.    So just to be clear here, your answer

17   talked about different units of SAs, you know, in

18   different functions, like airport or, you know,

19   ground or port of entry -- a land-based border

20   port of entry.                                               10:49

21             My question is concerned with all of

22   the SAs at all of the ports of entry who might

23   want to do a border device search.

24             As a general rule, if they want

25   information about the traveler that is in TECS,              10:49

1                    DAVID LEE DENTON

2    they have access to TECS, correct?

3                MR. DREZNER:  Objection: vague.

4                THE WITNESS:  They can get access to

5        TECS, yes.                                   10:50

6    BY MR. SCHWARTZ:

7        Q.    And if an SA has access to the

8    advanced -- strike that.

9                If an SA has access to the Automated

10   Targeting System, would they have that access    10:50

11   through TECS, or would they have it through some

12   other means?

13               MR. DREZNER:  Objection: it's vague.

14        And I believe he already answered that he

15        doesn't know the answer to this question.    10:50

16               THE WITNESS:  I'm not certain how

17        the system works -- how the ATS system

18        works, but I believe that access would be

19        granted from CBP.  Whether through --

20        through TECS or some other mechanism, I'm    10:50

21        not sure.

22   BY MR. SCHWARTZ:

23        Q.    Okay.

24               So we've kind of established what TECS

25   is and how information might have been uploaded   10:50

1                    DAVID LEE DENTON

2       investigation of this traveler?

3            A.     Yes, sir.

4            Q.     Okay.  And if the ICE officer in that

5       situation was making a decision whether to conduct    11:13

6       a border device search and they felt that

7       information in the CBP ATS system would help them

8       make that decision, the ICE SA would be able to

9       get that ATS information, correct?

10           A.     I believe they could, yes.              11:14

11           Q.     Okay.  So I would like to turn back to

12      Exhibit 1 of the deposition, which is the list of

13      topics -- it's the notice of the deposition on the

14      first page, and the second page is a list of

15      topics.                                              11:14

16                  And I'm going to identify two topics

17      that my next set of questions are relevant to that

18      are kind of overlapping.

19                  So Topic Number 1, do you see, it

20      says, Policies, practices?                           11:14

21           A.     Yes.

22           Q.     Okay.  So I'm going to read it out

23      loud.

24                  One, Policies, practices, and training

25      regarding the basis to search or seize electronic    11:14

1              DAVID LEE DENTON

2              Did I read that correctly?

3      A.     Yes, sir.

4      Q.     So just backing up a moment so I

5  understand the milieu within this -- this answer      11:18

6  makes sense, when would an ICE officer be in a

7  position to conduct a border device search?

8      A.     I believe that an ICE agent would be

9  in a position to conduct a border device search

10 anytime they have an investigative interest or       11:19

11 belief that there would be information on that

12 device that would help further our investigation.

13     Q.     So turning to the discussion we had

14 immediately after the break, where you made an

15 important clarification, I gather that there are      11:19

16 some situations where the traveler is referred by

17 CBP over to ICE, and in that situation, the ICE SA

18 might conduct a border device search?

19     A.     Yes, sir.

20     Q.     And there's also a scenario where the     11:19

21 ICE SA already has an open investigation of a

22 traveler, and, likewise, the SA might -- when that

23 traveler appears at the border, might be in a

24 position to conduct a border device search?

25     A.     Yes, sir.                                  11:19

1                    DAVID LEE DENTON

2        Q.     So of the ICE employees who are at

3    ports of entry potentially conducting border

4    device searches, is it just the SAs, or are there

5    other staff, such as forensic specialists, who          11:20

6    might be doing the -- the border device search at

7    the border, at the port of entry?

8        A.     The only people who would conduct a

9    forensic search at the border would be people who

10   are specifically trained for it, CFAs, generally       11:20

11   speaking.

12       Q.     And, again, the CFA is a computer --

13   what is a CFA?

14       A.     A computer forensic agent or a

15   computer forensic analyst.                              11:20

16       Q.     Okay.  So does the term "CFA" include

17   both of those?

18       A.     Yes.

19       Q.     Okay.  So we may have covered this

20   before, so I apologize.                                 11:20

21              A -- can an SA be a CFA?

22       A.     Yes.

23       Q.     And so for an SA to become a CFA, they

24   probably go through some additional kind of

25   training in order to be certified as competent to      11:20

1                    DAVID LEE DENTON

2    investigation and the deciding whether or not to

3    do the border device search, are family

4    relationships between the traveler and someone

5    else a factor that the SA might consider in          11:48

6    deciding whether to do the search -- the border

7    device search?

8              MR. DREZNER:  Objection: vague and

9         speculative.

10             THE WITNESS:  I guess that a            11:48

11        relationship between criminals could be a

12        factor.  And to the extent that criminals

13        could be members in the same family, it

14        could be.

15   BY MR. SCHWARTZ:                                 11:48

16        Q.    So what if the traveler was not

17   suspected of a crime, but they were related to a

18   person who was the subject of a ICE investigation?

19             Would that be a basis for ICE,

20   potentially, to conduct the border device search   11:48

21   of the -- the traveler before them?

22             MR. DREZNER:  Objection: vague and

23        speculative.

24             THE WITNESS:  By itself, I don't

25        believe that would -- would be a basis,     11:48

1                    DAVID LEE DENTON

2           but in conjunction with other factors, it

3           could be.

4    BY MR. SCHWARTZ:

5           Q.    So the same scenario:  It's the          11:49

6    traveler who is the subject of the investigation,

7    deciding whether to do a border device search.

8                 Is their travel history a factor that

9    might be considered in deciding whether or not to

10   do a border device search?                            11:49

11               MR. DREZNER:  Objection:

12           speculative.

13               THE WITNESS:  I suppose the travel

14           history could be a subject -- or could be

15           a factor in the decision to make a border    11:49

16           search.

17   BY MR. SCHWARTZ:

18           Q.    So suppose the traveler is a

19   nationalized U.S. citizen -- the same matrix:

20   there's an investigation, they're deciding whether   11:49

21   to do a border device search.

22                 Is their nation of birth potentially a

23   factor that might be considered in whether or not

24   to do a border device search?

25               MR. DREZNER:  Objection: vague and        11:49

1                    DAVID LEE DENTON

2        A.    I think you would -- "broadcast

3   message" just meant that it was sent out to

4   everybody and not to a specific location.  So it's

5   a message.                                        12:12

6        Q.    Okay.  So was this message sent to all

7   special agents and CFAs who might do border device

8   searches?

9        A.    Yes.

10        Q.    Okay.  So from the perspective of a SA  12:12

11   or CFA who potentially has in front of them two

12   different documents, one of which is Exhibit 5,

13   which is the 2009 directive, which says you never

14   need reasonable suspicion, and the other is the

15   2018 message, which says, for forensic searches --  12:12

16   well, it says whatever it says about reasonable --

17   about -- it says whatever it says.

18             Which one is the -- which one is

19   controlling on the special agents?

20        A.    The broadcast message is controlling.   12:12

21        Q.    And that would be understood by all

22   the special agents?  There's some kind of

23   understanding that a more recent broadcast message

24   trumps an older directive?

25        A.    Yes.                                    12:13

1                    DAVID LEE DENTON

2          A.    Yes.

3          Q.    And what are those systems?

4          A.    CBP has a variety of systems.  I think

5   we previously discussed ATS.  There's the APIS,        01:12

6   Advanced Passenger Information System; there's

7   ACS, the Automated Cargo [sic] System.

8                Outside of CBP, there are -- ICE

9   maintains its own databases.  We have what's

10  called ICM, the Investigative Case Management          01:13

11  system.  And ICM is the repository for pretty much

12  all of our case information, including our subject

13  records and reports of investigation.

14               I think those would be the primary

15  databases that -- that ICE agents would use to         01:13

16  have information about -- about travelers.

17         Q.    So you mentioned the ATS; you also

18  mentioned APIS.

19               What does APIS stand for?

20         A.    The Advanced Passenger Information         01:13

21  System.

22         Q.    Is that -- what agency manages the

23  APIS system?

24         A.    I believe CBP.

25         Q.    Is that different than the TECS           01:13

1                          DAVID LEE DENTON

2      data from -- from that company or from the

3      country, generally.

4                There's a lot of trade information

5      that's in there that would affect trade          01:16

6      investigations.

7           Q.    So -- in the context of a trade

8      investigation -- trade -- information in the ACS

9      could be helpful to an SA in deciding whether to

10     conduct a border device search?                   01:16

11          A.    Yes.

12          Q.    And so who -- what Government agency

13     manages the ACS?

14          A.    I believe CBP.

15          Q.    And what information is in the ACS?     01:16

16          A.    It's not information about persons;

17     it's information about cargo and shipments and

18     merchandise that's imported or exported.

19          Q.    Okay.

20                So you also mentioned the system known  01:16

21     as, I think you said, Investigative Case

22     Management?

23          A.    Yes.

24          Q.    And that is ICM?

25          A.    Yes.                                    01:17

1                    DAVID LEE DENTON

2        Q.     And ICM is a system that is operated

3    by ICE?

4        A.     Yes, sir.

5        Q.     And SAs who are deciding whether or        01:17

6    not to conduct a border device search would have

7    access to the information that's in the ICM?

8        A.     Yes, sir.

9        Q.     And information in the ICM, in some

10   cases, will be relevant to the SA's decision          01:17

11   whether to conduct a border device search?

12       A.     Yes, sir.

13       Q.     Okay.  And so what kind of information

14   is in the ICM?

15            MR. DREZNER:  Objection on the basis         01:17

16       of privilege.

17            You can answer, to the extent you

18       can do so in a nonprivileged way.

19            THE WITNESS:  So there could be a

20       wide variety of information contained in          01:17

21       ICM, but primarily, it would be reports of

22       investigation and subject records.

23   BY MR. SCHWARTZ:

24       Q.     What's the difference between a report

25   of an investigation and a subject record?            01:17

1                    DAVID LEE DENTON

2        A.    A subject record would be linked to a

3   report of investigation and it would identify

4   persons or objects that are connected to the

5   investigation.                                    01:18

6        Q.    So a subject record is a subset of the

7   report of investigation?

