# EXHIBIT 16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Ghassan Alasaad, Nadia Alasaad, Suhaib Allababidi, Sidd Bikkannavar, Jérémie Dupin, Aaron Gach, Ismail Abdel-Rasoul aka Isma'il Kushkush, Diane Maye, Zainab Merchant, Mohammed Akram Shibly, and Matthew Wright,<br><br>        Plaintiffs,<br><br>        v.<br><br>Elaine Duke, Acting Secretary of the U.S. Department of Homeland Security, in her official capacity; Kevin McAleenan, Acting Commissioner of U.S. Customs and Border Protection, in his official capacity; and Thomas Homan, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity,<br><br>        Defendants. | COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF (Violation of First and Fourth Amendment rights)<br><br>No. 1:17-cv-11730-DJC |

## AMENDED COMPLAINT

## PRELIMINARY STATEMENT

1. This lawsuit challenges searches and seizures of smartphones, laptops, and other electronic devices at the U.S. border in violation of the First and Fourth Amendments to the U.S. Constitution. U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE") search travelers' mobile electronic devices pursuant to policies that do not require a warrant, probable cause, or even reasonable suspicion that the device contains contraband or evidence of a violation of immigration or customs laws. Today's electronic devices contain troves of data and personal information that can be used to assemble detailed, comprehensive pictures of

1

extraordinarily invasive of travelers' privacy. With little effort, an officer without specialized training or equipment can conduct thorough manual searches, including by opening and perusing various stored files, programs, and apps, or by using a device's built-in keyword-search function. The device searches at issue in *Riley*, which the Supreme Court held were unlawful without a search warrant based on probable cause, were manual searches.

42. The accessibility of cloud-based content on smartphones and other electronic devices—including email, social media, financial records, or health services—further expands the amount of private information officers could view during a manual search.

43. In a forensic search, border officials use sophisticated tools, such as software programs or specialized equipment, to evaluate information contained on a device. Although there are different types of forensic searches, many of them begin with agents making a copy of some or all data contained on a device. Forensic tools can capture all active files, deleted files, files in allocated and unallocated storage space, metadata related to activities or transactions, password-protected or encrypted data, and log-in credentials and keys for cloud accounts. They also are able to capture the same kinds of information that can be viewed in a manual search. Officials then can analyze the data they have copied using powerful programs that read and sort the device's data even more efficiently than through manual searches.

44. CBP and ICE use various sophisticated tools to conduct forensic searches. For example, a CBP officer told Mr. Bikkannavar that "algorithms" were used to search the contents of his phone, indicating the use of one or more forensic tools. Likewise, an

ICE agent attempted to image Mr. Wright's laptop with MacQuisition software, and a CBP forensic scientist extracted data from the SIM card in Mr. Wright's phone and from his camera.

45. Searches of electronic devices by CBP and ICE, regardless of the method used, are extraordinarily invasive of travelers' privacy, given the volume and detail of highly sensitive information that the devices contain.

46. Searches of electronic devices also impinge on constitutionally protected speech and associational rights, including the right to speak anonymously, the right to private association, the right to gather and receive information, and the right to engage in newsgathering. For example, CBP officers twice searched the contents of Mr. Dupin's phone, which contained his confidential journalistic work product, including reporting notes and images, source contact and identifying information, and communications with editors. Similarly, on three separate occasions, officers searched the contents of Mr. Kushkush's phones, which he used for his work as a journalist, and which contained his work product, work-related photos, and lists of contacts. Such warrantless searches of travelers' electronic devices unconstitutionally chill the exercise of speech and associational rights protected by the First Amendment.

47. Border searches of electronic devices typically occur in the "secondary inspection" or "secondary screening" area of a port of entry. The secondary inspection environment is inherently coercive. Officers wear government uniforms and carry weapons, and they command travelers to enter and remain in the secondary inspection areas. Travelers are not free to exit those areas until officers permit them to leave. The areas are unfamiliar to travelers and closed off from the public areas of the airports or

period of ICE confiscation is 30 days, ICE supervisors may extend this period under undefined "circumstances . . . that warrant more time." ¶ 8.3.1.

