# EXHIBIT 43



*Homeland Security Investigations*

# Search and Seizure Handbook

HSI HB 12-04 / September 14, 2012

U.S. Immigration and Customs Enforcement

Defs. 1184

### 6.3 The Fourth Amendment

The constitutional limitations on SAs' authority to conduct searches and seizures are found in the Fourth Amendment, which states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment protects against unreasonable searches and seizures and extends this protection to people and their property. It applies to all persons in the United States, whether citizen or noncitizen, and whether they are legally or illegally in the United States.

The Fourth Amendment also provides that all warrants shall be based on probable cause. The Fourth Amendment does not mandate a warrant for all searches or seizures, and the courts have recognized several exceptions under which a warrantless search is reasonable. (These exceptions, including border search authority, are discussed in subsequent chapters.)

The courts have overwhelmingly expressed a preference for searches and seizures with a warrant. As a result, it is always recommended that SAs obtain a warrant if time permits, if one of the specific exceptions to the warrant requirement does not apply, and especially if SAs have any doubt concerning whether or not a particular search or seizure requires a warrant.

### 6.4 Concept of Level of Suspicion

Ultimately, when an SA's conduct is challenged, a court will decide whether the SA acted in a reasonable manner. When determining whether the SA's actions were reasonable under the Fourth Amendment, the courts will compare the SA's conduct during the search or seizure to the level of suspicion that the SA had at the time the search or seizure was conducted. The level of suspicion is a label used to describe how certain the SA is that there was a violation of law. Generally, as a seizure or search grows broader in scope or becomes more intrusive, the required level of suspicion increases.

### 6.5 Articulable Facts

To establish a level of suspicion, the SA combines articulable facts – pieces of information that can be observed and put into words. The SA may use any reliable information to establish a level of suspicion, including, but not limited to:

   A. The SA's own observations of people and physical evidence.

   B. Information gathered from other SAs or other law enforcement officers. (Statements from law enforcement officers are generally presumed to be reliable.)

### 7.11.3 Proportionality and the Eighth Amendment

Seizures of property for forfeiture purposes should not only be "reasonable" within the meaning of the Fourth Amendment, but also be proportionate in terms of the Eighth Amendment, which states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  Defendants often attempt to avoid forfeiture by arguing that it is "excessive."  In considering a defendant's arguments, the court will weigh the extent of the criminal activity against the value of the forfeited property.  For example, if a defendant's house is to be forfeited as a narcotics stash house, the court will consider the quantity of drugs stored in the house and how frequently the house was used for this purpose.  SAs should be mindful of this potential defense against forfeiture and should document as much evidence as possible of criminal misuse, particularly in the case of facilitating properties.

### 7.11.4 Seizure Warrants

As with seizures of property for evidence, seizures of property for forfeiture may or may not require a warrant.  If SAs have probable cause that an item is forfeitable as proceeds or for facilitation and if the SAs have lawful access to the property, SAs may make some seizures without a warrant.  For example, SAs may conduct a warrantless seizure of a vehicle used to smuggle drugs if the vehicle is located on the public street.  Likewise, if SAs are executing a search warrant at a house and observe money or other high value items that they have probable cause to believe are proceeds of the crime, they may seize the items for forfeiture without obtaining a seizure warrant.

However, if time allows, it is always recommended that the SAs obtain a seizure warrant.  The use of a warrant, even if one is not required, will help to prevent legal challenges to the SAs' conduct later in the forfeiture proceedings.

