# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Case No. 17-cv-11730-DJC

GHASSAN ALASAAD et al.,

Plaintiffs,

v.

KEVIN K. MCALEENAN, Acting Secretary
of the U.S. Department of Homeland Security,
in his official capacity, et al.,

Defendants.

DECLARATION OF RANDY J.
HOWE, EXECUTIVE DIRECTOR,
OPERATIONS, OFFICE OF FIELD
OPERATIONS, U.S. CUSTOMS
AND BORDER PROTECTION,
DEPARTMENT OF HOMELAND
SECURITY (DHS)

I, Randy J. Howe, hereby state as follows:

1. I am the Executive Director of Operations, the Office of Field Operations (OFO), U.S.
Customs and Border Protection (CBP), Department of Homeland Security (DHS). I have
been employed with CBP for over 31 years and I have held this position since October,
2017. I began my career in 1988 with the U.S. Immigration and Naturalization Service.
During my 30 years of federal service, I have held various leadership positions, including
Area Port Director, Buffalo; Assistant Director for Border Security; and Border Security
Coordinator. Immediately prior to assuming my current role, I served as Director of Field
Operations for the Preclearance Field Office.

2.  In my role as the Executive Director for Operations, I am responsible for executing the missions of CBP and, in particular, OFO.  The CBP mission includes the enforcement of the customs, immigration, and agriculture laws of the United States and hundreds of other laws at the border on behalf of numerous federal agencies.  OFO is the primary law enforcement office responsible for securing the U.S. border at ports of entry (POEs) and Preclearance locations outside of the U.S., while facilitating lawful international trade and travel.

3.  In my current position, I oversee the operations of more than 23,000 employees, with operations at 19 major field offices, 328 POEs, and 16 preclearance locations.

4.  As Executive Director, Operations, I am familiar with CBP's administration and enforcement of legal requirements at the border, including the enforcement and administration of immigration and customs laws and the inspection, processing, and admission of persons and things that seek to enter or depart the United States.  To accomplish its mission, CBP Officers conduct searches and inspections at the border and POEs.  This requires using a variety of investigative and law enforcement techniques.  It also entails the exercise of border search authority, which permits CBP Officers to detain and search persons and goods at the border without suspicion.

5.  This declaration is based on my personal knowledge and other information obtained in the course of my official duties and responsibilities.  I make this declaration in support of Defendants' motion for summary judgment in the above-captioned case.

6.  This declaration explains the unique nature of border inspections, describes the importance of border searches generally, and of electronic devices specifically, and demonstrates why a warrant requirement would not only endanger national security, but threaten CBP's ability to meet its mission responsibilities at the border.

DECLARATION OF RANDY J. HOWE
OFFICE OF FIELD OPERATIONS
U.S. CUSTOMS AND BORDER PROTECTION

7. CBP's law enforcement mission is primarily interdictive in nature – identifying and mitigating threats to border security and stopping prohibited and restricted goods and inadmissible aliens from crossing the border, while facilitating and expediting the flow of legitimate travelers and trade. *See* 6 U.S.C. § 211.  In this role, CBP is responsible for enforcing criminal and civil laws and administering comprehensive regulatory schemes. CBP border enforcement efforts include those relating to immigration, customs, international trade, child pornography, drug smuggling, weapons trafficking, financial crimes as well as national security and terrorism.  In addition, CBP enforces a host of other laws at the border on behalf of various federal agencies. *See, e.g.*, 31 U.S.C. § 5317; 19 CFR 161.2(a); 19 CFR Part 12.  CBP accomplishes this mission by conducting border inspections of all persons and goods at ports of entry.

8. Border inspections are unique and unlike any other law enforcement activity.  CBP's mission to inspect all people and things that cross the border must be balanced with its mission to facilitate the flow of travelers and trade.  Over one million travelers per day go through U.S. ports of entry, and CBP has limited to no advance information about these travelers.  The sheer volume of people and merchandise passing through the border each day means CBP has a limited amount of time to determine the specific law enforcement actions appropriate for each encounter.

