# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

GHASSAN ALASAAD et al.,

                Plaintiffs,

v.

KEVIN K. McALEENAN, Acting Secretary of the U.S. Department of Homeland Security, in his official capacity, et al.,

Case No. 17-cv-11730-DJC

DECLARATION OF DAVID L. DENTON, DEPUTY ASSISTANT DIRECTOR, CYBER DIVISION, HOMELAND SECURITY INVESTIGATIONS (HSI), U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE), DEPARTMENT OF HOMELAND SECURITY (DHS)

I, David Lee Denton, hereby declare as follows:

1. I am the Deputy Assistant Director, Cyber Division, Homeland Security Investigations (HSI), U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS), in Fairfax, Virginia. I have held this position since January 22, 2018.

2. I began my career in federal law enforcement in 1996 as a Special Agent with the former U.S. Customs Service in the San Ysidro and San Diego, California field offices. I then worked in ICE headquarters in Washington, D.C. as a Program Manager and Section Chief within the Financial, Narcotics, and Public Safety Investigations Division. I served as ICE Deputy Attaché in Montreal, Canada, responsible for facilitating investigative requests between HSI domestic offices and HSI's Canadian law enforcement and government counterparts regarding border related national security, immigration, and customs criminal

enforcement matters. Prior to joining HSI's Cyber Division, I served as the HSI Assistant Special Agent in Charge, Alabama, supervising approximately 40 HSI Special Agents and support personnel, and approximately 25 Task Force Officers in offices in Birmingham, Huntsville, Montgomery, and Mobile, Alabama.

3. In January 2017, I became the Division Chief for HSI's Cyber Division at ICE's Cyber Crimes Center in Fairfax, Virginia, overseeing HSI's Computer Forensics Unit, Cyber Crimes Unit, Child Exploitation Investigations Unit, and Forensic Laboratory. In January 2018, I became the Deputy Assistant Director for the Cyber Division, overseeing approximately 70 personnel at the ICE Cyber Crimes Center. My responsibilities include management and oversight of the Computer Forensics Program, which establishes policy and best practices within ICE for the forensic searching of electronic devices and their contents, including border searches of electronic devices.

4. This declaration is based on my personal knowledge and information obtained in the course of my official duties and responsibilities.

5. ICE HSI is the principal investigative arm of DHS and is charged with securing the United States from transnational criminal threats. HSI's mission is to investigate, disrupt, and dismantle terrorist, transnational, and other criminal organizations that threaten or seek to exploit the customs and immigration laws of the United States. HSI enforces a diverse portfolio of federal laws, including all types of cross-border criminal activity, such as:

- Financial crimes, money laundering, and bulk cash smuggling;
- Commercial fraud and intellectual property theft;
- Cybercrimes;
- Human rights violations;
- Human smuggling and trafficking;
- Immigration, document, and benefit fraud;
- Narcotics and weapons smuggling and trafficking;
- Transnational gang activity;

- Export enforcement; and
- International art and antiquity theft.

6. The crimes within HSI's jurisdiction, including those described above, all tend to involve merchandise crossing the United States border. Consequently, border search authority is a crucial investigative tool in fulfilling HSI's mission and responsibilities at the border and investigating the criminal activity within its jurisdiction.

7. Electronic devices themselves are merchandise and can contain both merchandise and evidence relating to merchandise. There is a myriad of electronic devices, such as computers, phones, tablets, flash drives, and SD Cards, which can all be encountered at the border. HSI will decide whether and how to conduct a search of any device based upon operational and investigative needs combined with the particular circumstances of the border encounter. Factors considered may include the device to be searched, its accessibility, its capacity, any encryption, the individual searched, the information sought, the level of suspicion, and the status of the investigation.

8. For example, financial crimes such as money laundering typically involve the movement of money or monetary instruments, which are merchandise, both into and out of the United States. A border search of an individual's electronic device could reveal the presence of virtual currency in an electronic wallet on the device, it could also reveal information about the movement of funds by wire transfer, the existence of bank accounts, and correspondence between co-conspirators relating to the movement and concealment of funds.