8        A.    Yes, sir, I think you could say that.

9        Q.    Okay.  Would, in some cases, reports

10  of investigate -- well, strike that.              01:18

11             Other than reports of investigation

12  and subject records, are there other categories of

13  information that are in the ICM that are available

14  to the SAs at the border?

15             MR. DREZNER:  Objection on the basis   01:18

16        of law enforcement privilege.

17             You can answer, if you're able to do

18        so.

19             THE WITNESS:  I don't think I can

20        expound further on the -- the subject        01:18

21        matter within ICM.

22  BY MR. SCHWARTZ:

23        Q.    Because of the privilege or because

24  you don't know if there's more?

25        A.    I believe there is more, but I am not  01:18

1                    DAVID LEE DENTON

2    sure I can say exactly, you know, what it is.

3    Because I know that there are a variety of -- of

4    records that are kept in ICM.

5         Q.    Okay.  And please answer this question    01:19

6    as literally stated:  The reason -- the reason why

7    you can't say more is because saying more would

8    intrude on the law enforcement privilege or

9    because you don't know the answer?

10        A.    I think a combination of both.          01:19

11        Q.    Okay.  I'm going to move on from

12   there.

13              The ICM -- might it contain

14   information about prior encounters between ICE and

15   the person at the border?                          01:19

16        A.    It would contain that information

17   within reports of investigation, yes.

18        Q.    Okay.  And might it contain

19   information about whether or not the traveler was

20   sent a secondary screening?                        01:20

21        A.    That information would be in those

22   reports, yes.

23        Q.    Would it contain information about

24   whether or not there had been a bag search of the

25   traveler?                                          01:20

1                    DAVID LEE DENTON

2         A.     Any border search that was conducted

3    would be recorded, yes.

4         Q.     And that would include a bag search?

5         A.     It would include a bag search, yes.        01:20

6         Q.     How about a pat-down/frisk of the

7    traveler?  Would that be -- if it happens, would

8    that be reported in the ICM system?

9         A.     ICE -- again, our situation at the

10   border is very different than CBP, and we would      01:20

11   not be conducting a pat-down or a frisk of anybody

12   at the border unless we were going to arrest them

13   and then take them to jail for evidence that we

14   found.  So it's not a situation that would occur.

15        Q.     Well, thank you for that                 01:20

16   clarification.  It shows my lack of knowledge of

17   your system compared to your knowledge of your

18   system.

19               How about a search -- a search of

20   someone's device at the border?  That would be      01:21

21   reflected in the ICM system?

22        A.     It would be, yes.

23        Q.     And all of that information that we've

24   just gone through -- the previous encounter, the

25   secondary screening, the search of the bag, the     01:21

1               DAVID LEE DENTON

2    search of the electronic device -- all of that

3    information, through the ICM, would be available

4    to the SA at the border who is deciding whether or

5    not, in real-time, to conduct a border device          01:21

6    search of the traveler, correct?

7          A.    Yes.

8          Q.    And all of that information would be

9    relevant to the decision whether to conduct the

10   border device search, correct?                          01:21

11              MR. DREZNER:  Objection:

12         speculative.

13              THE WITNESS:  I think all of those

14         factors could be relevant.

15   BY MR. SCHWARTZ:                                         01:21

16         Q.    Would the travel history of the person

17   at the border be reflected in the ICM?

18              MR. DREZNER:  Objection.  I think

19         that was asked and answered.

20              THE WITNESS:  I believe that it              01:22

21         would be or could be reflected in ICM, but

22         travel history is generally maintained by

23         CBP in the TECS system.

24   BY MR. SCHWARTZ:

25         Q.    And as we discussed before, in some         01:22

1                    DAVID LEE DENTON

2    circumstances, that information of the TECS system

3    might be made available to the -- the ICE SAs?

4         A.    Yes, sir.

5         Q.    So the information in the              01:22

6    Investigative Case Management -- I'm sorry.  Is it

7    just ICM or is it case management system --

8         A.    ICM is fine.

9         Q.    ICM.  Okay.

10              The information in the ICM about a      01:22

11   border device search of a traveler in the past --

12   might that contain content from the traveler's

13   device?

14              MR. DREZNER:  Objection on the basis

15         of privilege law enforcement.              01:23

16              But you can answer, if you can do so

17         in a nonprivileged way.

18              THE WITNESS:  Information about what

19         was found in a search might be contained

20         within a report of investigation, but the  01:23

21         contents of the search themselves would

22         not be maintained in ICM.

23   BY MR. SCHWARTZ:

24         Q.    Okay.  So I'm just going to read back

25   your answer.  Quote:                            01:23

1                    DAVID LEE DENTON

2      of that, it's not put into ICM itself, but a

3      description of it might be put into ICM in the

4      form of a report of investigation.

5           Q.     Thank you.  That was very helpful.        01:26

6                  If I can just try to summarize, it

7      sounds like you're saying the evidence itself, in

8      the sense of, like, the 1s and 0s, don't go into

9      the ICM -- they go into a different storage

10     system -- but a description of the -- the             01:26

11     information, as in, you know, an officer's

12     narrative/description of what they saw, might go

13     into the ICM; is that correct?

14          A.     Yes, sir.

15          Q.     Okay.  So the description by the           01:26

16     officer that goes into the ICM, it might be -- if

17     they're describing, for example, a -- a written

18     message, it might be a employee's summary of what

19     they saw.  So they might get the gist of a longer

20     message by being described more concisely.            01:27

21                 MR. DREZNER:  Objection: vague and

22            speculative.

23                 THE WITNESS:  That's correct, they

24            might have a verbatim transcript of a

25            conversation, for instance, if it was a        01:27

1                    DAVID LEE DENTON

2           child pornography investigation and they

3           wanted to put in their report the specific

4           language that was used by -- by the

5           suspect; or it might just be a description    01:27

6           of -- of a conversation; or it might say

7           that they, for instance -- continuing with

8           the same example -- looked at many

9           pictures of child pornography on the

10          phone, and it might describe them; or it      01:27

11          might just state they were encountered

12          and, you know, held as evidence, something

13          like that.

14    BY MR. SCHWARTZ:

15          Q.    So it could be a verbatim recitation    01:28

16    of written information, correct?

17          A.    Correct.

18          Q.    And it could be a summary of written

19    information, correct?

20          A.    Correct.                                01:28

21          Q.    And it could be a description of a

22    photograph, correct?

23          A.    Correct.

24          Q.    And when we talk about the written

25    materials that could be verbatim or summarized,     01:28

1                         DAVID LEE DENTON

2        that could be an e-mail, correct?

3        A.      Yes.

4        Q.      It could be a text message, correct?

5        A.      Correct.                                01:28

6        Q.      It could be a posting on social media?

7        A.      Correct.

8        Q.      It could be basically anything in

9     writing that one might find inside someone's

10    laptop or cell phone or other device?            01:28

11       A.      Yes.

12       Q.      Okay.  And all of that information --

13    that is, the officer's description of the content

14    of the person's electronic device that is reported

15    in the Investigative Case Management and which is  01:28

16    available to the SA at the border who is making

17    the decision whether or not to conduct a border

18    device search -- all of that information is

19    relevant to whether or not to conduct a new border

20    device search, correct?                           01:29

21             MR. DREZNER:  Objection: form and

22          speculative.

23             THE WITNESS:  I believe that

24          information could be relevant, yes.

25

1                    DAVID LEE DENTON

2              MR. SCHWARTZ:  Okay.  What the

3         Plaintiffs want to know -- and I'm going

4         to begin by directing this question to

5         Mr. Denton, and if Mr. Denton -- we'll see      01:50

6         if Mr. Denton knows.

7    BY MR. SCHWARTZ:

8         Q.    Mr. Denton, could you maybe look first

9    at Exhibit 7 and then Exhibit 9 and tell me

10   whether or not these are the same document,          01:50

11   except one is -- Number 7 is more redacted and

12   Number 9 is less redacted?

13        A.    I don't see Number 7 handy, but --

14              MR. DREZNER:  Here you go.

15              THE WITNESS:  -- yes, the -- one is       01:50

16        clearly more redacted than the other.

17   BY MR. SCHWARTZ:

18        Q.    And aside from the redactions, they

19   are the same document?

20        A.    Yes, sir.                                 01:50

21        Q.    Okay.  So is this document, this

22   message, as reflected in Exhibit 7 and 9, the

23   current -- currently in force as to the SAs when

24   deciding whether and how to conduct border device

25   searches?                                            01:51

1                    DAVID LEE DENTON

2         A.     Yes, sir, this is current policy.

3         Q.     This is current policy?

4         A.     Yes, sir.

5         Q.     All right.  Let's move along.          01:51

6                All right.  I'd like to turn, please,

7    back to Exhibit -- I'm sorry -- Exhibit 4, which

8    is the Defendants' third set of interrogatory

9    answers, and ask, Mr. Denton, please, to turn to

10   Page 7.                                            01:52

11               And do you see, towards the bottom, it

12   says, Interrogatory Number 17?

13        A.     Yes, sir.

14        Q.     Okay.  So I'm going to read the first

15   sentence.                                          01:52

16               Explain whether and under what

17   circumstances border officers employed by

18   Defendants search or confiscate travelers'

19   electronic devices at the request of any other

20   federal, state or local government, department,    01:52

21   agency or entity, closed quote.

22               Did I read that correctly?

23        A.     Yes, sir.

24        Q.     Okay.

25               Will you please turn to the next page?  01:52

1                    DAVID LEE DENTON

2                    And I'd like -- Page 8.  And I'd like

3      you to turn to the paragraph at the bottom that

4      begins, ICE states that ICE.

5                    Do you see that?                        01:53

6      A.      Yes, sir.

7      Q.      Okay.  So I'm going to read aloud this

8      paragraph.