## BORDER SEARCHES AND CONFISCATIONS OF PLAINTIFFS' ELECTRONIC DEVICES

*Ghassan Alasaad and Nadia Alasaad*

*Search 1*

62. On July 7, 2017, Plaintiffs Ghassan and Nadia Alasaad drove with their daughters and other family members from Revere, Massachusetts, to Quebec for a family vacation. During their return trip on July 12, 2017, they entered the United States at the border crossing near Highgate Springs, Vermont. Ghassan Alasaad had an unlocked smartphone, and Nadia Alasaad had a locked smartphone.

63. The Alasaads' 11-year-old daughter was ill and had a high fever.

64. CBP officers directed them to secondary inspection. Mr. Alasaad explained that his daughter was ill and needed care. Nevertheless, a CBP officer took Mr. Alasaad into a small room for questioning.

65. The Alasaads observed a CBP officer in the waiting room manually searching Mr. Alasaad's unlocked phone, which CBP officers had retrieved from the Alasaads' car.

66. The Alasaads told a CBP supervisor that their daughter's fever had worsened. The supervisor responded that they would have to continue waiting. Mr. Alasaad asked why the family was being detained and searched. The supervisor responded that he had simply felt like ordering a secondary inspection.

were told, the Alasaads understood that they would need to wait several hours for their phones to be searched. Exhausted and desperate to attend to their daughter's health, the Alasaads departed without their phones. CBP officers coerced them into leaving their phones at the border, with the threat of several more hours of detention.

71. The family departed after approximately six hours of detention.

72. Approximately fifteen days later, CBP returned the two phones to the Alasaads. On information and belief, CBP's search and seizure of Mr. Alasaad's phone damaged its functionality. Soon after CBP returned the phone to him, he attempted to access certain media files in his WhatsApp application, including videos of his daughter's graduation. The phone displayed the message, "Sorry, this media file doesn't exist on your internal storage." This problem did not occur prior to CBP's search and seizure of the phone.

*Search 2*

73. On August 28, 2017, Ms. Alasaad and her 11-year-old daughter arrived from Morocco, where they had been visiting family, in New York's John F. Kennedy International Airport. Ms. Alasaad was not carrying her smartphone with her because she had lost it while traveling. Her daughter was traveling with a locked smartphone.

74. CBP officers directed Ms. Alasaad and her daughter to a secondary inspection area. While questioning Ms. Alasaad, officers asked her to produce her phone. Ms. Alasaad informed the officers that she had lost it. Officers then searched Ms. Alasaad's handbag and found the smartphone her daughter was using. The phone was locked.

19

75. CBP officers directed Ms. Alasaad to unlock the phone. Ms. Alasaad informed the officers that she did not know the password. The officers then directed Ms. Alasaad's daughter to write down the password on a piece of paper. She did so, because the environment was coercive, and because she was an 11-year old obeying an instruction from an adult. A CBP officer took the phone to another room for approximately 15 minutes.

76. On information and belief, one or more CBP officers searched this phone during this time. They had the means to do so (Ms. Alasaad's daughter had provided the password to unlock it), and they had no reason to order her to unlock it other than to search it.

*Suhaib Allababidi*

77. On January 21, 2017, Mr. Allababidi returned from a business trip on a flight from Dubai, United Arab Emirates, to Dallas, Texas. He carried with him a locked smartphone that he used regularly for both personal and business matters inside the United States. He also carried an unlocked smartphone that he had brought on the trip because it enabled him to communicate easily while overseas.

78. At the passport control area in the Dallas-Fort Worth airport, a CBP officer directed Mr. Allababidi to a secondary inspection area. There, as CBP officers searched his belongings, Mr. Allababidi observed a CBP officer seize and manually search his unlocked phone for at least 20 minutes. The officer then returned the phone to Mr. Allababidi.

79. The officer then ordered Mr. Allababidi to unlock his other phone. Concerned about officers accessing private information on his phone, Mr. Allababidi

declined to do so. CBP officers responded by confiscating both phones, including the unlocked phone that the officer had already searched and returned to him.