With the assistance of the USAO, SAs may obtain a seizure warrant for any seizure, whether the intended forfeiture proceedings will be administrative, civil, or criminal.  When applying for a seizure warrant, an SA should prepare an affidavit establishing probable cause, which should contain the following:

   A. A section identifying the SA and describing the SA's training and experience;

   B. A section specifically identifying the property to be seized;

   C. A section explaining the legal basis for seizure and forfeiture and citing the applicable laws;

   D. A section providing the background of the investigation leading up to the discovery of probable cause for the seizure of the property; and

   E. A section that establishes the SA's probable cause for the seizure.

The SA will submit the seizure warrant, the supporting affidavit, and any sealing or other orders to a federal magistrate or district judge, swearing before the judge to the veracity of the affidavit. When issued, the warrant will command the SA or any authorized officer to execute the seizure within a 10-day period. Once executed, the SA must leave a copy of the warrant with the owner of the property or at the location where the property was seized. The SA must then return the warrant to the issuing judge or magistrate in a timely manner, specifying what property, if any, was located and seized pursuant to the warrant.

### 7.11.5  Asset Identification and Removal Groups

AIRGs are located in the SAC offices to assist criminal case agents with seizures of property for forfeiture. If SAs need additional expertise or assistance with forfeiture questions that arise during an investigation, they may contact the local AIRG. If an investigation holds the potential for significant seizures and forfeitures of property, the SAs should enlist the aid of the local AIRG as early in the investigation as possible.

Forfeitures of real property or businesses involve additional pre-seizure planning and forfeiture considerations. Only SAs assigned to an AIRG may seize real property. If a case holds the potential for forfeiture of real property or a business entity, the criminal case agent must request assistance from the local AIRG. The criminal case agent also should contact the local AIRG if the investigation involves any asset valued at more than $100,000. (*See* the Asset Forfeiture Handbook (HSI HB 10-04), dated June 30, 2010, or as updated.)

### 7.12  Electronic Tracing System

When acting in the capacity of seizing officer during any enforcement action or investigative process resulting in firearms seizures, or when encountering firearms during the course of an enforcement action or investigation, SAs should use the Bureau of Alcohol, Tobacco, Firearms, and Explosives' (ATF's) Electronic Tracing System (eTrace).

eTrace is a firearms trace request submission system and interactive trace analysis module that facilitates firearms tracing. eTrace provides the electronic exchange of gun crime incident data in a Web-based environment with a portal to ATF's Firearms Tracing System (FTS) database. The system provides real-time capabilities that allow ICE HSI SAs to submit electronic firearms trace requests, monitor the progress of traces, retrieve completed trace results, and query firearms trace-related data in the FTS database. Firearms tracing is the systematic tracking of the movement of a firearm from its creation by the manufacturer or its introduction into the U.S. commerce by the importer, through the distribution chain, to the first retail purchase.

eTrace also provides HSI SAs with the ability to initiate a search on virtually any data field or combination of data elements such as firearms serial numbers, an individual's name, type of crime, date of recovery, or other identifiers. Additionally, HSI SAs can generate statistical reports on the number of traces submitted, the top firearms traced, the average time-to-crime rates, and other variables.

has approved the affidavit and prepared the appropriate accompanying documents, the SA will present the affidavit to a federal magistrate or judge, affirm its contents under oath, and sign the affidavit in the presence of the judge or magistrate.

**8.2   Contents of a Search Warrant Affidavit**

While the precise format may vary depending on the nature of the property or item to be searched and the district in which the SA is operating, an SA's search warrant affidavit should include the following:

A. An introductory section identifying the SA and describing the SA's background, training, and experience.

B. A section describing the purpose of the affidavit, including the specific statutory violations and legal authorities for requesting the warrant.

C. An identification of the property or item to be searched.  This should consist of as complete a description of the property or item as possible, including not only an overall description of the property or item, but also any identifying marks or numbers (e.g., addresses, license plate numbers, vehicle identification numbers, serial numbers, etc.).  The description of the property or item to be searched is often incorporated into an attachment to the affidavit.

D. A detailed description of the evidence sought and the items to be seized.  This also may be included as an attachment to the affidavit.  The list should be as detailed and inclusive as possible.