9. TECS is CBP's principal law enforcement and anti-terrorism database system used at the border to assist with inspections and determinations regarding admissibility of arriving persons.  TECS includes law enforcement "lookouts" and other records entered by CBP and other law enforcement agencies regarding persons of interest.  These "lookouts" can include, for example, information pertaining to known or suspected criminals, wanted persons, and

persons of interest for law enforcement and counterterrorism purposes. TECS also receives Terrorist Screening Database (TSDB) data from the Federal Bureau of Investigation (FBI) Terrorist Screening Center (TSC) via the Watchlist Service (WLS). TECS also includes law enforcement records documenting certain inspections conducted by CBP at the border, including border searches of electronic devices. CBP also has access to other sensitive and classified information (though such information is not necessarily stored in TECS). CBP's documentation of its inspections are official government records made by the agency to evidence the decisions made and activities undertaken by CBP during the course of the encounter.

10. CBP officers evaluate the totality of the circumstances for each encounter at the border and will consider every piece of relevant information available to determine if the person and goods are admissible into the United States, if there is a violation of any of the laws CBP enforces or administers, or if there is a threat to border security.

11. When CBP has advance information about travelers or merchandise, CBP compares the advance information against law enforcement and intelligence information and conducts risk assessments to identify travelers or merchandise that warrant additional scrutiny, and a "lookout" can be placed in the TECs system to advise officers to perform additional scrutiny. Relevant information may be specific to an individual (*e.g.*, a prior conviction for possession of child pornography), or it may be an identified pattern of behavior that is associated with a threat to border security (*e.g.*, a travel pattern associated with drug smuggling). This risk assessment is crucial given the volume of travelers and goods that CBP inspects.   CBP can utilize the Automated Targeting System (ATS) to identify individuals and cargo that may require additional scrutiny ATS compares traveler, cargo,

and conveyance information against law enforcement, intelligence, and other enforcement data using risk-based assessments.   ATS uses, among other thigs, data from CBP's Advance Passenger Information System (APIS).  APIS includes information collected in advance of an air or sea passenger's departure from or arrival to the United States; the information collected and submitted to APIS can also generally be found on routine entry documents that passengers and crew members must provide when being processed into or out of the United States.

12. Upon arrival in the United States, individuals are generally required to present themselves to CBP at the port of entry's primary arrival location, often referred to as "primary" or "primary inspection."  At primary inspection, CBP Officers inspect travelers' documentation (*e.g.*, passport, customs declaration), attempt to verify travelers' identity and citizenship, and ask questions regarding their travel.  The CBP officer at primary may use the information provided by the traveler to conduct limited queries of information maintained in TECS.  The information available to the officer at primary includes biographical information, manifest information transmitted by the carrier and/or APIS information where available, queries against lookouts (such as "wants and warrants" and terrorist watchlist information), vehicle information (in the land environment), and information about the traveler's prior border crossings.  The information available to the officer at primary does not generally include information relating to past border searches of electronic devices; the CBP officer conducting the initial processing of travelers at primary is not automatically informed of the presence of records relating to past border searches of electronic devices and generally does not consult records relating to past border searches of electronic devices during the course of primary inspection.

DECLARATION OF RANDY J. HOWE
OFFICE OF FIELD OPERATIONS
U.S. CUSTOMS AND BORDER PROTECTION

13. CBP Officers use the available information and their extensive training and experience to identify situations that warrant additional scrutiny. If the CBP Officer at primary determines that additional scrutiny is appropriate (for example, to address concerns related to admissibility, customs, national security, and/or agricultural laws or other laws enforced or administered by CBP), the traveler may be referred for a continuation of the inspection, often referred to as "secondary" or "secondary inspection." A secondary inspection is a continuation of the border inspection and an officer may refer any traveler to secondary inspection. At secondary, the CBP officer may run law enforcement queries through TECS and other CBP systems. The information available at secondary includes the same types of information available at primary, but may also include additional information that is not generally available at primary, including additional records relating to prior encounters between the traveler and CBP. CBP officers conducting secondary inspection generally have access to TECS records regarding prior border searches of electronic devices, if they elect to query such records.

14. CBP's unified border mission responsibilities are varied and complex, and CBP Officers take a holistic approach that accounts for the totality of the circumstances in order to properly evaluate and assess the people and goods that seek to cross the border. During an inspection, every piece of information is evaluated in light of all of the other information. The inspection will continue until the officer is able to assess and evaluate the situation and resolve any concerns about border security or violations of law CBP is authorized to enforce or administer.