9. HSI's investigations of cross-border crimes can implicate the regulatory and enforcement missions of many other federal agencies in areas such as consumer protection, intellectual property rights, food and drug safety, agriculture, vehicle emissions standards, export controls of weapons and technology, tax and tariff fraud, money laundering, controlled substances and drug smuggling, forced labor, human smuggling and trafficking, and counterterrorism. Consequently, HSI regularly works joint investigations with other federal, state, local, and foreign agencies. When working on such a joint investigation, HSI may

conduct a border search in furtherance of that investigation but HSI Special Agents will still limit any border search to searching for merchandise and evidence relating to merchandise, as described above, relevant to the cross-border activity that HSI has jurisdiction to investigate.

10. HSI does not undertake border searches to uncover evidence of crimes that lack a nexus to the border. Nevertheless, during a border search HSI Special Agents may encounter evidence of crimes that have no border nexus and may share the information with the agency responsible for enforcing or administering the applicable law or, as federal law enforcement officers generally empowered to enforce federal criminal law, act on it themselves. HSI cannot ignore evidence of criminal activity if they encounter it during a border search and in fact may be obliged by statute, regulation, or executive order to act on and share that information with other appropriate law enforcement agencies.

11. ICE Directive 7-6.1, *Border Searches of Electronic Devices* (Aug. 18, 2009), governs how HSI Special Agents conduct border searches of electronic devices. That policy has been supplemented by guidance issued by HSI's Assistant Director, Domestic Operations on May 11, 2018. Pursuant to the directive and guidance, HSI must have reasonable suspicion of criminal activity to conduct an advanced search of an electronic device. Basic searches do not require reasonable suspicion, in accordance with the directive. HSI uses the same definitions of basic and advanced searches as are found in the CBP Directive 3340-049A, *Border Search of Electronic Devices* (Jan. 4, 2018) ¶¶ 5.1.3-4. The ICE directive is currently under review and a formal revision of ICE policy is expected. ICE policy is sensitive and responsive to the privacy concerns raised by changing technology and ICE also recognizes that there is congressional interest in this area. I am aware of two bills introduced during the current congress to place statutory limits on the exercise of border search authority with regard to electronic devices. I am also aware that ICE has engaged with lawmakers on these legislative proposals and recognizes that congress is the appropriate forum for these discussion on placing statutory limits on government authority more stringent than those of the constitution.

12. Despite suspicionless searches being permitted under ICE policy, HSI Special Agents will almost always have reasonable suspicion of criminal activity before conducting a search of an electronic device. This is because HSI's mission is not one of inspecting and interdicting people and merchandise at the border, which is CBP's role; rather, HSI's mission is one of criminal investigation. Accordingly, HSI will only conduct a border search of a device if there is already reason to believe that it will further a criminal investigation. Such searches will occur because HSI already has an open investigation involving the targeted traveler and has already developed a reasonable suspicion (based upon existing evidence) that there may be evidence of cross-border criminal activity on the device. HSI will also border search an electronic device if CBP Officers at the border have developed a reasonable suspicion that an individual traveler may be involved in criminal activity and so have requested HSI to respond to the port of entry to investigate further.

13. When HSI Special Agents have an investigative interest in searching an electronic device, they will usually conduct an advanced search based on reasonable suspicion that the device contains merchandise or evidence relating to merchandise relevant to an HSI criminal investigation. This preference for advanced searches is due to the importance of preserving any evidence discovered during a search of an electronic device for potential introduction into court during a prosecution. HSI trains Special Agents in conducting advanced searches of electronic devices and has trained Computer Forensics Agents and Analysts (CFAs) to ensure the search is conducted in a forensically sound manner and that any evidence discovered can be relied on by a court.

14. Prior to conducting a border search, HSI Special Agents can review information on a traveler contained in various government systems, including CBP's record systems (TECS, Advanced Passenger Information System (APIS), and Automated Targeting System (ATS)). Special Agents will likely review any information that ICE maintains on the traveler in its Investigative Case Management System (ICM). ICM is a system that enables ICE personnel to create an electronic case file that organizes and links all records and documents associated

with an investigation, so they are easily accessible from a single location. It also enables personnel to link records to multiple investigations and so draw connections between cases.