9                    ICE states that ICE special agents

10     make independent determinations of the -- on the    01:53

11     jurisdiction, justification, and necessity for

12     every border search they undertake.  While

13     information provided to ICE by other law

14     enforcement agencies may inform an ICE special

15     agent's decision to perform a border search of an   01:53

16     electronic device, ICE conducts border searches to

17     further ICE investigations and pursue ICE's law

18     enforcement mission and does not conduct border

19     searches or detain electronic devices at the

20     request of any other agency, closed quote.          01:53

21                   Did I read that correctly?

22     A.      Yes, sir.

23     Q.      So it is correct that information

24     provided to ICE by other law enforcement agencies

25     may inform an ICE special agent's decision to       01:53

1                    DAVID LEE DENTON

2      perform a border search of an electronic device,

3      correct?

4          A.     Yes, sir.

5          Q.     Okay.  So suppose that an officer from     01:53

6      another agency was to communicate with an SA at

7      the border, and the SA is interacting with the

8      traveler.  And the officer from the other agency

9      says, I'm investigating this traveler.  It would

10     help my investigation if you looked inside their     01:54

11     devices for a particular kind of evidence.

12              Now, as is clear here, you don't

13     automatically do anything for another agency, but

14     the fact that another agency is investigating them

15     and wants the information -- that is a fact that     01:54

16     would be relevant to the SA in deciding whether or

17     not to conduct a border device search, correct?

18              MR. DREZNER:  Objection: form;

19          vague; speculative.

20              THE WITNESS:  Yes, sir, that would     01:54

21          be a factor; but I would add that if

22          another agency contacted us, we, you know,

23          would decide if we had an ICE interest in

24          what they were investigating, if there

25          was, you know, a crime under our     01:54

1                       DAVID LEE DENTON

2          jurisdiction that would justify a joint

3          case.  And if there was, we would open up

4          a joint case.

5                And what they're looking for would          01:55

6          be a factor in whether we would do a

7          border search, but it would primarily be

8          if we could find evidence of whatever

9          violations we're looking for.

10   BY MR. SCHWARTZ:                                         01:55

11      Q.     All right.  So you get the kind of

12   request from the other agency I described.

13                And in the first instance, the SA is

14   going to decide whether or not this is a matter

15   that falls within ICE's enforcement jurisdiction,       01:55

16   correct?

17      A.     Correct.

18      Q.     And if it does, then the fact that

19   this other agency out there is doing an

20   investigation and wants the search done, that           01:55

21   would be a factor that would inform the SA's

22   decision whether to conduct the border device

23   search, correct?

24                MR. DREZNER:  Objection: vague and

25          speculative.                                      01:55

1                    DAVID LEE DENTON

2              THE WITNESS:  Yes, I believe that's

3         correct.

4    BY MR. SCHWARTZ:

5         Q.    So there are some cases where a          01:55

6    traveler is at the border and the SA is interested

7    in them where they would not search the device but

8    for this kind of request from the other agency,

9    correct?

10             MR. DREZNER:  Objection: vague and       01:56

11        speculative.

12             THE WITNESS:  I don't think I can

13        narrow it down that much.

14   BY MR. SCHWARTZ:

15        Q.    So isn't it possible that there's a      01:56

16   traveler who presents at the border and there is

17   no query about them from another agency, and you

18   would let them enter the country without a border

19   device search; but if there is the query from a

20   agency that says, We're investigating them, and     01:56

21   the process we talked about before, where it would

22   result in a search where there wouldn't have been

23   one before?

24             MR. DREZNER:  Objection: calling for

25        hypothetical; speculative.                     01:56

1                    DAVID LEE DENTON

2              THE WITNESS:  So I think the way the

3         process works would be if we're contacted

4         and asked to open up a case on an

5         individual as part of a joint                    01:57

6         investigation and we did open up that

7         case, and a traveler showed up at the port

8         of entry, you know, or -- or as -- on an

9         airplane, or however they show up, and

10        then we're -- we're alerted that they're       01:57

11        there -- so the case agent would decide

12        whether to respond and interview the

13        person.  And they could decide whether to

14        conduct a border search or not based upon

15        the needs of the case.                          01:57

16   BY MR. SCHWARTZ:

17        Q.     Okay.

18              So I think I understand the way the

19   process works.  I'd like to explore which non-ICE

20   agencies we're talking about here.                   01:57

21              If we could turn back to Exhibit 4,

22   the final paragraph on Page 8.

23              The clause that I focused here is

24   information -- so this is -- I see you're looking

25   for it, so I'll pause while you find it.             01:58

1                    DAVID LEE DENTON

2              MR. DREZNER:  Here, this one

3          (indicating).

4              THE WITNESS:  Sorry.

5              (Pause.)                          01:58

6    BY MR. SCHWARTZ:

7          Q.    That's no problem.  It's my job to

8    move at the pace so you can read along.

9              So on Page 8, the final paragraph, the

10   second line, there's a sentence that begins While.  01:58

11             Do you see that?

12         A.    Yes.

13         Q.    Okay.  It says -- so Information

14   provided to ICE by another law enforcement

15   agency -- or by other law enforcements agencies    01:58

16   may inform an ICE special agent's decision to

17   perform a border search of an electronic device.

18             So I would like to know the meaning of

19   law enforcement agencies.

20             What are those?                   01:58

21         A.    Well, there -- I would say there are

22   many state and Federal law enforcement agencies

23   that we work with.  So that could be ATF, the

24   Bureau of Alcohol Tobacco and Firearms; it could

25   be IRS, the Internal Revenue Service; it could be  01:59

1                      DAVID LEE DENTON

2      the Secret Service; it could be the FBI; it could

3      be any number of state or local law enforcement

4      agencies.

5           Q.    Okay.  So you named some Federal law      01:59

6      enforcement agencies, specifically ATF, IRS,

7      Secret Service, FBI.

8                 So those are among the law enforcement

9      agencies who might provide information that's

10     relevant to the decision about whether to search a   01:59

11     traveler -- to do a border device search of a

12     traveler?

13                MR. DREZNER:  Objection to the

14          extent it mischaracterizes prior

15          testimony.                                       01:59

16                THE WITNESS:  I believe that's

17          generally correct.

18     BY MR. SCHWARTZ:

19          Q.    And without going through them all, I

20     imagine there are other Federal law enforcement      01:59

21     agencies between these four who, likewise, if they

22     provided information to ICE SAs, those SAs might

23     find it relevant to whether to do a border device

24     search?

25                MR. DREZNER:  Objection:                  01:59

1                    DAVID LEE DENTON

2          speculative.

3                  THE WITNESS:  Again, assuming that

4          ICE had opened up an investigation along

5          with them and was pursuing an ICE case or     02:00

6          an HSI case.

7    BY MR. SCHWARTZ:

8          Q.    Okay.  So how about the State

9    Department, the Federal -- the U.S. State

10   Department?                                          02:00

11                 MR. DREZNER:  Objection: vague.

12                 THE WITNESS:  There are a couple of

13         State Department investigative components,

14         the -- the DSS, the Diplomatic Security

15         Services; and then, of course, there's the    02:00

16         State Department Office of the

17         Inspector General.

18                 There's probably others, but that's

19         all I can think of right now.

20                 So if we had a case that was a joint   02:00

21         case along with State Department or one of

22         those components, then we would possibly

23         conduct a border search pursuant to that

24         investigation.

25

1                    DAVID LEE DENTON

2    BY MR. SCHWARTZ:

3        Q.    Okay.  So pivoting from Federal, you

4    mentioned state and local.

5            So I assume that means, like, state        02:01

6    police and local municipal police departments and

7    county sheriffs?

8        A.    Yes, sir.

9        Q.    Okay.  How about foreign governments?

10           MR. DREZNER:  Objection to the            02:01

11       extent it calls for privileged

12       information.

13           But you can answer, if you can do so

14       in a nonprivileged way.

15           THE WITNESS:  We sometimes conduct        02:01

16       joint investigations with foreign law

17       enforcement.

18   BY MR. SCHWARTZ:

19       Q.    And information from foreign law

20   enforcement in those investigations might be        02:01

21   relevant to an SA in deciding whether or not to

22   conduct a border device search, correct?

23           MR. DREZNER:  Objection:

24       speculative.

25           THE WITNESS:  Correct.                     02:01

1                    DAVID LEE DENTON

2    BY MR. SCHWARTZ:

3        Q.    How about private corporations that

4    are doing law enforcement work either as

5    contractors or as their own kind of internal          02:01

6    security?

7        A.    Well, I can't envision where we would

8    have a joint investigation with anything that

9    wasn't a law enforcement agency.

10       Q.    So can you imagine a scenario where a        02:02

11   private corporation has information that is

12   provided to an SA that the SA finds relevant to

13   the decision whether or not to conduct a border

14   device search?

15            MR. DREZNER:  Objection: calling for          02:02

16       a hypothetical.

17            THE WITNESS:  Yes, I can imagine

18       that we have sources of information,

19       public and private.  And those can be --

20       they can span a wide variety of -- of           02:02

21       people, of corporations, business

22       interests.  And that would -- information

23       from prior entities would certainly be one

24       consideration that could enter into an

25       agent's determination of reasonable             02:02

1                    DAVID LEE DENTON

2          suspicion.

3    BY MR. SCHWARTZ:

4          Q.     So I think you just said that there

5    are a variety of private entities who might have     02:02

6    information that would be relevant to the decision

7    whether to do a border device search.

8                 Can you give some examples of the

9    kinds of private entities and the kinds of

10   private -- the kinds of information from them?       02:03

11                MR. DREZNER:  Objection to the

12           extent it mischaracterizes testimony.

13                And objection on the basis of law

14           enforcement privilege.

15                But you can answer, if you can do so     02:03

16           in a nonprivileged way.

17                THE WITNESS:  So, for example, an

18           HSI agent might have a confidential

19           informant that would have information on a

20           particular narcotic smuggling ring, so       02:03

21           would provide that information to the

22           special agent.

23                And that, by itself, might not be

24           enough to create reasonable suspicion for

25           a particular traveler, but combined with      02:03

1                    DAVID LEE DENTON

2           other circumstances, it might.

3     BY MR. SCHWARTZ:

4           Q.    So besides a confidential informant,

5     what other kinds of private entities might have      02:03

6     the relevant information for a border device

7     search?