80. The government returned the unlocked phone to Mr. Allababidi more than two months later. After more than seven months, CBP still has not returned the locked phone to him.

*Sidd Bikkannavar*

81. On January 31, 2017, Mr. Bikkannavar flew into Houston, Texas, from Santiago, Chile, where he had been on vacation. He traveled with a locked smartphone that is the property of his employer, NASA's Jet Propulsion Laboratory ("JPL"). Consistent with his employer's policies, Mr. Bikkannavar used the phone for both work and personal matters.

82. At the passport control area of the Houston airport, CBP officers escorted Mr. Bikkannavar to a secondary inspection area. A CBP officer seized Mr. Bikkannavar's phone. The officer coerced Mr. Bikkannavar into disclosing his phone's password. Specifically:

    a. The secondary inspection setting is inherently coercive. *Supra* ¶¶ 47–48.

    b. A CPB officer had handed Mr. Bikkannavar a CBP form titled "Inspection of Electronic Devices."[8] It stated in relevant part: "All persons, baggage, and merchandise . . . are subject to inspection, search and detention. . . . [Y]our electronic device(s) has been detained for further examination, which may include copying. . . . CBP may retain documents or information . . . . Consequences of failure to provide

---

[8] https://www.cbp.gov/sites/default/files/documents/inspection-electronic-devices-tearsheet.pdf.

21

   c. When Mr. Dupin had told a CBP officer that he was frustrated by the delay in his processing, the officer responded by putting his hand on the holster of his gun and ordering Mr. Dupin to sit down and wait.

90. A CBP officer searched Mr. Dupin's phone for about two hours. During some of this time, Mr. Dupin observed the officer manually searching his phone. At other times, the officer took Mr. Dupin's phone into another room and returned periodically to ask Mr. Dupin questions about the contents of the phone, including his photos, emails, and contacts.

91. After Mr. Dupin had spent about two hours in the smaller room, the officers returned Mr. Dupin's phone to him and told him he could leave.

*Search 2*

92. On December 23, 2016, Mr. Dupin traveled by bus with his seven-year-old daughter from Montreal to New York City. Mr. Dupin carried the same locked smartphone with him.

93. Mr. Dupin and his daughter arrived at the customs checkpoint at the U.S. border near midnight. A CBP officer directed Mr. Dupin and his daughter to a secondary inspection area, where they waited and tried to sleep. CBP officers arrived and asked Mr. Dupin some of the same questions officers had asked him in Miami.

94. During the questioning, the officers seized Mr. Dupin's phone and ordered him to provide the password to the phone. As on the day before, Mr. Dupin had no meaningful choice and provided the password.

95. The officers coerced Mr. Dupin into unlocking his phone. Specifically:

24

      a.      The secondary inspection setting is inherently coercive. *Supra* ¶¶ 47–48.

      b.      Mr. Dupin again understood, based on the CBP officers' tone and demeanor, that they were commanding him to disclose his password.

      c.      It was the middle of the night, and the bus on which Mr. Dupin and his daughter had been traveling had already departed. Mr. Dupin did not know how or when he would be able to catch another bus to New York City.

      d.      Mr. Dupin was traveling with his young daughter. When the officers ordered Mr. Dupin to unlock his phone, his exhausted daughter was trying to sleep in his lap. Mr. Dupin feared that if he refused to unlock his phone, the officers would escalate the encounter, which would upset and frighten his daughter.

96.      A CBP officer took Mr. Dupin's phone into another room for about four hours. During this time, one or more CBP officers searched the phone. An officer periodically returned to ask Mr. Dupin questions about the contents of the phone, including specific photos and emails.

97.      After approximately seven hours of detention on the morning of Christmas Eve, officers returned the phone to Mr. Dupin and told him that he and his daughter could catch another bus to New York City.

***Aaron Gach***

98.      On February 23, 2017, Mr. Gach arrived at San Francisco International Airport on a flight from Belgium, where he had participated in an art exhibition displaying works that could be considered critical of the government. He traveled with a locked smartphone.