(Note:  If SAs have probable cause to search for evidence that may be stored in electronic form, they should enlist the aid of their local computer forensics group.  Likewise, if they have probable cause to search for and seize financial documents, SAs should consult their local AIRG or financial investigative group.  These subject matter experts can assist in providing the appropriate language to be included in this section of the affidavit.)

E. A section providing background information about the investigation.  This may include an overview of the investigation leading up to the discovery of probable cause for the search warrant.  For investigations dealing with complex violations or technical issues, this section may also provide definitions or explanations necessary for an understanding of the probable cause.

F. A statement of probable cause.  It is not necessary to relate every fact of the investigation to the judge or magistrate, but it is important to be thorough and include enough detailed information for the judge to make a finding of probable cause based solely on the affidavit.  Information establishing probable cause should be timely, i.e., it should be recent enough to convince the judge that the evidence and items to be seized are still located in the place to be searched.

Probable cause may be established by means of any of the articulable facts described in Section 6.5. It may include both the SA's firsthand observations and hearsay. If the SA uses hearsay from non-law enforcement third parties, such as informants, the SA should include the reasons why he or she believes that the information is reliable. If the SA used his or her training and experience to add value to certain facts in the investigation, this should be stated and explained in the affidavit.

G. In applicable cases, the SA will include a statement justifying nighttime execution or a "no knock" entry. Primarily, justification for a "no knock" entry or nighttime execution are based on either officer safety or preventing the destruction of evidence. The list of factors that could fall under these general categories are numerous and should be articulated to the judge or magistrate in the affidavit when a "no knock" entry or nighttime execution is sought.

H. A search warrant may include additional attachments that provide documentary evidence for some of the assertions made in the statement of probable cause. Most search warrants will not include such attachments, but they are useful in cases where references to documentary evidence are so frequent that it is easier and clearer to attach the document itself.

## 8.3   Issuance of a Search Warrant

Upon a finding of probable cause, the judge or magistrate will issue a search warrant to be served within 10 calendar days from issuance. If, for some reason, SAs are unable to execute the warrant within the 10-day period, the warrant will become invalid and the SAs must apply for a new warrant based on whatever probable cause may still be timely.

Although a specific SA may be named as the affiant to a search warrant affidavit, it is recommended that the search warrant itself be directed to "any Special Agent of the U.S. Immigration and Customs Enforcement." If the affiant becomes unavailable, or if multiple warrants are to be served simultaneously at different locations, this wording will allow another SA to execute the search warrant.

## 8.4   Telephonic Search Warrants

In some critical circumstances, a federal judge or magistrate may issue a search warrant based on sworn testimony communicated by an SA from a remote location. In the past, these warrants were obtained by reading a warrant and probable cause statement over the telephone. Rule 41 of the FRCrP was modified to allow for the submission of search warrants by facsimile or other "reliable electronic means."

When seeking a telephonic warrant, the SAs should be prepared to show that: 1) they could not reach the magistrate in his or her office during regular business hours; 2) the SAs seeking to make the search are at a significant distance from the magistrate; 3) because of the particular factual situation, it would be unreasonable for a substitute SA who is near the magistrate to prepare a written affidavit and appear before the magistrate in person; and 4) the need for a

If SAs working in a border environment believe that an individual may be armed, they may conduct an immediate patdown of the individual. It may be conducted when there is reasonable suspicion that the person is armed. An immediate patdown is not a border search for merchandise, but rather a search conducted for the safety of the SAs and others. SAs should limit the immediate patdown to areas where they believe a weapon may be concealed.

Any border search beyond the scope of a routine personal search or an immediate patdown for weapons should be conducted by an SA of the same sex as the individual being searched. SAs should take care to conduct these more intensive personal searches in a private area away from the eyes of the public.