<u>Border Searches Of Electronic Devices Are An Essential Law Enforcement Tool</u>

15. Border searches of electronic devices must be evaluated in the broader context of border search authority generally. During border inspections, CBP Officers employ a range of law enforcement techniques. For example, CBP Officers may ask questions, conduct personal searches, inspect baggage, test samples of items, conduct queries in government databases, and inspect personal possessions, documents, and other merchandise crossing the border

16. The ability to engage in these actions and the discretion to determine – based on the totality of the circumstances – which actions are appropriate in a given inspection is crucial to CBP's ability to secure the border and identify and interdict threats to national security.

17. CBP conducts border searches in furtherance of CBP's mission responsibilities as described above. CBP Officers do not initiate border searches, including electronic device searches, for the purpose of gathering evidence to support prosecutions for crimes that lack a nexus to the border (though, as federal law enforcement officers, CBP Officers should not disregard evidence of criminality that is uncovered during a border search). Rather, border searches are employed to identify and resolve issues relating to the entire gamut of laws enforced and administered by CBP at the border.

18. CBP and U.S. Immigration and Customs Enforcement (ICE), another component of the Department of Homeland Security, exercise concurrent border search authority. CBP Officers and ICE Homeland Security Investigations (HSI) agents are federal law enforcement officers who are designated as both customs officers and immigration officers and authorized to exercise border search authority. HSI agents are also criminal investigators. Where circumstances warrant, CBP Officers may notify ICE of a matter encountered during the course of a border inspection, and ICE HSI agents may engage in

additional follow-up investigation, particularly where the matter may lead to criminal prosecution.

19. CBP's interest in searching for evidence relating to legal violations with a nexus to the border, is just as vital as its interest in searching for contraband itself. First, in many instances, CBP is unable to determine whether a traveler is carrying contraband, such as drugs or export-controlled materials, without examining relevant evidence of such crimes. For example, a traveler's electronic device may contain information indicating the traveler is transporting narcotics using sophisticated concealment techniques, and the narcotics would not have been uncovered but for the information contained in the device.

20. Relatedly, CBP would be unable to accomplish its mission to disrupt many border-related crimes, such as human trafficking, drug smuggling, and export control violations if it could not search for evidence related to who is participating in those activities, where the crimes are taking place, and how the crimes are being executed. For example, a traveler's electronic device may contain information evidencing the purchase of goods for export in violation of economic sanctions, an unlawful transaction that is difficult to establish without review of the documentary evidence.

21. All persons, conveyances, cargo, baggage, personal effects and merchandise of every description may be subject to a border inspection, inbound or outbound. This may include things as varied as a shipping container, a mobile home, a suitcase, or a purse, along with any items these things might contain.

22. CBP's border inspection may also include a border search of an electronic device. All border searches of electronic devices are undertaken in compliance with CBP Directive 3340-049A, *Border Search of Electronic Devices* (January 4, 2018) (CBP Directive). The

CBP Directive provides comprehensive policy guidance and standard operating procedures for conducing border searches of electronic devices.  The CBP Directive fulfills the requirement the Trade Facilitation and Trade Enforcement Act of 2015, codified at 6 U.S.C. § 211(k), to establish standard operating procedures for searching, reviewing, retaining, and sharing information contained in communication, electronic, or digital devices encountered by CBP personnel at United States ports of entry.

23. Electronic devices are merchandise capable of containing contraband, such as child pornography; items that violate intellectual property rights; classified information on a device not authorized to maintain such information; export controlled material, and many others.  Electronic devices can also contain records which constitute evidence of a crime or other legal violation.