15. When a border search is conducted, HSI Special Agents must record the occurrence of a search in ICE's Investigation Case Management System (ICM). Special Agents can also record in ICM their impressions of the search or notable observations. ICM does not contain the forensic copies of the data on any electronic device, which are stored separately. ICM only contains the descriptions that a Special Agent may make of what is observed during a search. These federal records are maintained in accordance with section 8.5(1)(b) of ICE Directive 7-6.1.

16. Based on my personal experience over the last two decades, electronic devices have replaced physical objects as the containers for information. Whereas in the past, a traveler would carry a diary, an address book, a notebook, photographs, and other paper records, that same traveler can now carry an electronic device that can contain all the same records. This is equally true of criminals and terrorists and I am personally aware that searches of electronic devices at the border have successfully uncovered threats to national security, illegal activities, contraband, and the inadmissibility of people and things. A traveler today is accordingly aware that their person and all of their effects, including electronic devices, are subject to search absent a warrant at the border.

17. HSI can and does conduct border searches on both inbound and outbound persons and objects, depending on the operational needs of the investigation. For example, if HSI is investigating an individual suspected of attempting to smuggle weapons technology out of the United States, HSI would do an outbound search of the individual's belongings, including any electronic devices, for the weapons technology in question and any evidence relating to that technology, the smuggling scheme, any co-conspirators, the suppliers, the potential customers, and so on. If HSI is investigating an individual returning to the United States that is suspected of child sex tourism, HSI would do an inbound search of his belongings, including any electronic devices, for contraband such as child pornography and any evidence

relating to that contraband, such as communications and payments for the acquisition or potential distribution of that contraband.

18. Requiring a warrant for all border searches of electronic devices would significantly impede HSI in its mission to investigate, disrupt, and dismantle terrorist, transnational, and other criminal organizations. As detailed above, border search authority is a crucial investigatory tool for HSI in executing its responsibility to secure the United States from transnational criminal threats. As discussed below, a requirement for search warrants at the border would essentially erase border search authority with regard to electronic devices, rendering the border as if it were the interior of the United States. This would incentivize criminals to conceal contraband and evidence of criminality on these devices to smuggle the same into or out of the United States. Such a rule would create a loophole in the United States' control of its borders, undermining its national security, and diminishing its sovereignty over what can and cannot be permitted to enter the nation.

19. As detailed in the HSI Search and Seizure Handbook, in general, for HSI to obtain a search warrant, a Special Agent must submit an affidavit to a federal magistrate or judge. The Special Agent must prepare the affidavit establishing probable cause to believe that evidence of a crime exists in the places and things to be searched. The affidavit must contain:

- An introductory section identifying the SA and describing the SA's background, training, and experience.

- A section describing the purpose of the affidavit, including the specific statutory violations and legal authorities for requesting the warrant.

- As complete an identification and description of the property or item to be searched as possible, including not only an overall description of the property or item, but also any identifying marks or numbers, such as serial numbers.

- As detailed and inclusive as possible a description of the evidence sought and the items to be seized. In the case of electronic devices, Special Agents will need the assistance and expertise of a CFA.

- A section providing background information about the investigation. This may include an overview of the investigation leading up to the discovery of probable cause for the search warrant. For investigations dealing with complex violations or technical issues, this section may also provide definitions or explanations necessary for an understanding of the probable cause.

- A statement of probable cause, including enough detailed information and relevant facts of the investigation for the judge to make a finding of probable cause. In addition to the Special Agent's firsthand observations, if the Special Agent uses hearsay from non-law enforcement third parties, such as informants, the Special Agent should include the reasons why he or she believes that the information is reliable. If the Special Agent used his or her training and experience to add value to certain facts in the investigation, this should be stated and explained in the affidavit.

20. In all but the most rare and exigent of circumstances, Special Agents are required by regulation to obtain the concurrence of an Assistant United States Attorney for the seeking of a warrant. Once that concurrence is obtained, the Special Agent must sign and swear to the affidavit's contents in the presence of the magistrate or judge. Therefore, obtaining a search warrant not only requires extensive work and time by the HSI Special Agent seeking the warrant, it also requires coordination with and the work and time of an Assistant United States Attorney and a federal magistrate or judge. Accordingly, seeking a search warrant is not something that HSI Special Agents undertake lightly or quickly.