8                 MR. DREZNER:  Same objections.

9                 THE WITNESS:  So there are private

10          citizens who see criminal activity and        02:04

11          would like to report it to law

12          enforcement.  And they don't expect

13          compensation for it, but they provide it

14          simply to help law enforcement.

15          And that would be another situation           02:04

16          where an agent might receive information

17          from any member of the public regarding

18          criminal activity.

19    BY MR. SCHWARTZ:

20          Q.    Would it be fair to -- to describe the   02:04

21    people in the scenario you just have, as

22    witnesses?

23          A.    They could be witnesses.

24          Q.    Or unpaid reporters of information?

25                I just want to know what -- how to       02:04

1                    DAVID LEE DENTON

2        concisely describe that person.

3            A.     I think they're just -- they fall into

4        so many different categories, it could be tough to

5        limit it.                                        02:04

6            Q.     Okay.  So besides the most recent

7        scenario and the confidential informants, what

8        other private information -- or information from

9        private entities would feed into the SA's decision

10       whether or not to do a border device search?    02:05

11               MR. DREZNER:  Objection on the basis

12           of law enforcement privilege.

13               But you can answer, if you can do so

14           in a nonprivileged way.

15               THE WITNESS:  So perhaps in a fraud     02:05

16           investigation, one business might want to

17           report their competitors for engaging in

18           fraudulent business practices or report

19           that there were intellectual property

20           rights violations being conducted by        02:05

21           another business, or something along those

22           lines.

23               And that would be a factor that

24           might give an agent reasonable suspicion

25           for a border search.                         02:05

1              DAVID LEE DENTON

2          So is it the case that in some cases,

3    ICE may search a traveler because he's the subject

4    of a flag or lookout in TECS from another agency?

5          MR. DREZNER:  Object on the basis of      02:10

6          law enforcement privilege.

7          But you can answer, if you can do so

8          in a nonprivileged way.

9          THE WITNESS:  So HSI might request a

10         lookout to be put into TECS in order to      02:10

11         have a traveler stopped at the border and

12         interviewed and possibly searched in order

13         to further their investigation.

14         So in that respect, yes, TECS is the

15         system of record that CBP uses for -- you    02:10

16         know, to record cases that -- that HSI has

17         an interest in.

18         So we would use that system to have

19         them stopped, and then they would be

20         referred into secondary, as you described    02:10

21         earlier.  And then HSI would respond and

22         interview and possibly do a -- do a border

23         search of their devices.

24    BY MR. SCHWARTZ:

25         Q.    So I think I heard you just say --     02:11

                    DAVID LEE DENTON

1

2      correct me if I'm wrong -- that HSI special agents

3      might place a flag on a person in the TECS system,

4      correct?

5           A.    Yes.  They would request that CBP put      02:11

6      that flag or that lookout into the system.

7           Q.    Is there a difference between a flag

8      and a lookout?

9           A.    Not that I know of.

10          Q.    Okay.  So if I use one or the other,     02:11

11     you'll know what I'm talking about?

12          A.    Yes.

13          Q.    So HSI will ask -- can ask CBP to put

14     a flag on a traveler in TECS, correct?

15               MR. DREZNER:  Objection: asked and         02:11

16          answered.

17               THE WITNESS:  Correct.

18     BY MR. SCHWARTZ:

19          Q.    Okay.  And what is the result of that

20     flag in TECS when the traveler presents at the        02:11

21     border?

22               MR. DREZNER:  Objection on the basis

23          of law enforcement privilege.

24               But you can answer, to the extent

25          you can do so in a nonprivileged way.            02:12

1                    DAVID LEE DENTON

2              THE WITNESS:  I believe that the

3          inspector at the border would be notified

4          that there was a lookout on that person.

5    BY MR. SCHWARTZ:                                02:12

6         Q.    When you say "the inspector," you mean

7    an employee of ICE?

8         A.    No; an employee of CBP.

9         Q.    So the CBP inspector at primary?

10        A.    Yes.                                   02:12

11        Q.    So they would see the flag?

12        A.    Yes.

13        Q.    And that might result in them being

14   referred to secondary, correct?

15             MR. DREZNER:  Objection:               02:12

16          speculative; and this also goes to CBP's

17          policies and procedures.

18             But you can answer, if you're able.

19             THE WITNESS:  It might.

20   BY MR. SCHWARTZ:                                 02:12

21        Q.    Okay.

22             And it might result in a ICE SA on the

23   scene coming to interact with a traveler who has

24   been flagged, correct?

25             MR. DREZNER:  Objection: vague and     02:12

1                    DAVID LEE DENTON

2        speculative.

3                    THE WITNESS:  It might.

4    BY MR. SCHWARTZ:

5        Q.    And it might be among the relevant        02:12

6    facts considered by the ICE SA in deciding whether

7    to conduct a border device search, correct?

8                    MR. DREZNER:  Objection: vague and

9            speculative.

10                   THE WITNESS:  Yes, that's correct.    02:13

11   BY MR. SCHWARTZ:

12       Q.    Okay.  So when ICE SAs are at the

13   border interacting with a traveler, is there a way

14   for them to find out whether or not the traveler

15   that they're interacting with has been flagged by    02:13

16   another law enforcement agency as a subject of

17   investigation?

18                   MR. DREZNER:  Objection: form;

19           vague; and law enforcement privilege.

20                   But you can answer, if you're able    02:13

21           to do so in a nonprivileged way.

22                   THE WITNESS:  I'm sorry.  Can you

23           restate the question?

24   BY MR. SCHWARTZ:

25       Q.    Sure.                                       02:13

1                    DAVID LEE DENTON

2              I'm going to begin by repeating it,

3     and if it still is confusing, it's my job to

4     reword it, but let me just try repeating the same

5     question.                                        02:13

6              When ICE SAs are at the border

7     interacting with a traveler, is there a way for

8     them to find out whether or not the traveler that

9     they're interacting with has been flagged by

10    another law enforcement agency as a subject of    02:14

11    investigation?

12              MR. DREZNER:  Same objections.

13              THE WITNESS:  So I believe that the

14         ICE agent that's interacting with the

15         traveler would already know, as the reason   02:14

16         for their interaction, whether there was a

17         lookout or a flag on the particular

18         traveler.

19    BY MR. SCHWARTZ:

20    Q.    And how would they know that?               02:14

21              MR. DREZNER:  Objection on the basis

22         of law enforcement privilege.

23              But you can answer, if you're able

24         to do so in a nonprivileged way.

25              THE WITNESS:  They would know that       02:14

1                    DAVID LEE DENTON

2          based upon the referral from CBP.

3     BY MR. SCHWARTZ:

4          Q.    So other than the referral from CBP,

5     is there a way for the ICE SA to know that there's   02:14

6     a flag from another law enforcement agency?

7                    MR. DREZNER:  Same objection.

8                    THE WITNESS:  Not that I'm aware of.

9     BY MR. SCHWARTZ:

10          Q.    Okay.  And so the CBP officer who made   02:14

11     the referral to ICE, they are aware of whether or

12     not there was a flag through the TECS system,

13     correct?

14                    MR. DREZNER:  Objection.  He can't

15               speak to what a CBP officer knows at that   02:15

16               time.

17                    You can answer, if you're able to.

18                    THE WITNESS:  I'm not sure if there

19               are other ways that a CBP officer would

20               know.                                       02:15

21     BY MR. SCHWARTZ:

22          Q.    Let me go back to my question one

23     second.

24                    Let me try that question again.

25                    I think you've said that if there is a   02:15

1                    DAVID LEE DENTON

2      flag on a traveler, the CBP officer becomes aware

3      of it first and then makes a referral of that

4      traveler over to the ICE SA, correct?

5           A.    Yes, that's correct.                    02:15

6           Q.    Okay.  So in this scenario, the CBP

7      officer is aware of a flag from another law

8      enforcement agency, correct?

9                MR. DREZNER:  Objection: calls for

10         speculation.                                   02:15

11               THE WITNESS:  I think, in this

12         scenario, yes, that's the case.

13     BY MR. SCHWARTZ:

14          Q.    Okay.  And what is the system by which

15     the CBP officer becomes aware of the flag from the  02:16

16     other law enforcement agency?

17               MR. DREZNER:  Objection: this calls

18         for inquiry into CBP policies and

19         practices.

20               But I guess you can answer.              02:16

21               THE WITNESS:  I believe, generally,

22         that alert would be placed into TECS.

23     BY MR. SCHWARTZ:

24          Q.    Okay.

25               (Sotto voce between co-counsel.)          02:16

1                    DAVID LEE DENTON

2      BY MR. SCHWARTZ:

3          Q.    So we're going to move to a new topic.

4                We can put away Exhibit 10 for now.

5                Please turn back to Exhibit 1 -- yeah,    02:17

6      Exhibit 1, which is the Notice of Deposition,

7      Page 2, which is the Areas of Inquiry.

8                Please tell me when you're there.

9          A.    I'm there.

10         Q.    So I'd like you to turn, please, to    02:17

11     Item Number 2, which I'm now going to read out

12     loud.

13               Policies, practices, and training

14     regarding what kind of information ICE employees

15     should view, document, or copy when they search    02:18

16     electronic devices obtained from travelers at the

17     border.

18               So you understand that you're

19     testifying on that subject for ICE today, correct?

20         A.    Correct.                               02:18

21         Q.    Okay.  So electronic devices that

22     travelers are carrying, such as a laptop or a

23     smartphone, they can contain a large volume of

24     information, correct?

25               MR. DREZNER:  Objection: vague.        02:18

1              DAVID LEE DENTON

2              THE WITNESS:  Yes, sir, I think

3         that's correct.

4    BY MR. SCHWARTZ:

5         Q.    And they can contain many different        02:18

6    kinds of information, like photos or e-mails or

7    texts, and whatnot?

8         A.    Yes, sir.

9         Q.    Okay.  So an officer conducting a

10   manual inspection -- they don't have the time to      02:18

11   read everything, correct?  They've got to make

12   some kind of choices about what to review during

13   their finite inspection?