25

99. A CBP officer directed Mr. Gach to a secondary inspection area, where two CBP officers asked him detailed questions about his work as an artist and the exhibition in Belgium and told him they needed to search his phone. Mr. Gach responded that he did not want the officers to search his phone, and he asked what specific information the officers were seeking. They refused to identify any information in response.

100. The CBP officers asked Mr. Gach why he did not want to submit his phone for a search. Mr. Gach responded that he believes strongly in the U.S. Constitution and in his right to privacy. The officers told Mr. Gach that his phone would be held for an indeterminate amount of time if he did not disclose his password. The CBP officers continued to demand that Mr. Gach submit to a phone search. Because he had no meaningful choice, Mr. Gach entered his password and handed over his unlocked phone.

101. The officers coerced Mr. Gach into unlocking his phone. Specifically:

  a. The secondary inspection setting is inherently coercive. *Supra* ¶¶ 47–48.

  b. The officers repeatedly demanded that Mr. Gach produce his phone for a search.

  c. The CBP officers told Mr. Gach that they would keep his phone for an indeterminate amount of time if he did not unlock his phone for a search.

102. The officers refused to conduct a search of the phone in Mr. Gach's presence. Instead, they took it behind a dividing wall for approximately 10 minutes.

26

103. On information and belief, one or more CBP officers searched Mr. Gach's phone during this time. They had the means to do so (Mr. Gach had unlocked it), and they had no reason to order him to unlock it other than to search it.

104. The CBP officers then returned Mr. Gach's phone and permitted him to leave the secondary inspection area.

### *Isma'il Kushkush*

*Search 1*

105. On January 9, 2016, Mr. Kushkush traveled to New York City from Stockholm, Sweden, where he had been conducting research for his master's thesis on refugees for Columbia Journalism School. He had a locked laptop computer and two unlocked cell phones, one being a smartphone, with him. He uses his laptop and phones for his work as a journalist.

106. Upon Mr. Kushkush's arrival at New York's John F. Kennedy International Airport, CBP officers took him to a secondary inspection area, where they questioned him and searched his belongings. The officers searched his notebooks, which contained information related to his work as a journalist, and asked him about the contents of the notebooks.

107. The CBP officers took Mr. Kushkush's laptop and two phones out of his sight for approximately 20 minutes. On information and belief, one or more CBP officers searched Mr. Kushkush's two phones during this time, either manually or forensically. The officers returned the devices to Mr. Kushkush and permitted him to leave after he had spent approximately three hours in the secondary inspection area.

27

information and belief, one or more CBP officers searched Mr. Kushkush's unlocked devices during that time, either manually or forensically.

113. The officers returned the devices to Mr. Kushkush and permitted him to leave after he had spent about one and a half hours in the secondary inspection area.

*Search 3*

114. On July 30, 2017, Mr. Kushkush traveled by bus from Middlebury, Vermont, where he was attending a language program at Middlebury College, to Montreal, Quebec, along with other students in the program. They returned the following day, on July 31, 2017, and entered the United States at Highgate Springs, Vermont. Mr. Kushkush carried a locked smartphone with him.

115. A CBP officer directed Mr. Kushkush to secondary inspection, where he waited for approximately one hour. An officer then demanded Mr. Kushkush's phone and the password to unlock it. The officer stated that he could seize the phone if Mr. Kushkush did not cooperate. Because he had no meaningful choice, Mr. Kushkush unlocked his phone and stated that he was doing so against his will.

116. Mr. Kushkush was coerced into unlocking his phone. Specifically:

   a. The secondary inspection setting is inherently coercive. *Supra* ¶¶ 47–48.

   b. The CBP officer told Mr. Kushkush that he would keep his phone for an indeterminate amount of time if Mr. Kushkush did not unlock his phone for a search.

117. The CBP officer wrote down the password to Mr. Kushkush's phone as he unlocked it and took the phone out of Mr. Kushkush's sight for at least one hour. On

29

information and belief, one or more CBP officers then searched the phone, either manually or forensically: they had the means to do so (Mr. Kushkush had unlocked it), and they had no reason to order him to unlock the phone other than to search it.