With some or mere suspicion, SAs may move a person to a private area and conduct a patdown search of an individual. As opposed to an immediate patdown for weapons, a patdown search is a search for merchandise and requires no suspicion. It may consist of one or more of the following actions:

    A. Patting the hands over the person's body.

    B. Removing the person's shoes.

    C. Lifting the pant leg or hem of a skirt a few inches.

    D. Removing a belt.

    E. Examining or reaching into pockets.

    F. Rolling up shirt sleeves.

    G. Removing a wig or hairpiece.

If, during the course of the patdown search, SAs develop reasonable suspicion that the person has merchandise concealed beneath the clothing, the SAs may conduct a partial body search. A partial body search is the removal of some of the clothing to recover an item hidden underneath. The removal of clothing should be limited to the area where the SAs believe the merchandise is hidden. The SAs should conduct a partial body search in a private area out of the public view. Unless the person refuses to cooperate, SAs should conduct the search by directing the person to remove his or her own clothing.

Any personal search related to the suspected concealment of merchandise within a person's body, i.e., x-ray or body cavity search, must be conducted by medical personnel and requires reasonable suspicion that the individual is concealing material evidence inside his or her body. In the absence of consent for an x-ray, monitored bowel movements may be conducted. All decisions regarding appropriate medical procedures for a patient are to be made by medical personnel only. CBP officers and HSI SAs neither suggest nor concur in any medical procedure.

## Chapter 11. IMMIGRATION BORDER AUTHORITY

The INA grants SAs the statutory authority to conduct certain types of border searches and seizures. While the purpose of a customs border search is to look for merchandise, the purpose of a border search under the INA is to examine aliens regarding their admissibility, search for aliens who are being transported into the United States, and search for documentary or other evidence of the alienage and admissibility of persons seeking entry into the United States.

### 11.1   Questioning and Routine Searches at the Functional Equivalent of the Border

Persons seeking admission to the United States must present themselves to an immigration officer at a U.S. POE. POEs are defined as FEBs, as discussed in Section 10.5, and may be land POEs, seaport POEs, or airport POEs. While inspections at POEs to determine admissibility are generally carried out by CBP officers, the INA also grants this authority to ICE HSI SAs.

An applicant for admission who claims to be a U.S. citizen must establish that fact to the SA's satisfaction. If U.S. citizenship is established, the person is not subject to any further examination under the INA and must be allowed to proceed (although he or she may still be detained and searched for merchandise under the SAs' customs border authority). If U.S. citizenship is not established, the person may be detained and examined as an alien. For additional guidance on claims of U.S. citizenship, refer to ICE Memorandum 16001.1, "Superseding Guidance on Reporting and Investigating Claims to United States Citizenship," dated November 19, 2009, or as updated.

An alien applicant for admission must answer any questions posed by SAs regarding whether or not the applicant is admissible, his or her purpose for seeking admission, the intended length of stay, and whether or not the applicant intends to establish permanent residence or become a U.S. citizen. The applicant must also present any documentation required to establish, to the SA's satisfaction, that the individual is entitled to enter the United States and is not subject to exclusion under the provisions of the INA.

In addition to the authority to detain and question, the INA grants SAs the authority to conduct routine searches at the FEB. The purpose of these searches is to look for documents or other evidence which might substantiate grounds for denial of admission. With mere suspicion that a person is inadmissible, an SA may search the person's outer clothing, luggage, and other personal effects. At the FEB, SAs may also search, with mere suspicion, any conveyance suspected of containing aliens or of containing documents relating to a person's admissibility.

To conduct a more intensive personal search – a partial body search or a destructive search of a vehicle, for example – SAs must have reasonable suspicion that the search will reveal evidence of a person's inadmissibility.

### 11.2   Access to Lands Within 25 Miles of the Border

Under Section 287(a)(3) of the INA [8 U.S.C. §1357(a)(3)], SAs are authorized to enter private lands located within 25 miles of the border for the purpose of patrolling the border to prevent the

_____
Search and Seizure Handbook                               53                         OFFICIAL USE ONLY
September 14, 2012

Defs. 1224