24. The following real-life example further clarifies how a warrantless search of an electronic device is critical to detecting such electronic contraband, in the context of a border inspection.  CBP stopped Hernando Vergara upon returning from a cruise in Mexico.  CBP officers conducted a brief manual search of "about five minutes" of one of Vergara's cell phones, which uncovered what appeared to be a video of child pornography.  *United States v. Vergara*, 884 F.3d 1309, 1311 (11th Cir. 2018).  A subsequent advanced search of his phones revealed "more than 100 images and videos" of child pornography, leading to Vergara's indictment and conviction for transporting and possessing child pornography, resulting in a sentence of 96 months' imprisonment.  *Id.*  If probable cause and/or a warrant had been required to conduct a search of Vergara's phone, it is highly likely that CBP agents would have been unable to conduct a search, and instead Vergara and his contraband would have entered the country, his crimes going entirely undetected.

25. CBP inspections at the border may involve any number of electronic devices including computers, tablets, removable media such as flash drives, disks such as CDs and DVDs, external hard drives, tapes, mobile phones, cameras, and media players.

26. As international travelers carry more electronic devices, there is a greater likelihood that information that was previously maintained in hard copy form, and easily accessible to CBP Officers, is now maintained electronically.  For example, historically, information documenting the purpose of an individual's trip abroad or their intent upon entry into the United States – such as travel itineraries, lodging information, or contact information – would have been included in hard copy that CBP would have viewed during inspections. CBP often reviews such information to determine the veracity of a traveler's statements at the border which may be crucial for identifying a threat to border security (such as terrorism information) or may inform a determination of admissibility for a foreign national (such as by indicating an intent to work in the United States that is inconsistent with the visa category).  Now, such information is often contained in electronic devices.  In short, border searches of electronic devices enable CBP to distinguish between legitimate travelers and travelers who violate the law or present threats to border security.

27. Through border searches of electronic devices, CBP has identified threats to national security, including a significant amount of information relating to terrorism.

28. As Executive Director, I am personally familiar with numerous incidents in which CBP Officers exercised their discretion to refer an individual for additional scrutiny based on no advance information or suspicion and in which the resulting search of the individual's electronic device revealed information of threats to national and/or border security.  For example, I am personally familiar with incidents in which CBP had no advance information

about a particular traveler and conducted a border search of an electronic device that revealed: (1) personal photographs of the subject of the border inspection with terrorist propaganda; (2) videos depicting terrorist images, violence and murder that could not be satisfactorily explained by the subject of the search; (3) evidence that the individual was procuring precursor materials and experimenting with explosive devices; (4) evidence that the individual was interested in joining or supporting a terrorist organization and had been radicalized during their international travel; (5) materials regarding terrorism along with evidence of the purchase of unusual amounts of weapons; (6) evidence of an attempt to bring a minor across the border to engage in sexual activity; (7) evidence that the subject of the search targeted individuals of a particular ethnicity for violence; and (8) evidence of a credible imminent threat to public safety and officer safety.

29. I am also personally familiar with situations in which CBP Officers exercised their discretion to refer an individual for additional scrutiny and the resulting search of the subject's electronic device revealed information that clearly contradicted the individual's stated purpose for travel to the United States.  For instance, an electronic device may contain information indicating an alien was intending to work in the United States contrary to the limitations of his/her visa or evidence of violations of laws relating to controlled substances.

30. I am aware of instances where border searches of electronic devices have revealed information that was used to support a criminal prosecution, such as child pornography and narcotics or have revealed information that facilitates the execution of the non-criminal aspects of CBP's mission, which includes the enforcement of civil and administrative legal requirements.  For example an electronic device search may support a determination that a foreign national is inadmissible (or admissible, as the case may be), lead to a forfeiture of

prohibited merchandise or contraband, form the basis for a civil penalty for violation of customs laws, or reveal terrorism information.

31. The vast majority of border searches of electronic devices are basic searches that may be as short as a matter of minutes and that may involve briefly scrolling through the device.  In many instances, a brief, basic search is sufficient to alleviate – or heighten – concerns presented during a border inspection.

Judicial Limitations On Border Search Authority Would Endanger
National Security And Impede CBP's Ability To Secure The Border

32. Any effort to detail the impact a probable cause and/or warrant requirement for border searches of electronic devices would have involves some amount of prediction because it has *never* been required by a court for any border search (with very limited exceptions for certain types of searches involving international mail).  Nevertheless, it is clear that a probable cause and/or warrant requirement for border searches of electronic devices would, at the very least, create a special class of merchandise at the border insulated from CBP's general search authority; would likely impede CBP's ability to expeditiously complete certain border inspections; would likely prevent CBP from detecting electronic contraband; and would deprive the federal government of crucial information, including terrorism related information, that informs admissibility determinations relating to both people and goods.