21. Search warrants are usually the culmination of an investigation that has, by other means, established probable cause that evidence of criminality will be found in the places and things to be searched. This is because the probable cause standard required for a search warrant is the same as to arrest and indict an individual for committing a felony. Consequently, execution of a search warrant commonly occurs in tandem with the arrest and charging of the targets of the investigation and is also usually the occurrence when an investigation of an

individual or organization transitions from a covert investigation that the targets are unaware is occurring to an overt one.

22. In contrast, a border search is generally not a search where the places and things to be searched can be particularly described in advance, as required in a warrant, but is a search of the individual and her belongings as she chooses to present them at the border.  The things to be searched at the border are not those identified, described, and targeted by the government, but whatever the traveler chooses to carry with her across the border between nations.  Because of these differences, it is impractical, if not impossible, for the government to seek a warrant to search any particular possession of a traveler upon her arrival at the border because what, where, how, and when she presents herself and her possessions at the border is generally not knowable to the government in advance.

23. Requiring a warrant for electronic devices at the border would have serious consequences for border security by creating a category of, and a container for, merchandise immune from border search.  Such an obvious loophole in the ability of the United States to patrol its borders would inevitably result in exploitation by criminals, terrorists, and transnational criminal organizations to smuggle merchandise, contraband, and evidence of criminal conspiracies into and out of the United States.

24. One real example that demonstrates the need for ICE to be able to conduct border searches of electronic devices without first having probable cause or obtaining a warrant is the investigation into export violations by a Chinese corporation.  The Corporation and its U.S. affiliate were under investigation for export violations and some of its employees were suspected of leaving the United States with information concerning the scheme to evade export controls.  Based upon that reasonable suspicion, HSI Special Agents detained and searched electronic devices from several of the corporation's employees as they were departing the United States.  Documents discovered as a result of those border searches implicated the corporation's executive management in a conspiracy to avoid U.S. export control laws.  On the basis of those documents, the corporation and three of its affiliates were

added to the Export Administration Regulations Entity List, restricting their ability to gain export licenses, and the corporation subsequently pleaded guilty to exporting significant amounts of U.S. origin goods to Iran, in violation of U.S. sanctions and export controls, and paid a fine of more than $430 million.

25. If HSI Special Agents had been required to obtain warrants prior to conducting searches of the electronic devices, those border searches could not have taken place because the information available to HSI at the time did not rise to the level of probable cause to seize or search those devices. Those employees would have departed the United States without their devices being searched, and the evidence that directly led to the enforcement actions taken against the corporation would not have been discovered. This would have at least delayed, if not entirely thwarted, detection of the conspiracy to evade U.S. export controls and continued to allow the sale of U.S. technology to Iran, in violation of sanctions.

26. Another real example demonstrating the negative consequences of a probable cause and warrant standard is an HSI investigation, in collaboration with foreign law enforcement partners, that developed information that third-party money launderers were providing illegal money laundering solutions to foreign government officials and politically connected individuals. The joint investigation identified an individual as a possible money launderer and his cell phone was detained and searched when he entered the United States at the Miami International Airport. Although the investigation had established reasonable suspicion that this traveler was involved in a money laundering scheme, and that his electronic devices may contain evidence of money laundering, the investigation lacked probable cause at that time. The border search of the cell phone uncovered messages, documents, and communications regarding transfers and financial contracts involving millions of U.S. Dollars and foreign currency. The cell phone search and also resulted in the identification of thousands of contacts, bank accounts, and businesses associated with the money laundering scheme.

27. If HSI had been required to obtain a warrant based upon probable cause prior to conducting the search of the cell phone, no border search would have taken place and HSI would not have confirmed the suspicions that the traveler was a third-party money launderer and would not have learned crucial details about the nature and extent of the corruption and money laundering scheme.

I declare under penalty of perjury that the foregoing statements are true and correct.

DATED: June 6, 2019

DAVID L. DENTON
Deputy Assistant Director
Cyber Division
Homeland Security Investigations
U.S. Immigration and Customs Enforcement