14        A.    That sounds reasonable, yes, sir.

15        Q.    Okay.  Is there instruction from ICE        02:19

16   to the SAs regarding what kinds of information the

17   SAs should be looking for when they conduct manual

18   searches?

19             MR. DREZNER:  Objection on the basis

20        of law enforcement privilege.                     02:19

21             But you can answer, if you can do so

22        in a nonprivileged way.

23             THE WITNESS:  So in a border search

24        situation, as explained before, it would

25        be very unusual for an agent to be               02:19

1                    DAVID LEE DENTON

2          conducting a manual search because they're

3          going to be looking for evidence of a

4          crime.  So they would conduct a forensic

5          search where all the contents of the          02:19

6          device would be transferred or viewed on

7          the device, depending on the situation.

8    BY MR. SCHWARTZ:

9          Q.     So in the circumstances which you've

10   described as unusual, where an ICE SA is           02:19

11   conducting a manual search, they would document

12   that they had conducted a manual search, correct?

13         A.     Yes, sir, they would document that in

14   a report of investigation.

15         Q.     All right.  And the report of          02:20

16   investigation, as we said before, might contain

17   information -- or the officer's description of the

18   information that they saw inside the device,

19   correct?

20              MR. DREZNER:  Objection: asked and       02:20

21          answered.

22              THE WITNESS:  Yes, sir.

23   BY MR. SCHWARTZ:

24         Q.     So many electronic devices like laptop

25   computers and smartphones, they contain their own   02:20

```
 1                    DAVID LEE DENTON

 2    internal search tools, correct?

 3         A.    Yes, sir.

 4         Q.    So, for example, it's common for a

 5    smartphone to have a function where you can type      02:20

 6    in a word, and then the smartphone searches itself

 7    for the occurrences of that word in the smartphone

 8    and kind of lists them so that someone can quickly

 9    page through the documents that contain that word?

10              MR. DREZNER:  Objection.                    02:21

11              Is that a question?

12              MR. SCHWARTZ:  I should have said

13          "correct" at the end.

14    BY MR. SCHWARTZ:

15         Q.    Is that correct?                           02:21

16         A.    I believe it is.

17         Q.    And are there different kinds of

18    search tools -- or internal search tools that are

19    built into smartphones and laptops and other

20    devices?                                              02:21

21         A.    I believe there are.

22         Q.    So what are those different kinds of

23    internal tools?

24              MR. DREZNER:  Objection: this calls

25          for knowledge of general electronics, I        02:21
```

1                    DAVID LEE DENTON

2          suppose.

3                    MR. SCHWARTZ:  I'll be happy to have

4          the director of the, you know, ICE

5          laboratories here.                              02:21

6                    THE WITNESS:  Well, I think you can

7          say that there are a very wide variety of

8          tools.  And it would depend on the

9          manufacturer of the device, the type of

10         device.  For instance, a flash drive made     02:21

11         by different manufacturers requires

12         different equipment in order to view the

13         software, and it may require specialized

14         tools that the -- that we would have to

15         acquire, or other things.                      02:22

16               You know, when it comes to cell

17         phones, an Apple iPhone is going to be

18         different than an Android phone or a

19         Huawei phone or other types of electronic

20         devices.  So I think it -- it varies          02:22

21         widely depending on the type of electronic

22         device and on the manufacturer of that

23         type.

24    BY MR. SCHWARTZ:

25         Q.    So some of these internal -- these      02:22

1           DAVID LEE DENTON

2    tools internal to the device, they can search for

3    words, correct?

4         A.    I believe they can, yes.

5         Q.    Are there other things they might be      02:22

6    asked to search for?

7              MR. DREZNER:  Objection: this is

8         vague.  And, again, I think this is

9         outside the scope.  This isn't regarding

10        ICE policies, practices and procedures.      02:22

11             MR. SCHWARTZ:  Just to be clear

12        here, because I think this is a

13        significant objection, the topic is

14        Policies, practices, and training

15        regarding what kinds of information ICE      02:23

16        employees should view, document or copy

17        when they search electronic devices

18        obtained from travelers at the border.

19             So we consider the search tools

20        that are built into consumer's devices to    02:23

21        be intrinsic to this -- this announced

22        topic.

23             MR. DREZNER:  We don't believe that

24        the search tools go to the kinds of

25        information that ICE officers should copy,    02:23

1                    DAVID LEE DENTON

2          view or document.

3                  But you can answer, to the extent

4          that you're able.

5                  THE WITNESS:  I'm sorry.  Can you          02:23

6          repeat the question?

7    BY MR. SCHWARTZ:

8          Q.    Sure.

9                  The question is whether or not the

10   search tools that are internal to consumer devices    02:23

11   have the ability to search for things other than

12   words?

13                 MR. DREZNER:  Same objection.

14                 THE WITNESS:  I believe they can.

15   BY MR. SCHWARTZ:                                       02:23

16         Q.    So, for example, what?

17                 MR. DREZNER:  Objection: vague and

18          speculative.

19                 THE WITNESS:  I believe they could

20          search for pictures.                            02:24

21   BY MR. SCHWARTZ:

22         Q.    Okay.  And do they have the ability in

23   some cases to identify metadata?

24                 MR. DREZNER:  Objection: vague and

25          speculative.                                    02:24

1                      DAVID LEE DENTON

2    BY MR. SCHWARTZ:

3         Q.     Let me pause there.

4                Do you know what I mean by "metadata"?

5         A.     I believe I do, yes.                    02:24

6         Q.     What does metadata mean to you?

7         A.     Metadata would be data that is

8    generally not present visibly on the device but

9    would be present on objects within the device.

10   For instance, a photograph might have metadata     02:24

11   that would indicate the type of camera that was

12   used to take the picture, the location, where the

13   picture was taken or the time that the picture was

14   taken.  And that information would be metadata to

15   the picture.                                        02:24

16        Q.     Okay.  So are there search tools

17   internal to consumer devices that can identify

18   metadata?

19               MR. DREZNER:  Objection: vague and

20          speculative.                                 02:25

21               You can answer, if you're able.

22               THE WITNESS:  I believe that you can

23          obtain apps on certain phones that will

24          search for metadata, but I don't believe

25          standard search tools on most electronic     02:25

1                    DAVID LEE DENTON

2          devices contain that sort of ability.

3    BY MR. SCHWARTZ:

4          Q.    So if the traveler had downloaded

5    those apps onto their phone and the special agent    02:25

6    was searching that phone, in the course of the

7    manual search, they could use that app to locate

8    metadata, correct?

9                MR. DREZNER:  Objection:

10          speculative.                                  02:25

11               THE WITNESS:  I believe that's

12          possible.

13    BY MR. SCHWARTZ:

14         Q.    The internal search tools to these

15    phones -- can they identify use history, such as    02:25

16    the browsing history?

17               MR. DREZNER:  Objection: vague;

18          speculative.

19               And, again, we'll reiterate,

20          objection: beyond the scope.  This is not     02:26

21          about the type of information ICE is

22          looking at; it's the way that they're

23          finding the information.

24               You can answer, to the extent you're

25          able.                                         02:26

1          DAVID LEE DENTON

2          MS. EDNEY:  He's not a technical

3     witness.

4          MR. DREZNER:  Right.

5          THE WITNESS:  I believe that certain          02:26

6     Internet browsers have the capability of

7     retaining information on searches, but I

8     also believe that they can be cleared

9     pretty much at any point.  So there may or

10    may not be any information present during          02:26

11    a search of browser history.

12 BY MR. SCHWARTZ:

13    Q.    So if the device is seized by the

14 special agent and put into airplane mode and the

15 ICE officer goes to the browser, which obviously          02:26

16 is not connected to the Internet anymore, there

17 may be cached information showing some of the

18 browsing history, correct?

19          MR. DREZNER:  Objection: vague.

20          MR. SCHWARTZ:  Michael, just for my          02:27

21    own knowledge, what part of that was

22    vague?

23          MR. DREZNER:  "There may be"?

24    You're just asking whether something might

25    exist?          02:27

1                    DAVID LEE DENTON

2              MR. SCHWARTZ:  Okay.  That's fine.

3              MR. DREZNER:  Okay.

4    BY MR. SCHWARTZ:

5         Q.    I will just jump from that.                    02:27

6              Do you know what I mean by "cached

7    information"?

8         A.    I believe I do, yes.

9         Q.    What does cache information mean to

10   you?                                                      02:27

11        A.    To me, cached information would be

12   information that the device stores on the device,

13   as opposed to somewhere else.

14        Q.    So sometimes -- correct me if I'm

15   wrong on this -- sometimes there is information       02:27

16   that a user obtains by going to the Internet.  And

17   it was not previously on their phone, but when

18   they go to the Internet, it goes to their phone.

19              And then when connectivity is ended,

20   for example, by putting it in airplane mode, some     02:28

21   of that information from the Internet remains

22   resident in the phone.

23              Is that correct?

24        A.    I believe that's generally correct,

25   yes.                                                      02:28

1                        DAVID LEE DENTON

2          Q.     And might that be described as "cached

3     information"?

4          A.     I think that could be described as

5     cached information.                                    02:28

6          Q.     And when a special agent seizes a

7     phone and puts it in airplane mode, they will, in

8     some cases, have access to cached -- cached

9     information that remains on the phone, even though

10    connectivity is disconnected, correct?                 02:28

11         A.     So I want to go back to the beginning,

12    and you said when we seize the phone.

13               So if we're seizing the phone, under

14    our policies, that would mean that we were keeping

15    it for evidence in -- in a future trial.  And that    02:29

16    would require a different standard of evidentiary

17    consideration.

18         Q.     Thank you for that clarification.

19               I clearly have asked a confusing

20    question, and that's not what I intended.              02:29

21               Later on today, we're going to talk

22    about what might be described as a long-term

23    seizure device, meaning that the Government --

24    that ICE keeps the device after the traveler

25    leaves the border.  I don't want to talk about        02:29

1                     DAVID LEE DENTON

2    word, "envelope," which did not appear here.

3              So let me try to clean up the little

4    mess I've made here.

5              If a sealed item of mail appears to        03:12

6    only contain correspondence, it's the policy of

7    the -- of ICE to not open that item of mail absent

8    having a warrant, correct?