118. After nearly three hours, two CBP officers directed Mr. Kushkush to a separate room, where they questioned him about his work as a journalist.

119. The officers permitted Mr. Kushkush to leave after he had spent approximately three and a half hours in the customs inspection building. He was given his phone to take with him.

*Diane Maye*

120. On June 25, 2017, Ms. Maye flew from Oslo, Norway, to Miami, Florida. She was on her way home after a vacation in Europe. She was traveling with a locked laptop computer and a locked smartphone.

121. Upon landing, a CBP officer seized Ms. Maye's computer and phone and ordered her to unlock the devices. Because she had no meaningful choice, Ms. Maye unlocked both devices.

122. An officer coerced Ms. Maye into unlocking her computer and phone. Specifically:

  a. The secondary inspection setting is inherently coercive. *Supra* ¶¶ 47–48.

  b. She was confined alone with two CBP officers in a small room that felt to her like a police station. An officer had ordered her to enter the room.

  c. Ms. Maye understood, based on the CBP officers' tone and demeanor, that they were commanding her to unlock her devices.

d. Ms. Maye was exhausted after 24 hours of continuous travel, and she needed to communicate with her husband, who was waiting for her.

123. Ms. Maye observed a CBP officer manually search her unlocked laptop.

124. A CBP officer seized Ms. Maye's unlocked phone for approximately two hours. On information and belief, one or more CBP officers searched Ms. Maye's phone during this time: they had the means to do so (Ms. Maye had unlocked it), and they had no reason to order her to unlock it other than to search it.

*Zainab Merchant*

125. Zainab Merchant is the founder and editor of *Zainab Rights*, a media organization that publishes multimedia content on the Internet on current affairs, politics, and culture, and she is a graduate student at Harvard University.

126. In March 2017, Ms. Merchant traveled from her home in Orlando, Florida to Toronto, Ontario to visit her uncle. On March 5, 2017, she went to the Toronto airport for her flight home to Orlando. She carried with her a locked laptop and a locked smartphone.

127. At a U.S. customs preclearance station at the Toronto airport, she was directed to a secondary inspection area.

128. CBP officers took Ms. Merchant's laptop out of her sight.

129. CBP officers told her to turn over her smartphone. Ms. Merchant, who wears a headscarf in public in accordance with her religious beliefs, did not want to turn over the phone because it contained pictures of her without her headscarf that she did not want officers to see. It also contained information and communications related to her blog site. She told the CBP officers she would turn over the phone, but would not unlock it. A

31

135. Ms. Merchant's laptop and phone were out of her sight for approximately one and a half hours. On information and belief, one or more CBP officers searched her laptop and phone during this time: they had the means to do so (they had the passwords), and they had no reason to seize the laptop and phone other than to search them. When the CBP officers returned the phone to Ms. Merchant and she unlocked it, the Facebook application was open to the "friends" page. It had not been open to that page when she had given up the phone.

### *Akram Shibly*

### *Search 1*

136. Akram Shibly drove from his home in Buffalo, New York, to Toronto, Ontario, in late December 2016 for his job as a professional filmmaker. He returned on January 1, 2017, and sought to enter the United States at the Lewiston-Queenston Bridge in New York. He was traveling with a locked smartphone.

137. At the customs checkpoint, a CBP officer directed Mr. Shibly to a secondary inspection area, where officers told Mr. Shibly to fill out a form with information that included, among other things, his phone's password. Mr. Shibly left that line of the form blank. A CBP officer examined the completed form and ordered Mr. Shibly to provide his password. Mr. Shibly told the officer that he did not feel comfortable doing so. In an accusatory manner, the officer told Mr. Shibly that if he had nothing to hide, then he should unlock his phone.

138. Because he had no meaningful choice, Mr. Shibly disengaged the lock screen of his phone, which the officer then took from him.