33. As explained above, each day, CBP is responsible for inspecting and establishing the admissibility of over 1 million travelers and over $7.5 billion worth of imported products. Many travelers enter the United States via a land border and CBP has little to no advance knowledge of those travelers yet still has to make a determination if that individual and his personal belongings are entitled to entry. The border inspection is the first and most critical

DECLARATION OF RANDY J. HOWE
OFFICE OF FIELD OPERATIONS
U.S. CUSTOMS AND BORDER PROTECTION

moment when the United States government makes a determination as to whether someone, and their possessions, may enter the country. Thus, a probable cause and/or warrant requirement is not feasible in the unique context of the border and would likely be unworkable if required for border searches of electronic devices. Unlike a typical law enforcement investigation, the nature of the border environment requires CBP to make rapid determinations regarding the people and things present at the border, based on the limited information available, generally without the benefit of extrinsic information developed through a prolonged investigation.

34. In contrast, a warrant necessarily requires advance information to support the probable cause determination, requires the time and deliberateness associated with review by a neutral magistrate, and requires the identification of a specific person or thing to be searched and the particular crime that is implicated. In a border environment, such advance information necessary to support probable cause for search is often minimal.

35. Based on my knowledge and experience, requiring probable cause and/or a warrant to conduct a border search of an electronic device would significantly hamper CBP's ability to fulfill its mandate to secure the border and identify and interdict threats to border security and national security because the result would be that most electronic devices would not be able to be searched. CBP simply cannot fulfill its mandate if all electronic devices could be introduced into the United States without being subject to inspection.

36. Based on my knowledge and experience, a warrant and/or probable cause requirement for electronic devices would lead to several negative effects. First, it would likely increase the length of detentions and increase the number of instances in which a traveler's device was detained after the traveler was released, as CBP would need to consult alternatives sources

DECLARATION OF RANDY J. HOWE
OFFICE OF FIELD OPERATIONS
U.S. CUSTOMS AND BORDER PROTECTION

of information to resolve issues as to the admissibility of the traveler or the device or, if the issue could not be resolved and circumstances warranted, CBP would need to seek a warrant to conduct a search of the device.  Second, it would likely increase the number of instances in which an alien was unable to establish their admissibility to the satisfaction of the CBP Officer, as CBP may lack access to important information regarding the alien's intentions in traveling to the United States (information that previously may have been routinely examined in hardcopy).  Third, it would likely increase the burden on the judicial system given the sheer volume of international travelers and the multitude of legal requirements that apply at the border.  Fourth, it would likely increase the number of electronic devices excluded from the United States due to CBP's inability to complete the inspection of the item.  Fifth, it would likely result in travel delays due to the increased time involved in pursuing a warrant or due to the inability to resolve issues at the border without gathering information from other sources, if they exist.  Sixth, it would introduce a threat to national security given the various types of information that may be contained in an electronic device and the  difficulty in demonstrating probable cause in the border environment

37. For example, if CBP had concerns about a traveler that did not rise to the level of probable cause – such as evasive answers or contradictory statements – CBP could refer the traveler to secondary inspection to resolve the concern.  If, under current authority, the CBP Officer conducted a brief basic search of the traveler's electronic device, that review may quickly and effectively clarify the purpose of the traveler's international trip and resolve the issue. If CBP were prohibited from conducting that search, however, the CBP Officer would be more likely detain the traveler for extensive questioning, thoroughly search the remainder of the traveler's belongings, conduct additional research, and engage in other actions as needed

DECLARATION OF RANDY J. HOWE
OFFICE OF FIELD OPERATIONS
U.S. CUSTOMS AND BORDER PROTECTION

to resolve the concern. This would increase the length of the traveler's detention and reduce efficiency, which would undermine CBP's mission to facilitate legitimate travel and trade. While CBP Officers conduct border searches of electronic devices in only a minute fraction of a percent of border inspections, they do so when it is appropriate in the context of the totality of the circumstances. In those situations, searches of electronic devices are an indispensable law enforcement tool at the border.