9         A.    Yes, sir.

10        Q.    Okay.  And if an item of sealed mail     03:12

11   is opened on reasonable suspicion of merchandise

12   or contraband and it was found to contain

13   correspondence, the correspondence would not be

14   read without first getting a warrant, correct?

15        A.    I believe that's correct, yes.          03:12

16        Q.    So what if, on opening the -- the

17   sealed item of mail, a digital media is discovered

18   and it is believed that it contains

19   correspondence?  ICE would not read that

20   correspondence without first getting a warrant,    03:13

21   correct?

22             MR. DREZNER:  Objection: vague and

23        speculative.

24             THE WITNESS:  I'm not sure how you

25        would know what was on the electronic         03:13

1                      DAVID LEE DENTON

2            media without taking a look to determine

3            if it was correspondence or something

4            else.

5   BY MR. SCHWARTZ:                                    03:13

6        Q.    Well, let's take your scenario:  They

7   open up the envelope on reasonable suspicion.

8   They found a digital storage media, such as a

9   thumb drive.  And the officers do not know whether

10  it contains -- let me get the word --              03:13

11  correspondence, as opposed to something else.

12  After reasonable investigation, they still don't

13  know.

14            Would they open it up and start

15  reading it without getting a warrant?              03:13

16            MR. DREZNER:  Objection: calls for

17          speculation.

18            THE WITNESS:  I believe they could.

19  BY MR. SCHWARTZ:

20       Q.    Okay.  So if they open it up and they   03:13

21  see correspondence, would they continue reading

22  it, or would they stop and get a warrant?

23       A.    I believe they would stop reading it

24  and get a warrant if they wanted to continue

25  reading it, but it's unlikely they would if it was  03:14

1                    DAVID LEE DENTON

2       just correspondence.

3          Q.    Okay.  But just to be clear here, if

4       they open up the digital media, they see it

5       contains correspondence and they wanted to keep      03:14

6       reading it, they would stop and get a warrant

7       before continuing to read, correct?

8              MR. DREZNER:  Objection: asked and

9              answered.

10             THE WITNESS:  I believe so.                   03:14

11             MR. SCHWARTZ:  Okay.  I would like

12             to ask for the marking of another exhibit,

13             and this one is going to be the Personal

14             Search Handbook.

15                        -  -  -                            03:14

16             (ICE Deposition Exhibit Number 13,

17              Excerpts of Personal Search

18              Handbook, Bates stamped Defs. 1057

19              through Defs. 1103, marked for

20              identification, as of this date.)            03:14

21                        -  -  -

22      BY MR. SCHWARTZ:

23          Q.    So a little bait-and-switch here,

24      before we turn to the Personal Search Handbook, I

25      want to just go back a step about what we were      03:16

1                    DAVID LEE DENTON

2    just talking about with the -- the warrant and the

3    U.S. mail.

4              In the scenario we discussed, where an

5    SA would seek a warrant, SAs are trained in how to    03:16

6    seek a warrant, correct?

7         A.    Yes.

8         Q.    Okay.  So turning --

9              MR. SCHWARTZ:  I'm sorry.  What

10         number do we have?                              03:16

11              MS. COPE:  Thirteen.

12              MR. SCHWARTZ:  Thirteen.

13              For the record, Exhibit 13 is, on

14         the front page, titled Personal Search

15         Handbook, Office of Field Operations --         03:16

16         something I don't understand -- July 2004,

17         U.S. Customs and Border Protection.  And

18         the first page of this document is 1057.

19              For the record, this is only

20         excerpts of the Personal Search Handbook        03:16

21         as I thought were relevant for my purposes

22         today.

23    BY MR. SCHWARTZ:

24         Q.    So I'd like to --

25              (Sotto voce discussion.)                   03:17

1                    DAVID LEE DENTON

2    not an ICE duty agent present?

3         A.    Yes, sir.

4         Q.    And so is it the case that when a --

5    it says here, In all circumstances, when someone        03:19

6    has been detained for more than eight hours, that

7    the ICE duty agent or the CBP prosecution officer

8    contacts the U.S. Attorney's Office?

9         A.    I see that, yes, sir.

10         Q.    So is that the case?                          03:20

11         A.    This is CBP policy.  I'm not sure if

12    that's still the case or not.  This has nothing to

13    do with ICE, really.  It's . . .

14         Q.    Well, true, as you say, this is a

15    document that's written by CBP, but it's              03:20

16    describing what ICE duty agents do.  And my

17    understanding is that you, on behalf of ICE, can

18    tell me what ICE duty agents do.

19              And so my question is, When a person

20    has been detained for eight or more hours at a        03:20

21    port of entry for a medical exam, is it the case

22    that sometimes the ICE duty agent reaches out to

23    the U.S. Attorney's Office?

24         A.    If the ICE agent has been notified

25    and, you know, a case is referred to ICE, then ICE    03:20

1                    DAVID LEE DENTON

2       policy would be to make sure that they're not

3       detained longer than necessary, for sure.  And if

4       they're going to -- that they might conduct -- or

5       contact the U.S. Attorney's Office depending on          03:21

6       the nature of the encounter.

7            Q.    Okay.

8                  So moving along to the next paragraph

9       of this document, it says, The ICE duty agent

10      and/or the CBP prosecution officer shall advise         03:21

11      the U.S. Attorney's Office of the detention.

12                 So, again, mindful this is a Customs

13      document and that you are here from ICE, is it

14      correct that in some of these situations when the

15      ICE duty agent has reached out to the U.S.              03:21

16      Attorney's Office, they advise the U.S. Attorney's

17      Office of the detention?

18                 MR. DREZNER:  Objection: vague and

19           speculative.

20                 THE WITNESS:  I believe that's              03:21

21           right, yes.

22      BY MR. SCHWARTZ:

23           Q.    Okay.  So moving on to the next

24      sentence, it says, If the assistant U.S. attorney

25      believes that probable cause has been established,     03:22

1                    DAVID LEE DENTON
2        the ICE duty agent and/or the CBP prosecution
3        officer will work with the AUSA to obtain an
4        arrest or search warrant before a magistrate.
5              Again, mindful this is a CBP document      03:22
6        and you only can tell me what ICE actually is
7        doing, is it the case that in some circumstances,
8        the ICE duty agent will work with the AUSA to
9        obtain an arrest or a search warrant from a
10       magistrate in connection with this lengthy medical   03:22
11       detention?
12           A.    Yes, I believe that's the case.  I'm
13       not sure what they mean by medical examination
14       detention, though.
15           Q.    Well, putting aside the uncertainty     03:22
16       about the medical exam aspect of it, the salient
17       point for the Plaintiffs is that there are
18       circumstances where the ICE duty agent will work
19       with the AUSA to get a warrant from a magistrate
20       involving a lengthy detention of a traveler,       03:23
21       correct?
22           A.    Yes.  That's possibly correct.
23           Q.    I'm sorry.  What was your answer?
24           A.     I said, yes, that's possibly correct.
25       I think it depends, again, on the situation.       03:23

1                    DAVID LEE DENTON

2    Like, if this was -- if they were suspected,

3    perhaps, of being an internal carrier and they

4    were being medically detained in order to

5    determine if they had balloons of heroin in their    03:23

6    stomach, then ICE would usually contact the U.S.

7    attorney and determine if there was probable cause

8    to get a search warrant to arrest them or take

9    them to the hospital for an X-ray or -- or other

10   means, or if they had to wait where they were in    03:23

11   order to let the heroin come out via natural

12   methods.  I'm not sure the best way to say that.

13        Q.    I think "natural methods" was

14   excellent.  We all know what you mean.

15              Proceed.                                  03:24

16        A.    I think, like, it just depends on the

17   situation and what the reason is for the medical

18   examination as to whether or not the ICE agent

19   would contact the AUSA and try and get a warrant.

20   They might, but I don't know that they would in    03:24

21   every situation.

22        Q.    Right.

23              They might not in some situations, but

24   in some situations, the ICE agent might work with

25   the AUSA to get a warrant in connection with       03:24

1                     DAVID LEE DENTON

2    detention of the internal carrier?

3         A.    Yes, sir.

4         Q.    I'd like to now move on the same

5    exhibit but to Page 1095.                          03:24

6              MR. SCHWARTZ:  Off the record a

7         second.

8                      -  -  -

9              (Whereupon, a discussion was held

10              off the record.)                        03:25

11                     -  -  -

12   BY MR. SCHWARTZ:

13        Q.    So on Page 1095 at the top, it says --

14             MR. SCHWARTZ:  Off the record.

15                     -  -  -                          03:25

16             (Whereupon, a discussion was held

17              off the record.)

18                     -  -  -

19   BY MR. SCHWARTZ:

20        Q.    Page 1095, the very top, it says, h.    03:25

21   Involuntary X-Rays.

22             Do you see that?

23        A.    Yes, sir.

24        Q.    Okay.  So I'm going to read the third

25   paragraph that begins Port directors will.        03:25

1                         DAVID LEE DENTON

2               Do you see that?

3        A.    Yes, sir.

4        Q.    Okay.

5               Port directors will consult with the        03:26

6    local associate/assistant chief counsel and the

7    duty ICE agent or CBP prosecution officer to

8    determine whether to seek a court order for an

9    involuntary X-ray search.

10              Stopping there.                              03:26

11              So it is the case that on some

12   occasions, a port director will consult with a

13   duty ICE agent to determine whether to seek a

14   court order from a magistrate about an involuntary

15   X-ray search, correct?                                 03:26

16       A.    Yes, sir.

17       Q.    I'd like to turn in the same document

18   to Page 1101.

19              This page, at the very top, says,

20   Chapter 8?                                             03:26

21       A.    Yes.

22       Q.    Okay.  So most of the way down,

23   there's a little d that says, Court-Ordered

24   Involuntary Body Cavity Searches.

25              Do you see that?                             03:27

1                    DAVID LEE DENTON

2          A.     Yes, sir.

3          Q.     The first sentence -- well, I'm just

4     going to start reading it.