139. The officer coerced Mr. Shibly into unlocking his phone. Specifically:

33

      a.    The secondary inspection setting is inherently coercive. *Supra* ¶¶ 47–48.

      b.    Mr. Shibly understood, based on the CBP officer's tone and demeanor, that the officer was commanding him to disclose his password.

      c.    Mr. Shibly feared that if he refused to unlock his phone, the officer would assume he had done something wrong and treat him accordingly. Among other things, Mr. Shibly feared that if he refused to unlock his phone, the officer would detain him for the rest of the day.

140.    The CBP officer took Mr. Shibly's phone out of his sight for at least one hour. On information and belief, one or more CBP officers searched Mr. Shibly's phone during this time: they had the means to do so (Mr. Shibly had unlocked it), and they had no reason to order him to unlock it other than to search it.

141.    A CBP officer also coerced Mr. Shibly into disclosing his social media identifiers. On information and belief, CBP officers used this information to facilitate their search of Mr. Shibly's phone as a portal to search his cloud-based apps and content.

142.    A CBP officer returned Mr. Shibly's phone and permitted him to leave the customs inspection building.

### *Search 2*

143.    On January 4, 2017, Mr. Shibly again drove from Buffalo to the Toronto area for a social outing. He returned later that day and again sought to enter the United States at the Lewiston-Queenston Bridge in New York. He was traveling with the same smartphone, but this time it was not locked, because he had not restored the lock screen that he had disengaged during the prior border crossing.

149. The CBP officers confiscated Mr. Wright's devices on instructions from ICE's Homeland Security Investigations ("HSI"), which sought "further forensic review," according to CBP documents disclosed to Mr. Wright under the Freedom of Information Act and Privacy Act ("FOIA/PA").

150. An officer informed Mr. Wright that it might take CBP as long as a year to return his devices to him.

151. Soon after leaving the airport, Mr. Wright spent $2,419.97 for a new laptop and phone. He is a computer programmer, and his livelihood depends on these tools.

152. CBP records show that HSI "attempted to image" Mr. Wright's laptop with MacQuisition software. Also, a CBP forensic scientist extracted data from the SIM card in Mr. Wright's phone and from his camera, stored the data on three thumb drives, and sent those thumb drives to other CBP officers.

153. CBP did not find any "derogatory" information about Mr. Wright, in his devices or otherwise, according to a CBP document disclosed to Mr. Wright under the FOIA/PA.

154. Mr. Wright received his devices 56 days after CBP had confiscated them.

155. On information and belief, CBP retained the information it extracted from Mr. Wright's devices:

    a. CBP extracted data from Mr. Wright's devices. *Supra* ¶ 152.

    b. The 2009 CBP Policy provides that if a CBP officer destroys the information extracted from a traveler's device, then the agent must document the destruction. ¶ 5.3.1.2.

36

    c.  CBP's documentation of its search and seizure of Mr. Wright's devices, disclosed to Mr. Wright under the FOIA/PA, does not reflect such destruction.

## FACTS RELEVANT TO ALL PLAINTIFFS

  156. All Plaintiffs face a likelihood of future injury caused by the challenged policies and practices:

    a.  Defendants adopted the policies and practices discussed above related to searching and seizing electronic devices at the border. The frequency with which border officials enforce these policies and practices against travelers is rapidly growing. *Supra* ¶ 38.

    b.  All Plaintiffs have traveled across the U.S. border with their electronic devices multiple times. All Plaintiffs will continue to do so in the future.

    c.  When Plaintiffs cross the U.S. border, they will be subject to CBP's and ICE's policies and practices. Thus, all Plaintiffs are at great risk of constitutional harm, namely, search and seizure of their devices absent a warrant, probable cause or reasonable suspicion that their electronic devices contain contraband or evidence of a violation of immigration or customs laws. There is nothing that Plaintiffs can do to avoid this harm, except to forego international travel or to travel without any electronic devices, which would cause great hardship.

  157. On information and belief, Plaintiffs are suffering the ongoing harm of CBP and ICE retaining (a) content copied from their devices or records reflecting content observed during searches of their devices, (b) content copied from their cloud-based accounts accessed through their devices or records reflecting content from their cloud-