38. A requirement to obtain a warrant to search electronic devices at the border would pose a clear threat to CBP's law enforcement mission and thereby present a critical threat to national security by creating a safe-haven for contraband and evidence for those who would seek to harm United States interests. Indeed, shielding electronic devices while permitting border searches of all other items would provide an obvious incentive for criminals to use electronic devices to introduce contraband and other security threats into the United States. The inability to search or detain an electronic device absent probable cause thus risks creating a significant blind spot in CBP's ability to assess persons and things crossing our borders.

39. When it comes to contraband, an electronic device is no different than any other container that may contain prohibited merchandise or other items that are unlawful to import or possess. For example, an electronic device can contain child pornography, classified information, technology and data subject to export controls, and counterfeit or pirated digital materials. Electronic devices can also contain information that poses a threat to national security, including terrorist information, seditious materials, and information relating to weapons proliferation.

40. I am aware that plaintiffs assert digital contraband such as child pornography can also be distributed through the internet and, as a result, may bypass border inspections conducted at ports of entry.  While child pornography is distributed through the internet, it is also transported in the personal electronic devices of travelers.   The fact that contraband is available domestically does not obviate the fact that it is unlawful to possess such material while crossing the border.  Just as it is entirely appropriate for CBP to conduct border searches for narcotics despite the fact they may be available domestically, the government has a strong interest in interdicting digital contraband contained in electronic devices that are crossing the border.

41. I am also aware that plaintiffs argue that certain border searches of international mail already require a warrant and therefore, according to plaintiffs, a warrant requirement for border searches of electronic devices would not impose an undue burden on the government.  However, this warrant requirement is for limited circumstances and rarely exercised. By regulation, customs officers are required to obtain consent or a warrant to open sealed letter class mail that appears to contain only correspondence or to read correspondence contained in sealed or unsealed letter class mail.  19 C.F.R. §§ 145.2 and 145.3.  CBP policy on the search of inbound international mail is consistent with the governing regulations.  However, these limited requirements only apply to one type of mail – specifically, letter class mail.  Furthermore, the applicable policy and regulations only apply to international mail articles being transmitted in the postal system.  Letters carried by individuals or private carriers (e.g., express consignment operators) are not considered to be mail, even if they are stamped.

42. With regard to the governmental interests served by border search authority, electronic devices are markedly different from correspondence in the international postal system. An electronic device, by its nature, can serve as a virtual container for many different types of information and digital media, including prohibited or restricted items, but the nature of the device's contents cannot be known unless the information is actually reviewed. Mail, on the other hand, contains a physical object or objects that can be examined non-intrusively without opening the article (e.g., by feeling the envelope, conducting an x-ray scan, etc.). See 19 C.F.R. Part 145 App'x, sec. C. Thus, information can be gleaned about the contents of a mail article without opening a sealed envelope or reading the correspondence; the same cannot be said about the contents of an electronic device. Furthermore the restrictions on examining correspondence contained in letter class mail only applies to mail articles in the international postal system. In contrast, the vast majority of electronic devices inspected by CBP are in the possession of an individual who is seeking to bring the device into the United States. By virtue of crossing the international border, that individual is already subject to inspection and the reduced expectation of privacy that encounter entails.

43. Based on my training and experience, the imposition of a probable cause and warrant requirement on border searches of electronic devices would incentivize individuals who traffic in prohibited materials to store such information in electronic devices when traversing the border and would remove the clear deterrent effect of border searches for electronic devices. It would also adversely impact CBP's ability to utilize border search authority in furtherance of the United States' clear interests in enforcing the law at the border and protecting border security.

DECLARATION OF RANDY J. HOWE
OFFICE OF FIELD OPERATIONS
U.S. CUSTOMS AND BORDER PROTECTION

1

2

I declare under the penalty of perjury that the foregoing statements are true and correct, to the best of my knowledge, information, and belief.

3

Dated: June 6, 2019

Randy J. Howe
Executive Director, Operations
Office of Field Operations
U.S. Customs and Border Protections

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

DECLARATION OF RANDY J. HOWE
OFFICE OF FIELD OPERATIONS
U.S. CUSTOMS AND BORDER PROTECTION