5                    Involuntary body cavity searches        03:27

6     require a court order.  Port directors (GS-13 or

7     above) will consult with the local

8     associate/assistant chief counsel and the duty ICE

9     agent or CBP prosecution officer to determine

10    whether to seek a court order for an involuntary      03:27

11    body cavity search.

12                    Did I read that correctly?

13         A.     Yes, sir.

14         Q.     So it is the case that on some

15    occasions, a port director will consult with an       03:27

16    ICE duty agent about whether to seek a court order

17    for an involuntary body cavity search.

18                    Correct?

19         A.     Correct.

20         Q.     And on some occasions after those          03:27

21    consultations between the port director and the

22    ICE duty agent, the ICE duty agent will assist in

23    the seeking of a court order for an involuntary

24    body cavity search, correct?

25         A.     Yes, sir.                                   03:28

1                  DAVID LEE DENTON

2     Q.    So we've talked about ICE special

3   agents at the border being involved in acquisition

4   of court orders for involuntary body cavity

5   searches, involuntary X-rays and lengthy        03:28

6   detentions.

7          In all of these cases, ICE trains

8   special agents in how to seek a court order,

9   correct?

10    A.    Yes, sir.                     03:28

11         I think in -- I guess I'd like to

12   clarify.  I'm not sure how specific our training

13   is in how to get a court order, but I do know that

14   in a variety of investigative situations, special

15   agents will receive instruction.  And if they're   03:28

16   unsure, they can always contact our OPLA for

17   advice, if they're not sure.

18    Q.    So let's -- that's very helpful.

19   Thank you.

20         I think you've just said that if a ICE   03:29

21   special agent is uncertain of how to proceed with

22   regards to a warrant, that they can reach out to

23   OPLA for guidance.

24         Correct?

25    A.    Yes, sir.                     03:29

1                    DAVID LEE DENTON

2        Q.    Okay.  And in addition to the ability

3    to reach out as needed to OPLA, they also have

4    training on whether and how to seek a warrant,

5    correct?                                              03:29

6        A.    Yes, sir, they receive training on how

7    to seek and achieve a warrant.  But the policies

8    and procedures vary so much from judicial

9    districts that they'll receive some training at

10   the Academy; and then they will receive further      03:29

11   advanced training in the field and on-the-job

12   training; and they'll receive instruction from the

13   local U.S. Attorney's Office on methods that they

14   would use to -- to contact those U.S. attorneys,

15   whether it was a duty U.S. attorney or a different   03:30

16   one.

17             And there just could be a lot of

18   factors that would be involved in how the

19   interaction with the U.S. Attorney's Office would

20   work in order to get a search warrant or a           03:30

21   judicial order, or anything like that.

22             The -- generally speaking, it would

23   depend a lot more on the U.S. Attorney's Office

24   than it would on our HSI policies.

25        Q.    So for the ICE SA to understand           03:30

1                    DAVID LEE DENTON

2    whether and how to obtain a warrant in connection

3    with these border events, there are a variety of

4    sources of information.

5              And one of them is by turning to ICE's      03:30

6    own OPLA, correct?

7         A.    Yes, sir.

8         Q.    And one of them is by turning to the

9    local U.S. Attorney's Office, correct?

10        A.    Yes, sir.                                   03:31

11        Q.    And one of them is that they went

12   through standardized Fourth Amendment training at

13   the ICE Academy, correct?

14        A.    Yes, sir.

15        Q.    And I think you referenced training      03:31

16   from ICE that is localized and ongoing, correct?

17        A.    Yes, sir.

18        Q.    So besides the four things I just

19   said -- the OPLA, the U.S. Attorney's Office, the

20   Academy and regional offices own update            03:31

21   training -- are there other ways that ICE informs

22   special agents about when and how to seek warrants

23   in connection with events at the border?

24        A.    I think most agents -- when they are

25   first assigned to a group, they're assigned a        03:31

1                        DAVID LEE DENTON

2      field training officer.  And that field training

3      officer will usually be an experienced agent

4      that's done warrants, that's testified in court,

5      that's produced affidavits, and -- and would          03:32

6      generally guide the newer agents in how to -- how

7      to conduct themselves as a special agent, how to

8      go about getting the evidence that they need for a

9      case.

10             And -- and so there's the formalized          03:32

11      training that -- that you've mentioned, but I

12      wouldn't want to preclude training that might be

13      received informally from other people within the

14      office, from group supervisors or other management

15      personnel or from their field training officer.      03:32

16         Q.     So your most recent answer -- I just

17      want to make sure I'm understanding all the

18      different pieces of how ICE informs its SAs about,

19      you know, how to do this job and whether and how

20      to seek warrants in connection with the border.      03:32

21             So you mentioned field training

22      officers.

23             That's one way, correct?

24         A.     Yes, sir.

25         Q.     And you mentioned senior -- or more         03:32

1                    DAVID LEE DENTON

2      senior officers who are not specifically the field

3      training officer of the more junior officer?

4           A.     Yes, sir.

5           Q.     And there also are managers who          03:33

6      provide instruction to the assistant -- the

7      special agents?

8           A.     Yes, sir.

9           Q.     So besides the FTO, the senior

10     officers and the managers, was there any other way   03:33

11     that ICE is giving instruction to the special

12     agents in whether and how to seek borders --

13     warrants at the border?

14          A.     I think that with all the other stuff

15     we talked about before is about all I can think of   03:33

16     right now.

17          Q.     Okay.  Thank you.

18                 So it's possible for special agents at

19     the border to obtain a warrant from a judge

20     remotely by way of telephone, correct?               03:33

21                 MR. DREZNER:  Objection: vague.

22                 THE WITNESS:  I know it is certainly

23            possible, but it is extremely unlikely and

24            would only be done in the most critical

25            situations.                                    03:34

1                          DAVID LEE DENTON

2          could develop after a referral that did

3          not include a strip search that would

4          necessitate an additional search that

5          could be a strip search, in which case, an          04:00

6          ICE special agent would be involved in it.

7     BY MR. SCHWARTZ:

8          Q.     So in that scenario that you just

9     described, the ICE special agent would need

10    reasonable suspicion of crime before conducting          04:00

11    the strip search, correct?

12         A.     I believe that in any situation -- or

13    in most situations, ICE would have reasonable

14    suspicion to -- to conduct a border search that

15    would include a strip search.                            04:01

16         Q.     The same thing with a body cavity

17    search -- let me back up.

18                Is there some set of circumstances

19    where the ICE officer might be involved in a body

20    cavity search of a traveler at the U.S. border?          04:01

21                MR. DREZNER:  Objection: calls for

22            speculation.

23                THE WITNESS:  It is possible, yes.

24    BY MR. SCHWARTZ:

25         Q.     And in that circumstance as well,            04:01

1                    DAVID LEE DENTON

2     they -- the ICE SA could not conduct the body

3     cavity search without having a -- having

4     determined that they have reasonable suspicion of

5     crime?                                          04:01

6              MR. DREZNER:  Objection.  I'll also

7          object that -- outside the scope of this.

8              You can answer, if you're able.

9              THE WITNESS:  I believe our policy

10         would require reasonable suspicion for      04:01

11         that -- for a search like that.

12    BY MR. SCHWARTZ:

13         Q.    The same question but with an X-ray

14    search.  It happens -- it could happen some time.

15             And in such circumstances, they would  04:02

16    need reasonable suspicion to conduct the X-ray

17    search?

18             MR. DREZNER:  Same objection.

19             THE WITNESS:  I believe that's

20         accurate.                                   04:02

21    BY MR. SCHWARTZ:

22         Q.    ICE trains special agents regarding

23    the reasonable suspicion standard, correct?

24         A.    Yes, sir.

25         Q.    That would include what sets -- or    04:02

1                     DAVID LEE DENTON

2      what combinations of facts might or might not,

3      together, comprise reasonable suspicion to

4      authorize the particular kind of search?

5          A.    I believe that we definitely train our    04:02

6      agents on how to understand the nature of

7      reasonable suspicion, but there are so many

8      different factors that could enter into it.  I

9      don't think the training is as specific as, you

10     know, these factors absolutely will justify, you    04:03

11     know, reasonable suspicion, and these won't; or --

12     you know, it's generally about the ability to

13     understand the nature of the evidence and -- and

14     to be able to gauge whether or not it justifies

15     additional searches.                                04:03

16         Q.    And how is that training -- you know,

17     exactly what you described -- provided to the ICE

18     special agents?

19         A.    So --

20         Q.    Would it be the same things we talked      04:03

21     about before, the Academy and the --

22         A.    That's where I was going.

23               Yes, it would be very similar to what

24     we've talked about before, where it would start at

25     the Academy, and then there would be a lot of       04:03

1                    DAVID LEE DENTON

2      helping field agents investigate child

3      pornography, correct?

4           A.    Yes, sir.

5           Q.    So isn't it the case that there are      04:08

6      computer servers located outside the United States

7      and that people inside the United States can see

8      child pornography located on those foreign

9      computer servers by way of the Internet?

10               MR. DREZNER:  Objection: asked and        04:08

11          answered and calls for speculation.

12               THE WITNESS:  I believe that's

13          correct.

14     BY MR. SCHWARTZ:

15          Q.    Okay.  It's also possible for someone    04:08

16     outside the United States to send an e-mail to

17     someone inside the United States with attachments

18     which comprise child pornography, correct?

19          A.    I believe that could happen.

20          Q.    Okay.  It's also possible to send text   04:08

21     messages with attachments that likewise deliver

22     child pornography over the Internet from outside

23     the United States to inside the United States,

24     correct?

25          A.    I think that's possible.                 04:09

1                    DAVID LEE DENTON

2              MR. DREZNER:  Same objections.

3              THE WITNESS:  I believe there are

4         other ways that it could be received

5         over -- could you clarify what the two        04:10

6         examples previously are -- that you

7         mentioned?

8    BY MR. SCHWARTZ:

9         Q.    Sure.

10              One is that there is a computer server   04:10

11   located outside the United States that is

12   accessible inside the United States by way of the

13   Internet, and the second is some kind of directed

14   one-on-one communication, via e-mail or text

15   message that has an attachment to it, that          04:10

16   delivers the pornography -- the child pornography

17   from outside the United States to inside the

18   United States.

19              And so other than those two

20   examples -- those two categories, are there any     04:10

21   additional ways that child pornography that is

22   located outside the United States can get into the

23   United States over the Internet?

24              MR. DREZNER:  Objection as to scope:

25         Calls for speculation.                         04:11

1                    DAVID LEE DENTON

2              You can answer, if you're able.

3              THE WITNESS:  So another situation I

4          can envision would be if there was a live

5          streaming broadcast of child pornography,        04:11

6          sexual abuse of a child in a foreign

7          country being viewed in the United States.

8    BY MR. SCHWARTZ:

9          Q.    Okay.  I understand that.

10             Besides that, plus the earlier two           04:11

11   examples, any other ways that the child

12   pornography could be delivered over the Internet

13   from outside the U.S. to inside the U.S.?

14             MR. DREZNER:  Objection as to scope.

15         This is not going to the volume of              04:11

16         information.  This is going to the type or

17         the way that information can be

18         transported.

19             You can answer, if you're able.

20             THE WITNESS:  I believe another             04:11

21         possible method would be membership within

22         on a LISTSERV or a chat group on the

23         Internet whereby child pornography is

24         distributed.

25

1                    DAVID LEE DENTON

2    BY MR. SCHWARTZ:

3         Q.    Okay.  A LISTSERV or a chat group.

4               I've got that.

5               Any other examples?                    04:12

6               MR. DREZNER:  Same objections.

7               THE WITNESS:  I -- I'm not sure if

8          you are including the dark Web in your

9          definition of Internet.

10   BY MR. SCHWARTZ:                                   04:12

11        Q.    Tell me about the dark Web -- tell me

12   about how the dark Web would be a way to transmit

13   child porn from out of the country to into the

14   country.

15               MR. DREZNER:  Objection as to scope.   04:12

16               Objection as to relevance.

17               Objection as to calls for

18          speculation.

19               You can answer, if you're able.

20   BY MR. SCHWARTZ:                                   04:12

21        Q.    Just as to the speculation, I just

22   want to say, again, you are the director of the

23   Cyber Crimes Center -- you are, ultimately, the

24   boss of the Cyber Crimes Center, right?

25        A.    Yes, I am.                              04:12

1                        DAVID LEE DENTON

2          A.      Yes, sir.

3          Q.      So I'm going to read that sentence.

4                  It says, With the advent of the

5     Internet, the sharing and trading of child          04:20

6     pornography now primarily occurs online.

7                  Did I read that correctly?

8          A.      Yes, sir.

9          Q.      And it's true that in the view of ICE,

10    child pornography now primarily is transferred       04:20

11    online, correct?

12         A.      That's correct.

13         Q.      All right.  We're done with this

14    document.

15                 So I'll pivot to the perspective of     04:20

16    special agents who are at the border trying to

17    seize contraband that's being carried across the

18    border.

19                 So when an officer finds digital

20    contraband during a border device search, do they   04:21

21    have any way of knowing whether or not the

22    contraband they have seized has not already

23    entered the United States by way of the Internet?

24                 MR. DREZNER:  Objection: calls for

25                 speculation.                            04:21

1                        DAVID LEE DENTON

2              And the way that comparison is done,

3    is that sometimes called "hashing"?

4         A.    Yes, sir, it is.

5         Q.    Okay.  So other than -- so you've just    04:22

6    identified a way that when an item of contraband

7    has been seized at the border, it is sometimes

8    possible to ascertain that it has already entered

9    the United States because, by hash comparisons,

10   you can see it's the same as an image that's         04:22

11   already been detected by the Government -- by --

12   by someone, correct?

13        A.    Yes, sir, that is correct.

14        Q.    Okay.  So if the image that they

15   have -- or the contraband they have seized does      04:23

16   not match through hashing one of these other known

17   examples of contraband, from the perspective of

18   ICE, there is no way of knowing whether or not the

19   seized contraband already is available in the

20   United States through the Internet?                  04:23

21             MR. DREZNER:  Objection: calls for

22        speculation.

23             THE WITNESS:  I don't believe

24        there's any way we can know for sure.

25

1                    DAVID LEE DENTON

2      in sub e), and I'm not aware of it saying that in

3      this document.  But we'll leave that till later.

4             Turning back to the previous page,

5      8.5.1(b), it says that To the extent of authorized    04:55

6      by law, ICE may retain information.

7             And so you're saying that by

8      "information" here, that is the officer's

9      narrative description of what they saw, but it's

10     not the 1s and 0s copy, correct?                      04:56

11         A.    I believe that's what this

12     subsection is about, yes, sir.

13         Q.    So in the case of information as

14     you're interpreting it -- let me read the

15     sentence.                                             04:56

16            To the extent authorized by law, ICE

17     may retain information relevant to immigration,

18     customs or other law enforcement matters in ICE

19     systems.

20            Right?                                         04:56

21            And then it goes on, but I'll say --

22     let me just pause and say, What are those ICE

23     systems?

24         A.    So the ICE system, generally speaking,

25     would be our Investigative Case Management --         04:56

1                    DAVID LEE DENTON

2    Investigative Case Management system that we

3    discussed earlier.  And that's where all of the

4    case information is -- is -- is kept.

5          Q.    Okay.  So reading the sentence one          04:56

6    more time, or I guess, I can't promise it's the

7    last time -- To the extent authorized by law, ICE

8    may retain information -- and I'm seeing a first

9    condition -- relevant to immigration, customs and

10   other law enforcement matters in ICE systems if --     04:57

11   and here's a second condition -- such retention is

12   consistent with the privacy and data protection

13   policies of the system -- which you're telling me

14   means the -- the ICM -- in which such information

15   is retained.                                            04:57

16              So it's correct, isn't it, that ICE's

17   policy says that ICE can keep information, meaning

18   the narrative description, about what they saw in

19   the traveler's device so long as two things are

20   true: Number 1, that it's relevant to immigration,     04:57

21   customs or other law enforcement matters; and, 2,

22   that the retention is consistent with the rules in

23   the ICM; is that correct?

24              MR. DREZNER:  Objection as to form.

25              THE WITNESS:  I believe that's               04:58

1              DAVID LEE DENTON

2          for border search of electronic devices,

3          and so in that circumstance, the -- the

4          data would be entered in -- and we're

5          talking about the narrative data like in a       04:59

6          report of investigation?

7      BY MR. SCHWARTZ:

8          Q.     Right.

9          A.     And -- I'm sorry.  Tell me if I

10     misphrase your question.                              04:59

11              You're asking if there are policies

12     within ICM that govern how long that data is

13     retained?

14         Q.     How long or anything else.

15              So here's my question -- let me try           04:59

16     this again.  And I appreciate your patience.  That

17     was a very logical effort at clarification.

18              So assume that a special agent has

19     narratively reported on what they saw in a

20     traveler's device, and that information has been       04:59

21     placed in the ICM, and that information is deemed

22     relevant to immigration, customs and other law

23     enforcement matters.

24              Is there anything in the ICE rules

25     about the ICM that limit the continued retention       05:00

1                    DAVID LEE DENTON

2    of that information in the ICM?

3                MR. DREZNER:  Objection: vague.

4                THE WITNESS:  Not that I'm aware of.

5    BY MR. SCHWARTZ:                                    05:00

6        Q.    All right.  I'm going to flip back to

7    Topic 9, which was the one about aggregate

8    statistics.

9                You may recall that a half an hour or

10   so ago, we began talking about it, but I put a pin  05:00

11   in it so we could talk about retention periods and

12   confiscation rules -- or lengthy detention rules.

13               Okay.  So now we're going to turn back

14   to aggregate statistics.

15               MR. SCHWARTZ:  So we're going to        05:00

16        take a two-minute break.

17                        -  -  -

18               (Whereupon, a discussion was held

19                off the record.)

20                        -  -  -                        05:01

21               MR. SCHWARTZ:  Back on the record.

22   BY MR. SCHWARTZ:

23        Q.    We are now in, I believe, the final

24   topic, which is the continuation of Topic 9, which

25   concerns aggregate statistics.                      05:03

1                    DAVID LEE DENTON

2              ICE does not have any aggregate

3    statistics regarding the number of times that ICE

4    conducted a lengthy detention of a device, meaning

5    took a device away from a traveler after the          05:05

6    traveler left the border, correct?

7         A.    So all border searches are recorded,

8    but I don't believe that we separate the times

9    that a device was detained longer than at the port

10   in that manner.                                        05:05

11        Q.    I'll turn to a new document -- or a

12   different document, Exhibit 11.

13              MR. SCHWARTZ:  For the record,

14        Exhibit 11 is the Declaration of

15        David Denton that we looked at before.           05:06

16   BY MR. SCHWARTZ:

17        Q.    I would like you, please, to turn to

18   the third page and, in particular, to the second

19   paragraph, which begins, While ICE special agents

20   record.                                                05:07

21              Do you see that?

22        A.    Yes, sir.

23        Q.    So I'm now going to read that

24   paragraph.

25              While ICE special agents record all        05:07

1              DAVID LEE DENTON

2    documents we've gone over today, but one of the

3    documents produced shows statistics regarding the

4    number of times that there was a prosecution or an

5    arrest or some other event resulting from border      05:15

6    device searches.

7              Is that what you're talking about?

8              MR. DREZNER:  I think -- objection.

9         I -- it's hard for him to describe -- to

10        agree that he's describing a document that      05:15

11        you're not showing him.

12   BY MR. SCHWARTZ:

13        Q.   Let me --

14             MR. SCHWARTZ:  I think that's a fair

15        objection, especially it's 10 minutes left      05:15

16        in this deposition.

17   BY MR. SCHWARTZ:

18        Q.   So let me reframe a little bit.

19             Is there statistics that currently

20   exist on the specific issue of the number of times   05:16

21   that -- of all of the border device searches that

22   evidence of crime was discovered?

23        A.   I am not aware of those statistics

24   being aggregated, no, sir.

25             MR. SCHWARTZ:  Okay.  So that is my        05:16