UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____

GHASSAN ALASAAD, et al.,

                    Plaintiffs,          Civil Action
                                         No. 17-11730-DJC
V.
                                         July 18, 2019
ELAINE DUKE, et al.,                     2:59 p.m.

                    Defendants.
_____



TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE DENISE J. CASPER

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210




DEBRA M. JOYCE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
joycedebra@gmail.com

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:

 3    ESHA BHANDARI, ESQ.
      HUGH HANDEYSIDE, ESQ.
 4    ACLU Foundation
      125 Broad Street 18th Floor
 5    New York, NY 10004
      212-549-2500
 6
      NATHAN FREED WESSLER, ESQ.
 7    ACLU Foundation of Massachusetts
      211 Congress Street
 8    3rd Floor
      Boston, MA 02110
 9    212-519-7847

10    ADAM SCHWARTZ, ESQ.
      SOPHIA COPE, ESQ.
11    SAIRA HUSSAIN, ESQ.
      Electric Frontier Foundation
12    815 Eddy Street
      San Francisco, CA 94109
13    415-436-9333

14    FOR THE DEFENDANT:

15    MICHAEL DREZNER, ESQ.
      MARSHA S. EDNEY, ESQ.
16    U.S. Department of Justice
      Federal Programs Branch
17    1100 L. St. NW
      Room 12210
18    Washington, DC 20001
      202-514-4505
19

20

21

22

23

24

25
```

P R O C E E D I N G S

     (The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on July 18, 2019.)

     THE CLERK:  Court is in session.  Please be seated.

     Civil action 17-11730, Alasaad v. Duke.

     Would counsel please state your name for the record.

     MS. BHANDARI:  Esha Bhandari from the American Civil Liberties Union Foundation for the plaintiffs, and I'm here with co-counsel from the ACLU and Electronic Frontier Foundation.

     MR. SCHWARTZ:  I'm Adam Schwartz from the Electronic Frontier Foundation.

     MS. BHANDARI:  And we wanted to reiterate our request to the Court that we be allowed to divide our argument.

     THE COURT:  That's fine.  I see you have a third person at your table.

     MR. WESSLER:  Nathan Wessler from the American Civil Liberties Union.

     THE COURT:  Good afternoon to all.

     MR. DREZNER:  Good afternoon.  Michael Drezner on behalf of the defendants, the Department of Justice.

     MS. EDNEY:  Good afternoon.  I'm Marsha Edney from the

```
 1   Department of Justice.
 2           THE COURT:  Good afternoon to you both.
 3           MR. DREZNER:  Good afternoon.
 4           THE COURT:  And are there other counsel on the
 5   plaintiffs' side?
 6           MR. HANDEYSIDE:  Yes.  Hugh Handeyside from the
 7   American Civil Liberties Union.
 8           MS. COPE:  Good afternoon, your Honor.  Sophia Cope
 9   with EFF.
10   MS. HUSSAIN:  Good afternoon, your Honor.  Saira
11   Hussain from EFF.
12           THE COURT:  Good afternoon to all.
13           Counsel, I know we're here for cross-motions on
14   summary judgment.  In addition to the plaintiffs' request to
15   split the argument, which is fine, I understood the plaintiffs
16   were planning to go first and counsel for the defense would go
17   second to address response and then cross-motion, and that you
18   each wanted some time for respective replies; is that fair?
19           Okay.
20   Counsel, I'm prepared to hear argument.  I'll just let
21   you all know that I've read the papers on either side.
22           MS. BHANDARI:  May it please the Court, Esha Bhandari
23   for the plaintiffs.
24           This case is about the Fourth Amendment protections
25   that apply to modern technological information that raises
```

03:00 (line 10)
03:01 (line 20)

unique and unprecedented privacy concerns.  As the Supreme

Court has repeatedly emphasized, most recently in <u>Riley</u> and

<u>Carpenter</u>, existing precedence and search authorities should

not be uncritically extended to new technology.

The defendants argue that no court has previously

required a warrant for a search at the border.  But at the same

time, the Supreme Court has never said that a warrant can never

be required for a border search, and, in fact, it has

contemplated that a warrant might be required specifically in

<u>Ramsey</u>.  This Court is, therefore, in the position that the 1st

Circuit was in when it decided <u>Wurie</u>.  In that case, the <u>Wurie</u>

court had to evaluate in the first instance how the search

incident to arrest warrant exception would apply to searches of

cell phones, and it held that a warrant is required for those

searches while explicitly noting that the majority of other

appeals courts to date had, in fact, ruled in the other

direction and that the courts were split on this question.

But, nonetheless, it conducted that balancing test

independently.  And of course, <u>Wurie's</u> holding was upheld by

the Supreme Court in <u>Riley</u>.  Therefore, <u>Riley's</u> balancing test

and the way it applied that balancing test is instructive here,

as this Court recognized in its opinion on the motion to

dismiss.

The summary judgment record that we have now before us

demonstrates that the privacy interests here are clearly

outweighed by the government interests, and this Court also is

the first court to be able to evaluate a summary judgment

record in a civil case --

THE COURT:  Or that the government interests are

outweighed by the privacy?

MS. BHANDARI:  My apology.  The record demonstrates

that the privacy interests outweigh the government interests

here.

THE COURT:  I understand.

MS. BHANDARI:  So I would like to address the

undisputed facts in the record that show why the balancing test

is in favor of the privacy interests, but I would first like to

mention something about why Riley is so instructive here.

The government argues that in the border context the

government has heightened interests.  It states that its

interests in keeping out unwanted people and goods are at its

zenith while privacy interests are at the same time less than

for travelers.  But in Riley, the Supreme Court specifically

stated that the government has heightened interests in volatile

arrest situations, and that people who have been arrested have

lowered privacy interests.

So when Riley conducted its balancing test, it, in

fact, started with a thumb on the scale in favor of the

government interests and against the privacy interests, and

nonetheless, it held that the privacy interests were

1   outweighing the government interests.

2           So the Riley context in which the balancing was struck

3   is instructive here, regardless of the fact that we're talking

4   about a border search.

5           Now, the Riley privacy interests that the court found

6   there are at least identical here, if not greater, because of

7   the passage of time and the increasing power of technology.

8   Riley, of course, considered only manual searches of cell

9   phones, and it noted that the cell phone searches at issue

03:04 10  there involved devices that were not even contemplated 10 years

11  previously.

12          So --

13          THE COURT:  Or at least one was, right?  Yes.

14          MS. BHANDARI:  Yes, your Honor.  And they noted that

15  technology advances and the invasiveness of these searches

16  increases over time.

17          So I do not want to belabor the point on the privacy

18  interests, because I think the sensitivity of these searches is

19  well established, both by the undisputed facts in the record

03:05 20  and by Riley.  But I do want to highlight a few of the facts of

21  the plaintiffs' device searches here, because I think that they

22  are illuminating.  For example, plaintiffs Nadia El Assad and

23  Nainab Merchant wear headscarves in public in accordance with

24  their religious beliefs, and they did not want their devices to

25  be searched because they did not want to have officers,

particularly male officers, view photos of them without their

headscarves.  Plaintiff Merchant additionally was searched

despite letting officers know that she had attorney-client

privileged information on her device, communication with her

counsel in this case.  And plaintiff Jérémie Dupin used his

device for his journalism work.

So the plaintiffs' examples are illuminating and

instructive, and that, coupled with the Riley findings, I think

establish the strong privacy interests here.

In turning to the government interests' side of the

balancing test, the summary judgment record clearly

demonstrates that those interests are neither sufficiently

strong nor sufficiently advanced by warrantless and

suspicionless device searches.  And in addition, there is no

evidence that a warrant requirement would significantly impede

the defendants' activities.

I would like to address these in turn.

First, regarding the government interests in searching

for digital contraband.  It is undisputed in the record that

specifically child pornography, which is one category of

digital contraband that the government identified, is primarily

transferred by the internet.  It is also not disputed that

digital data of all kinds can be posted and shared on the

internet and that in some circumstances digital contraband is

already available in the United States.

1          Now, the government in its motion for summary judgment

2     has a footnote, Footnote 6, in which they identify a series of

3     cases in which they state that device searches at the border

4     uncovered either contraband or evidence of contraband.  In the

5     first instance, only 27 of those cases, in fact, involved what

6     we would consider digital contraband as opposed to evidence.

7     But even counting all 34 of those cases, they date from as

8     early as 2005 and 2006.  And so we're talking about a time

9     period of 14 years in which the government has identified these

03:07 10    34 cases.  We know that since 2012 alone, CBP, one of the

11    defendants, has conducted over 108,000 device searches.  So

12    even though we don't have statistics dating back prior to 2012,

13    we can look at the numbers in scale and get a sense of the

14    incidents of finding digital contraband.  We're talking about

15    34 cases over a period of 14 years and over 108,000 searches by

16    CBP alone.

17          Additionally, if we look at those 34 cases, only three

18    of those cases, were truly suspicionless searches.  In three of

19    those cases the court said the searches were done without

03:08 20    suspicion; in four of those searches, it was left ambiguous or

21    unclear.  In the remainder of those cases, the searches were

22    done on either reasonable suspicion or probable cause.  So

23    we're talking about at most seven cases over a 14-year span in

24    which there was a truly suspicionless search resulting in

25    either digital contraband or evidence.

1          THE COURT:  And just to back up to the privacy

2    interests at the border.  At least some of the cases, circuit

3    cases that have begun to explore this issue or close to this

4    issue focus on the difference or the different treatment that

5    border searches get from other kinds of searches, including

6    searches incident to arrest.

7          What is your best argument about sort of the lesser

8    expectation of privacy once you are at the border seeking to be

9    readmitted?

03:09 10          MS. BHANDARI:  Well, I think, your Honor, that one of

11   the reasons that travelers are deemed to have a lesser

12   expectation of privacy is that they have control over the

13   physical goods that they can bring across the border.  And

14   border cases have repeatedly mentioned this.  And I think that

15   that simply does not hold in the first place because in modern

16   travel, it's simply impractical for most travelers to leave

17   home and go internationally without a cell phone, for example.

18   And so the concerns, you know, where courts have said, Well, if

19   you don't want some particular physical object to be searched,

03:09 20   leave it at home, you don't have to travel with it.  That

21   doesn't really extend to devices; it's not practical.  And the

22   Riley court also noted this, when it said that the average

23   person who might be arrested on the street, maybe once in a

24   while you catch them with a diary that had very intimate

25   information, but most people can't leave home without a cell

phone.

And the second point is that people have less control over the amount of data that is accessible to the government. We know from the record that advance searches can uncover such things as deleted information and metadata.

THE COURT:  Well, that was my second question. Meaning, what about this distinction between what the government calls the basic search, and I think some of the courts have called sort of a more manual search versus this forensic search.  Should that make a difference in terms of what privacy interest is implicated?

MS. BHANDARI:  We don't think it makes a difference, your Honor, just because the record shows a basic or a manual search, whatever you call it, can be highly invasive.  And specifically, it can be highly invasive in ways that worried the courts in Wurie and Riley.  The record shows you can do key word searches for images and text, you can use the native search function of a device.  So it's not just, you know, a basic search meaning you don't have access to specific things, you can actually use very sophisticated internal search tools in a laptop or a phone.  You can search metadata and you can search cached information.  So, for example, if someone has a trove of e-mails, it's generally only accessible in the cloud. Many devices will cache copies of those, and that cache data can be searched in a basic search, which, again, opens up the

1    vast realm of data that normally lives in the cloud and

2    e-mails.  So we don't think the distinction holds in terms of

3    the privacy concerns.

4         And I think that critically as well, when we're

5    talking about digital data, the government's interests also are

6    not advanced by searches of devices.  The border search

7    exception consistently has been held to effectuate the

8    government's interest in keeping out physical contraband goods.

9    That dates from Boyd, it's been reiterated in Montoya de

03:12 10   Hernandez and in Ramsey, and the record shows here that the

11   government does not keep track of how many searches of digital

12   devices uncovered digital contraband and even evidence of

13   criminal violations.  Neither -- it neither keeps track of that

14   information, nor can it identify whether any digital contraband

15   it does find is, in fact, already present in the United States.

16        And so --

17        THE COURT:  What, suggesting that that's not the true

18   interest?

19        MS. BHANDARI:  Well, it suggests that the government

03:12 20   can't actually advance its interest.  If its interest is in

21   keeping out digital contraband, the record shows that it cannot

22   do that because it can at most identify if digital data already

23   exists in the United States.

24        And I do think it is relevant that the government does

25   not keep track of how many of these searches produce digital

1    contraband.  It certainly goes to whether this is a significant

2    or prevalent problem that the government needs to address at

3    the border.  And the Riley court used that language, whether a

4    problem was significant or prevalent.  And specifically in

5    Riley, the court noted that even though there had been a couple

6    of cases where people who had been arrested had remotely wiped

7    the data on their devices, those handful of cases just did not

8    meet the standard of, you know, what the government interests

9    would have had to be to outweigh the privacy concerns.

03:13 10           I also want to address quickly why it's not

11   impractical or impossible for the government to get a warrant

12   in the border context.

13           THE COURT:  Just before you get there, the government

14   suggests in their cross-motion and opposition that you seem to

15   be dropping an argument about reasonable suspicion, your

16   alternative argument; is that true?

17           MS. BHANDARI:  That is not true.  In the first place,

18   the plaintiffs have pled a claim that the defendants' policy

19   and practices of warrantless device searches violate the Fourth

03:14 20   Amendment, and this Court is empowered to provide an equitable

21   remedy.  If the Court finds that practice of warrantless device

22   search violates the Fourth Amendment, the Court is free to

23   order whatever remedy it deems would cure that violation.  And

24   if this Court deems that to be a probable cause requirement or

25   reasonable suspicion requirement, that is within the Court's

equitable power based solely on the plaintiffs' claim, Count I

in the amended complaint.  And even if this Court were to look

at the question of waiver that the defendants raise, the

plaintiffs raise this alternative argument in their opposition

to the defendants' motion to dismiss.  It was raised in the

joint statement on discovery, it was raised in the plaintiffs'

motion for summary judgment; and so there's certainly no

prejudice to the defendants, they have been on notice for a

very long time that the plaintiffs argued this in the

alternative.  And, you know, the plaintiffs' argument is not

required to be of a particular length.  The plaintiffs have

consistently made this separate and alternative argument in a

separate heading and have cited the case law and cited to the

portions of the record that support it.

So simply because the defendants choose not to respond

to the argument does not mean that it is incapable of being

understood or responded to.

So turning to the point about the practicability of

getting warrants, the record shows that the defendants, in

fact, do get warrants for searches at the border.  In the first

place, international mail, incoming international mail can only

ever be read pursuant to a warrant, and this is a long-standing

legal requirement; it's a regulatory requirement, the court

noted it in Ramsey.  And the record shows that, in fact, the

defendants get warrants when they need to read international

1   mail correspondence.

2       Defendants CBP and ICE train their agents on how to

3   get warrants; they receive guidance on it.  They often get --

4   the record shows that they can get warrants for particular body

5   cavity, x-ray searches, certain medical detentions.  So those

6   are circumstances when got you've travelers at the border.  So

7   they certainly know how to get it, it's not impossible, and a

8   warrant requirement here would simply impose that same

9   requirement that applies to reading international mail

03:16 10   correspondence.  It would bring those two device searches of

11   digital data and international mail correspondence into

12   harmony.

13       The government argues that they don't have enough

14   advance information about arriving travelers to get a warrant,

15   and they rely on that to argue that this is why it would be

16   impractical to even develop suspicion.  But the record shows

17   that the defendants, in fact, have far more information about

18   the average arriving traveler than a police officer on the

19   street.

03:16 20       In the first place, the record shows they have access

21   to the APIS system, Advance Passenger Information System, for

22   travelers arriving by air.  That leaves the travelers arriving

23   by land, and while it may be the case that border officers do

24   not know when someone will present themselves at a land port of

25   entry, at that point they have access to multiple databases,

1    including TECS and the Automated Targeting System which provide

2    information about that traveler.  And the record shows that

3    when border officers query these databases, they can get a

4    whole host of information, including lookouts or alerts and

5    about travelers of interest.  So this is, in fact, far more

6    information, as I said, than the average police officer would

7    have, for instance, in a vehicle stop.

8          THE COURT:  And is there any evidence in the record

9    about when the searches involving these plaintiffs occurred, if

03:17 10   it was the primary stop or the secondary?  Meaning, is there

11   information, evidence before me -- I know it's not disputed

12   that these searches happened, but is there evidence about

13   whether they all happened in secondary?

14         MS. BHANDARI:  Your Honor, all of the plaintiffs who

15   were searched were referred to secondary.  That's the extent of

16   the record evidence.

17         So, lastly, I'd like to just make a point about the

18   government's assertion of a broad law enforcement interest in

19   conducting border device searches.

03:18 20        THE COURT:  Meaning, there's nothing -- in the

21   plaintiffs' view, there's nothing that would stop -- if I were

22   to accept your position, there's nothing stopping agents from

23   relying upon their observations in primary and secondary for

24   building a basis for probable cause.

25         MS. BHANDARI:  That is correct, your Honor.  Officers

1    at primary have both access to database information about

2    travelers, they can question the travelers, and they also have

3    the ability to conduct warrantless baggage and effects

4    searches.  And that can be enough itself to allow them to form

5    probable cause.  And I think noteworthy is that the decision in

6    Molina-Isidoro and Kolsuz involve situations where a device

7    search happened after a baggage search that revealed

8    contraband.  So primary officers and secondary officers all

9    have those tools at their disposal.

03:19 10          So addressing the point about general law enforcement

11   very briefly, the Court should reject the attempt to justify

12   border device searches on the basis of a general interest in

13   enforcing the hundreds of federal laws that the defendants say

14   that they enforce.

15          The plaintiffs do not dispute that the defendants have

16   the statutory authority, but the question is what the

17   warrantless border search authority permits them to do, and

18   that has always been limited to searches of goods and people.

19   And so, regardless of whether it is within their mission to

03:19 20   enforce these hundreds of federal laws, that general law

21   enforcement interest cannot support warrantless device

22   searches.  And the Wurie court specifically noted this, and it

23   said if a programmatic purpose extends to general law

24   enforcement, those searches have to be conducted pursuant to a

25   warrant.

1    And I think the record has evidence in this case that

2    supports the fact that the programmatic purpose of warrantless

3    device searches has strayed beyond even the search for illegal

4    contraband.

5    The record evidence is undisputed that ICE, for

6    example, will work in conjunction with other agencies, such as

7    the FBI, the State Department, the IRS, the Environmental

8    Protection Agency, and will conduct device searches to find

9    evidence of violations of laws, including consumer protection

03:20 10   laws, environmental laws, tax laws.  This, again, shows that

11   the programmatic purpose behind these searches is supporting

12   general law enforcement and investigation, and that is an

13   impermissible purpose to support warrantless device searches.

14   If there are no further questions, your Honor, I will

15   rest on the papers for our --

16   THE COURT:  Well, I guess just to put this in sort of

17   the spectrum of probable cause and cause that's required for

18   various stops or searches, why should it be, if I were to

19   accept your warrant argument, that the standard for a border

03:21 20   search of this kind would be higher than it would be for a

21   Terry stop on the street?  Like why -- how do you -- how would

22   you address that issue?

23   MS. BHANDARI:  Well, your Honor, I think that the

24   Riley court opinion addresses this, because of the privacy

25   interests that are at stake.  You know, in Riley, the court

considered the rights of people who had been arrested, so they

were people for whom the officer had already established

probable cause for a criminal violation.  So, again, they're in

a different position than someone who's been subject to a Terry

stop.  There is a higher level of suspicion to support the

detention of someone who has been arrested if there's probable

cause, and nonetheless, the Supreme Court held, even in that

context, where you have -- there is probable cause to suspect

you of some criminal violation, that is not enough to justify a

03:22  free-floating search of your cell phone and your device because

of the privacy concerns there.

Now, the travelers that we're talking about are

subject to suspicionless searches, so there is not even that

baseline level of probable cause to suspect them of something.

So we are asking the Court, in fact, to harmonize the standard

at the border to what it would be in the interior for domestic

law enforcement, including the context in which they already

have the requisite level of suspicion to arrest someone.

THE COURT:  Thank you.

03:22  MS. BHANDARI:  I will rest on the papers for our

Fourth Amendment confiscation claim and the First Amendment

claim.

THE COURT:  Thank you, counsel.

MR. SCHWARTZ:  Your Honor, Adam Schwartz.  I will be

arguing that the plaintiffs have injunctive standing.

1          Before I get started, a small item of housekeeping.

2     The plaintiffs renewed their motion to file a supplemental fact

3     statement containing one assertion, which is, that on July 6,

4     2019, border officers searched the devices of plaintiff Suhaib

5     Allababidi.

6          THE COURT:  Counsel, I've read that, as well as the

7     defendants' response.  Is there any objection to that?

8          MR. DREZNER:  No, your Honor.

9          THE COURT:  Okay.

03:23 10          Counsel, you can consider that allowed and in the

11    record.

12          MR. SCHWARTZ:  Thank you.

13          So there are three independent foundations in the

14    record for injunctive standing.

15          Number one, the plaintiffs seek expungement.  The

16    defendants have admitted that they have retained information

17    from device searches of seven different plaintiffs, and the

18    expungement of this information will remedy the ongoing harm

19    created by the original unlawful searches.

03:23 20          Number two, the plaintiffs have standing because they

21    face substantial risk of future searches at the border of their

22    device and also confiscations.  Suhaib Allababidi less than two

23    weeks ago had his second search.  Zainab Merchant has had four,

24    including three after the filing of this case.  Isma'il

25    Kushkush, Nadia Al-Assad, Jérémie

Dupin all have two border searches, and everyone else in the plaintiff group has at least one.

And they face additional risk for two reasons:  The defendants have policies that expressly authorize these warrantless and suspicionless searches and confiscations, and there is a widespread practice of this happening in the field. And plaintiffs plan to keep traveling abroad, and so they are exposed to these policies and practices.

The third --

03:24 THE COURT:  And, counsel, what do you say to the argument that I took to be taken by the government, at least implicit in their papers, that the policies of these two agencies have changed such that perhaps under the new policy the number of searches may decrease?

MR. SCHWARTZ:  Well, the searches in FY '18 are up 9 percent compared to the prior year.  So any hope that the change of policy would reduce the number of searches is clearly not happening.

03:25 The change of policy does not alter that no warrant is required to search, it does not change that no probable cause is required to search or confiscate, and it does not change that no suspicion at all is required to do a basic search, or in the case of the customs department, a basic search -- an advance search that has national security concerns.  It's only when there is an ICE advance search or a CBP advance search

absent a national security concern that reasonable suspicion is

required at all.  So we do not consider the changes in policy

to have made any difference in terms of our demands, and we

have not seem them slow down these searches.

THE COURT:  Thank you.

MR. SCHWARTZ:  There is a third foundation for

standing in addition to the expungement and the substantial

risk based on their policies and our exposure, which is the

probabilistic analysis, meaning that the odds of a search or

confiscation based on their policies are significant.

There also in the record is evidence of a feedback

loop, which buttresses our standing on all three of these

fronts.  What we see is that the passport device searches

increase the risk of the next border device search.

THE COURT:  Because, what, because the agents all have

access to, what is it, the TECS system or -- why is that?

MR. SCHWARTZ:  Yeah, well, it's TECS, but more.  When

an officer conducts a border device search, they can put

information about what they found and what they were doing in

the TECS system of CBP.  They can also put it in the ATS, the

Automatic Targeting System, of the CBP, and they can also put

it in ICE's system, which is called ICN, or Investigative Case

Management.

What happens next is that the ATS system generates

flags for travelers to get more scrutiny, and those can be

1    based on the information from the past border device search.

2         You also have in TECS a process of lookouts for

3    travelers, and these can be put down by CBP and by other

4    agencies.  And the CBP and the other agencies, when deciding

5    whether to do this, they have access to the past border device

6    searches.  So when the traveler arrives at the border the next

7    time and they're faced with a primary inspection, that primary

8    inspector is going to see the ATS flags, they're going to see

9    the TECS lookouts, and on that basis they can send the traveler

03:27 10   over to secondary.  And when the traveler gets to secondary,

11   all of these systems and all of this information about the past

12   border device search, it is a relevant factor in deciding

13   whether or not to conduct the next border device search.  So

14   this is a distinction between our clients on the one hand and

15   the other traveling public.  The Tabbaa District Court decision

16   made the same finding, which, without our substantial record,

17   it was able just intuitively to say once you've had one of

18   these device searches you're at greater risk of the next one.

19        (Pause.)

03:28 20       THE COURT:  Counsel.

21       MR. SCHWARTZ:  So, your Honor, if you have any other

22   further questions on injunctive standing, these three

23   foundations, the record in this case, I'm happy to answer them,

24   otherwise the plaintiffs would like to reserve their remaining

25   time for rebuttal.

1          THE COURT:  Thank you.

2          MR. SCHWARTZ:  Thank you.

3          THE COURT:  Counsel, I'll hear you.

4          MR. DREZNER:  Thank you, your Honor.

5          May it please the Court, Michael Drezner on behalf of

6     defendants.

7          No court has ever required probable cause of a warrant

8     for any border search for any person or property, and

9     plaintiffs concede as much in their reply and I think they just

03:29 10    conceded as much in their argument.  But they're bringing a

11    claim today that's breathtaking in scope that would undermine

12    the authority of border officers that's been established for

13    centuries.  They're not demanding simply a warrant for a

14    specific kind of border search of a specific kind of electronic

15    device, rather, their motion and their complaint demands that

16    this Court require a warrant for every border search of every

17    electronic device, regardless of the length or the nature of

18    that search and regardless of the type of device at issue.  And

19    they fail to support this kind of boundless claim.

03:29 20    But even if that were not enough, a weighing of the

21    relevant interests here, we believe, compels dismissal.

22          At the border the government has the very highest

23    interests in national security and preventing violations of

24    federal law with nexus to the border, and those interests are

25    very clearly connected to searches of electronic devices at the

border.  On the other hand, the privacy interests of travelers
are significantly reduced.  So because the government interests
here outweigh any privacy concerns at the border, we believe
that this Court should reject plaintiffs' claims.

THE COURT:  So what's the best evidence I have in the
record in regards to warrantless searches at the border of
digital devices advancing the governmental interests that
you've just cited?  What's the best factual evidence?

MR. DREZNER:  I think there are probably three bases
for that.  The first two are the Howe and the Denton
declarations that I think go through in pretty precise detail
as to real-life examples in which device searches without
reasonable suspicion or probable cause without a warrant
uncovered threats to national security, evidence of quite
significant crimes, terrorist-related threats, things of that
nature; and those simply could not be accomplished if the
government was required to get a warrant.  And then in
addition --

THE COURT:  But even if there is a warrant
requirement, wouldn't the exigent circumstances exception to
the warrant requirement always apply as it does in other
contexts?

MR. DREZNER:  I think certainly it would, but in many
of those instances there wasn't an exigency in that
circumstance.  There was no sense to think that there was an

ongoing emergency.  Rather, what the government does is it
evaluates whether a person is bringing contraband or are they
participating in some sort of crime or other violation of
federal law, again, with a nexus to the border.  And so that's
why you have all of the cases, and this is the third thing you
can look to in Footnote 6 of our cross-motion, and you have
numerous offenses of child pornography, where they are being
transported across the border, you have numerous instances
where there's evidence of drug trafficking detected on
electronic devices, that's what the 1st Circuit found in
Molina-Gomez, that the cell phone text messages on the
travelers there supported the reasonable suspicion to further
detain that traveler's laptop, and in there they found I think
it was heroin.

So it's not that in every -- or even in most
situations that you have that this idea of exigent
circumstances could apply.  Instead, we have put forward quite
specific facts in the record based on the expert or at least
very well-reasoned judgment of CBP officers and ICE officers,
and plaintiffs have not responded to that.  They simply haven't
put forward any countervailing evidence as opposed to I think
their own argument.  So I think the Court should, in fact,
credit the understanding of ICE and CBP as to how this would
affect their mission going forward.

And indeed, we would argue, your Honor, plaintiffs'

1    claim is, in fact, barred by precedent, that's for three

2    reasons.  The Supreme Court has addressed this issue in Ramsey,

3    in Montoya de Hernandez, and in Flores-Montano, and in each

4    case they declined to require probable cause and a warrant at

5    the border, and that's with regard to searches of people and

6    property.  If the Supreme Court wishes to change its decisions

7    on this point, it alone is empowered to do that.

8          But it's for that reason, this comes to the second

9    point, the 1st Circuit since those cases held that border

03:33 10   searches must be evaluated as either routine, requiring no

11   suspicion, or non-routine, requiring reasonable suspicion.  So

12   plaintiffs cannot really argue in this circuit that there are

13   some border searches that would require probable cause and a

14   warrant.  This Court, again, need only to look to Molina-Gomez

15   or even the Casallas case in 1991 where it held --

16         THE COURT:  But is it fair to extrapolate the routine

17   versus non-routine in the context of the searches -- in the

18   context of searches of electronic devices that contain as much

19   information as the 1st Circuit was concerned about in Wurie?

03:33 20   Meaning, doesn't the context matter here in terms of what is

21   being searched and what potentially could be subject to search?

22         MR. DREZNER:  So I think the question is -- well,

23   there's two questions.  What are the standards the 1st Circuit

24   has set up for all border searches, that's including invasive

25   searches -- search of a person's body or any searches of a

1    person's property.  And the standards they've set up is routine

2    and non-routine.  They've never given any daylight to think

3    that really invasive searches or some other kind of search

4    might require probable cause and a warrant, rather there a

5    standard that has to be applied to the court.  That's the first

6    question.

7         The second question to what your Honor is saying is,

8    Well, even if we were to look within this standard, sort of

9    where might cell phones or other electronic devices fall, and I

03:34 10   think plaintiffs don't respond to our point that in Braks, the

11   1st Circuit made clear that for any border search to require

12   even reasonable suspicion, it must be just as invasive as a

13   strip-search, and by that they meant it imposes the same degree

14   of indignity on a traveler as a strip-search.  And I don't

15   think there's any argument here that a brief review of an

16   electronic device imposes the same degree of indignity as

17   forcing a traveler to a --

18        THE COURT:  Does that change if the government keeps

19   the information or cites it for further intelligence in the

03:35 20   future?

21        MR. DREZNER:  So I think the question as to what

22   privacy concerns might arise in certain situations is a good

23   one, but it's not presented by this case.  And this brings me

24   to my second sort of overall point that the plaintiffs have

25   brought a facial challenge.  They're not simply saying that the

1    precise searches that the plaintiffs here experienced are

2    unconstitutional or certain kinds of searchs in the future

3    might be unconstitutional, their claim is that every search,

4    again, of every electronic device is unconstitutional.  So your

5    Honor need not grapple with the possibilities of various kinds

6    of searches at the border.  The question is whether every

7    single one of these searches is unconstitutional absent a

8    warrant.

9         And plaintiffs don't shy away from this argument.

03:35 10    They say that, yes, this would involve the briefest search of

11    an electronic device, and then they adopt CBP's definition of

12    what an electronic device is.  They say this is any device that

13    can contain information in electronic or digital form,

14    including computers, tablets, disks drive, tapes, mobile phones

15    and other communication devices, such as cameras, music and

16    other media players.

17         So having brought a facial challenge against every one

18    of these searches, plaintiffs now have to establish that all

19    are unconstitutional.  This is the black letter law the Supreme

03:36 20    Court reaffirmed in the 2015 Patel decision.  But plaintiffs

21    cannot carry their burden.  They give this Court no basis to

22    think that such a heightened degree of protection, an

23    unprecedented degree of protection should be applied across the

24    board to every electronic device.

25         THE COURT:  But, counsel, is the difference between

1   routine and non-routine the level of invasiveness as opposed to

2   the practice?

3        MR. DREZNER:  So I think what the court in Braks said,

4   there's a footnote there that says, By "invasiveness" we mean

5   not intrusive as per se but the degree of indignity it imposes

6   on a traveler.  And they give some factors that can be

7   pertinent to the analysis, such as exposure of a traveler's

8   intimate body parts, whether there's force that's used against

9   the traveler, if the traveler is placed in fear.  But then at

03:37 10  the end of the decision they reiterate what the 1st Circuit had

11  previously held, and I think this is the quote:  Of course no

12  level of suspicion is required for a search that is less

13  intrusive than a strip-search.  So I don't think there's any

14  question that that is the 1st Circuit standard here.

15       Again, just wrapping up on the facial challenge point,

16  the 7th Circuit very recently, in 2019, in the Wanjiku case

17  recognized not only did Riley not speak at all to border

18  searches, it certainly didn't speak to data stored on other

19  electronic devices, such as portable hard drives or laptops.

03:37 20  There's no basis on which to extrapolate Riley not only to the

21  border context but to every single possible electronic device

22  at the border.

23       So we think the overbreadth of plaintiffs facial

24  challenge supports dismissal as well.

25       If this Court were inclined to sort of forgo that

1    analysis and look simply to the balance of interests at the

2    border, we think it's clear that that balance supports

3    rejection of plaintiffs' claims.

4         It's important to note that I think now apart from the

5    1st Circuit in Molina-Gomez, several other circuit courts have

6    now addressed this exact issue.  The 3rd, the 4th, the 5th, the

7    6th, the 7th, the 9th, and the 11th have now all held either

8    that a warrant is not required at the border or that in that

9    case, the officers at the border relied in good faith on

03:38 10   precedent that did not require a warrant at the border or does

11   not anymore require a warrant at the border.

12        So, put simply, every court to have considered this

13   question post-Riley has agreed with defendants that Riley has

14   not worked some sort of sea change in border search law.  And

15   that's because each of these courts have properly weighed the

16   government interests at the border, which, again, are of the

17   highest order.

18        The 5th Circuit pointed out in 2017 that there's a

19   real difference between the -- the power incumbent in a simple

03:39 20   arrest and what they called a plenary power of customs

21   officials to search for concealed merchandise.  And they said

22   we're applying the law as it stands, i.e., the border search

23   law to hold that a warrant is not required.

24        The 4th Circuit went on to note that not only is there

25   this justification for the border search exception to search

1    for merchandise and contraband itself, but there's a

2    well-established justification to search for evidence of those

3    types of crimes.  And that's why in that case they explicitly

4    upheld the government's stated reason to search cell phones

5    there, to search for evidence on an ongoing transnational

6    offense.  They said very clearly that that fits within the core

7    justification of the border search exemption.

8            So --

9            THE COURT:  And do all of these circuits make a

03:39 10    distinction between what just in the shorthand is the basic

11    search versus a forensic search?

12            MR. DREZNER:  So, no, your Honor.  There is some

13    difference of opinion.  I think the 9th Circuit in Cotterman

14    found that reasonable suspicion is required for forensic

15    searches, but it's sort of -- Arnold in 2008 said that it's not

16    required for manual searches.  The 11th Circuit is somewhat to

17    the contrary saying that no suspicion is required for any

18    device search.  But they're all in accord that a warrant at the

19    very least is not currently required or has not been required

03:40 20    under past precedent.

21            There is not a single case, I think in short, to

22    support plaintiffs' claims.  So we're not in a situation like

23    we were prior to Riley where there was a split, as they say, of

24    authority.  It's all on one side of the ledger here when it

25    comes to plaintiffs' precise claims.

1          So contrary to plaintiffs' argument the government

2     somehow has this lesser evidence in uncovering evidence of

3     crimes or violations of federal law, that's never been accepted

4     by any court.  And indeed, if you look to the DC Circuit in the

5     Gurr case, the 2nd Circuit in Levy, they've all held that

6     there's no material distinction between searches for contraband

7     and searches for evidence of crimes at the border, because in

8     many cases they can only detect the contraband by looking to

9     the evidence or they can only detect other efforts to import or

03:41 10    export contraband by looking to the necessary facts and

11    circumstances of a given traveler.

12          So it's these interests --

13          THE COURT:  But isn't that lack of distinction in the

14    past because what was being searched was capable of holding the

15    contraband or the evidence of contraband where it's harder to

16    make that argument in regards to digital devices?

17          MR. DREZNER:  I think, respectfully, digital

18    devices -- and again, we're talking everything, I guess, from a

19    CD to a cell phone, is just as capable of carrying contraband.

03:41 20    Again, plaintiffs pointed out that child pornography has been

21    routinely used on electronic devices as a transport mechanism

22    into the country.  That's certainly contraband, and the

23    government has the highest interests in preventing the import,

24    the possession, the distribution of child pornography.  I don't

25    think we can --

1    THE COURT:  I certainly understand that.  But in the

2    record before me, are the number of searches conducted

3    justified based on what has resulted in what the government

4    can't say in terms of what digital contraband, such as child

5    pornography, has been uncovered?

6    MR. DREZNER:  So if I hear your Honor's question, are

7    you asking sort of whether there's a sufficient frequency of

8    uncovering these types of --

9    THE COURT:  Right.  Or to the extent that it's

03:42 10    being -- you're relying upon this particular interest, how is

11    that borne out in the record I have before me where there's

12    no -- as I understand it now, there's no particularized record

13    to suggest that this -- the number of searches conducted even

14    over the past year or two would bear out that -- that evidence

15    is being uncovered or that it's been promoting that interest,

16    which I certainly understand is a legitimate one.

17    MR. DREZNER:  I appreciate that.  I think there are

18    two responses.  I think, first, this whole framework that

19    plaintiffs have put forward, the government has to show some

03:43 20    unknown level of frequency by which we are able to detect

21    contraband and if we hit some marker, then all of a sudden the

22    warrant exception becomes justified.  There's simply no support

23    for that in the case law.

24    I think if we look to what Riley said, the test is

25    very clear, whether an exception to the warrant required is

1    tethered to a search of a particular kind of good.  And if you

2    want a bit more explanation on it, you can look at Kolsuz,

3    which said this is how it sort of characterized this analysis.

4    Where government interests underlying a Fourth Amendment

5    exception are not implicated by a certain type of search and

6    where an individual's privacy interests outweigh any ancillary

7    government interests, the government must obtain a warrant.

8          There's no indication in any other case that I'm aware

9    of that you have to hit some sort of level of prevalence or

03:43 10   frequency in order to justify these types of searches.

11         The question the Court should ask is are electronic

12   devices capable of carrying contraband?  Are they capable of

13   concealing evidence, evidence of violations of federal law?

14   And then, if the Court wishes to ask the further question,

15   well, have they been found to do this?  The answer is obviously

16   yes.

17         THE COURT:  Yeah, but isn't that essentially the

18   analysis the court was rejecting in Riley in terms of search

19   incident to arrest?  Meaning -- I mean, the cell phone was

03:44 20   certainly capable, and I think, in fact, did -- and, counsel,

21   you can correct me if I'm mixing up the facts of these various

22   cases, but I think there -- I mean, it was certainly capable.

23   I think -- wasn't there evidence of -- that was incriminating

24   against the defendant there?  Meaning, it was capable of

25   holding this evidence, gang membership.  I think there were

1  pictures, photographs of Riley standing in front of a vehicle

2  that the law enforcement suspected was involved in a shooting.

3  It's certainly capable of holding it, but the court in the

4  final analysis said that that was not sufficient to exempt it

5  from a warrant requirement.  So what do you say to what I

6  should do with Riley in that respect?

7       MR. DREZNER:  So if I'm understanding your question

8  correctly, I think it's important to remember what the court

9  was asking in that case, which is, what are the justifications

03:45 10  for the warrant exception in a search incident to arrest

11  context?

12       The justifications the government provided were not is

13  there evidence on the phone, that's a question that I think is

14  more akin to the border context, is someone bringing in

15  evidence of a federal crime or evidence of contraband.  But in

16  the search incident to arrest context, the justifications were

17  can an object be used to harm the arresting officer, and there

18  is a risk of destruction of evidence.  So for those reasons, in

19  general, you're able to search and seize items incident to

03:46 20  arrest.

21       But the court in Riley found that a digital device

22  cannot be used to harm an arresting officer, there's no risk of

23  that, and that once an arrestee is, in fact, arrested and put

24  in custody, there is no risk that person can wipe the data off

25  of their phone.

1          THE COURT:  And I guess -- and I understand your

2     point, but I guess -- and let me articulate it better.  I mean,

3     I took some part of their analysis to be that the interests or

4     the concerns that the government was concerned about and was

5     relying upon for the exception there were remote, that the

6     danger of destruction of evidence was remote.  And I understand

7     the plaintiffs to be arguing here that if you look -- not that

8     there's some tipping point by which you have to show so many

9     searches resulted in confiscation of child pornography, but

03:46 10    that if you look at the enormous -- the large number of

11    searches and the lack of any record about it resulting in

12    confiscation of digital contraband, that there's a disconnect

13    between the two.  Meaning, that the danger here or the concern

14    here is remote or remote enough that it doesn't justify an

15    exception to the warrant requirement.

16          MR. DREZNER:  So I think two things.  First, as to

17    what the court was saying in Riley, I think the only

18    justification they found that could plausibly be advanced by a

19    device search in that case was destruction of evidence.  But

03:47 20    then they looked and they said, Well, once you arrest the

21    person, that person can't destroy this evidence.  So then they

22    said, Well, maybe you have this further attenuated

23    justification where a third party might remotely wipe a phone.

24    But they said, on one hand, that's extremely attenuated from

25    the justifications that we're thinking about here, so it's not

really applicable.  And then they went on to say, And basically

we've been given no evidence to think that this happens; they

said only a couple of anecdotal examples.  So to the extent

that we're looking for more than a couple of anecdotal

examples, we've given that not only are there the cases we've

laid out in Footnote 6, and again, that's not purported to be

an exhaustive list, again, that's only the published decisions

from federal courts that have grappled with the exact issue

before you, so I think that pretty much shows prevalence.  But

if you look at the Howe and the Denton declarations, they lay

out additional multiple real-life examples in which these types

of border searches have uncovered very serious threats to

national security and significant evidence of federal crimes.

        So I don't think there's any debate as to whether

electronic devices are capable of carrying contraband and

evidence and whether they are, in fact, discovered having those

illegal goods and materials on them.  So I don't think there's

any real debate here that government interests are, in fact,

tethered and strongly tethered to the searches of electronic

devices at the border, and that's a distinction from Riley, if

we're going to use that balancing interest here.

        So on the other side of the ledger we have plaintiffs'

claim of privacy interests.  And I think they argue that they

are the same privacy interests that we saw in Riley, but they

fail to respond to the point that in the arrest context, if you

1    want to search an arrestee's locked luggage, their car, their

2    home, you must have not only reasonable suspicion but a

3    warrant.  And at the border, there's no dispute, the case law

4    is uniform that if you wish to search a traveler's locked

5    luggage, their vehicle, their home, you don't need a warrant,

6    you don't often even need reasonable suspicion.  So there's a

7    material distinction in the privacy interests at the border

8    than in the search incident to arrest context that was at issue

9    in Riley.

03:49 10          So you have a completely different balancing of

11    interests, and that's why the court held in Montoya de

12    Hernandez, the balance of the interests here at the border is

13    qualitatively different than in the interior.  And that's in

14    light of the very significant government interests and the

15    diminished interests of travelers at the border.

16          Your Honor, I noted that my -- counsel responded to

17    your question as to a lesser standard.  She did not respond

18    with any substantive argument as to what that argument would

19    be, but, again, simply saying they haven't waived it.  Our

03:50 20    argument is simply that their complaint was straightforward and

21    clear.  It stated that there was a Fourth Amendment violation

22    to search an electronic device absent a warrant and probable

23    cause.  That's their clear claim here.  That's what they

24    articulated in their motion, and then they have this sort of

25    brief mention about, well, probable cause and reasonable

1    suspicion.

2         But the 1st Circuit has made plain that if you want to

3    make an argument in a pending motion, you have to make it

4    squarely and distinctly, and it said that that requirement --

5         THE COURT:  Counsel, I understand the argument that

6    more time was spent on the warrant, but hasn't this issue of

7    whether or not I accept the -- or adopt the plaintiffs'

8    argument it's either a warrant requirement or reasonable

9    suspicion, something other than no suspicion, hasn't that been

03:51 10   a live issue before me since the motion to dismiss?

11         MR. DREZNER:  I don't believe so.  I think if we look

12   to your opinion, I think it's Docket 34, you stated what

13   plaintiffs' claim was, and plaintiffs' claim was that a warrant

14   and reasonable suspicion is required here.  And plaintiffs, I

15   agree, have stated that they wanted to preserve this argument,

16   but at some point, especially in their motion for summary

17   judgment, they should make a detailed explanation as to why

18   these requirements should be put in place.

19         And we did, in fact, respond.  We said, Well, if your

03:51 20   Honor wants to consider these points, probable cause is quite

21   synonymous with a warrant requirement, would impose all the

22   same risks and dangers that a warrant would entail.  And

23   instead, we said reasonable suspicion under 1st Circuit

24   precedent requires a showing that every search of every

25   electronic device is just as invasive as a strip-search.

1    Plaintiffs didn't respond to that.  They haven't even attempted

2    to make that argument, so we, frankly, think that either the

3    argument is meritless or it's been waived.

4         THE COURT:  Right.  And I take your point as to the

5    first and not as to the second.  Meaning, I don't think it's

6    been waived.  I don't see any prejudice to the defense.

7    Certainly, counsel, I'll be more than happy to go back over my

8    own opinion, but I remember argument about it or certainly

9    thought about it in response to the arguments that were made to

03:52 10   me at the motion to dismiss stage.  I certainly understand the

11   government's position substantively.

12        MR. DREZNER:  Thank you, your Honor.

13        So I'll move on.

14        I note in my -- the plaintiffs here did not seek to

15   argue at all about their sort of detention argument or their

16   First Amendment claim.  I'm happy to address those issues if it

17   would be helpful to your Honor.

18        THE COURT:  Counsel, what about the -- any argument

19   that you'd like to return to about expungement as relief here?

03:53 20   MR. DREZNER:  I think, your Honor, we would generally

21   say that to receive expungement, and plaintiffs, I think, now

22   are talking about expungement of federal records regarding

23   their searches.  And to receive expungement, I think, as we've

24   said before, this is a pretty extraordinary remedy.  It would

25   be deletion of federal records from federal agencies who

1    created that.  To receive that remedy, at the very least they

2    need to show why it would be appropriate.  Why is it a

3    violation of federal law or the Constitution to retain records?

4    They simply haven't made any argument before your Honor.  I

5    think if this were the correct remedy, I think in every case

6    that the government improperly seized something, that would be

7    the remedy, destroy it.  But, in fact, we have a complex

8    exclusionary rule test where you ask:  Can the government even

9    bring in this evidence against someone in a criminal

03:53 10    proceeding?  So there's no basis just to think just because the

11    government violated the Fourth Amendment, which, of course, we

12    vigorously dispute, but even in that context, there's no sense

13    to think that simply by dint of that fact the government must e

14    required to destroy all of this evidence and all of this data.

15         THE COURT:  Right.  Although the difference is in the

16    criminal context, right, the suppression or not suppression

17    would address potentially the harm that the defendant is

18    alleging would happen if evidence improperly seized was used

19    against him at trial.  Here, there's not the same context,

03:54 20    counsel.  So is it the government's position that this can

21    never be a remedy that can never be had in the context outside

22    of the criminal context?

23         MR. DREZNER:  No, your Honor.  I think there are

24    examples, they're very sparring, I don't think hare are any in

25    the 1st Circuit, not that I'm aware of, in which expungement

has been discussed.  But I think the question -- I think there

are two questions:  Is the retention of a record a violation of

federal law or some other provision?  And secondly, what is the

injury that is caused by the retention of that record?

Plaintiffs just claim that there may be some way in the future

the government could use this information, but that's simply

not enough, especially at the summary judgment phase.  They

have to put before you specific facts as to why they are at

imminent risk of an injury, in fact, because of retention of

these records.  They haven't done so.

Thank you, your Honor.

THE COURT:  Thank you.

Counsel, I think each side wanted reply time.

Counsel, plaintiff?

MS. BHANDARI:  Yes, your Honor, if that's permissible.

THE COURT:  Yes.

MS. BHANDARI:  I want to address the point that the

government made regarding the supposed breadth of the

plaintiffs' challenge, and they cite to Patel.  But the Supreme

Court in Patel noted that facial challenges in the Fourth

Amendment are not particularly disfavored.  In that context,

the court specifically identified challenges to warrantless

search regimes that had been permitted to go forward.  What we

are dealing with here is exactly that, it is a warrantless

search regime pursuant to the defendants' policies and

practices, and it is our contention that all searches of

electronic devices without a warrant violate the Fourth

Amendment.  So Patel is not to the contrary.

In any event, the government's argument that if there

were any subset of searches that were permissible, that the

plaintiffs' claim would be fatal is simply not supported.  The

court is always free to fashion a narrower remedy.  So if this

Court were to determine only searches of cell phones and

laptops, for example, were covered by its decision, it could

order an injunction with respect to only those devices.  Any

contrary rule would be illogical because the government could

then tack on a clearly constitutional search regime to an

unconstitutional search regime in the same policy and then

preclude all challenges to it if the entire --

THE COURT:  And what would be the basis for making

that distinction?

MS. BHANDARI:  Your Honor, we think that because the

defendants' policies group all these electronic devices

together, they are all subject to the same rule.  And I would

particularly note that the 1st Circuit in Wurie considered this

and it made two findings.  One, it noted that even the most

primitive cell phones with the most basic storage capacity

still had such a storage capacity that was so great that it

would invade privacy and justify a warrant requirement.  But,

two, it noted that there is a preference for brightline rules

1   in this context, and that it shouldn't be the case that an

2   officer has to make an individual determination about a

3   particular device, is this more akin to a computer or is this

4   more akin to something else?  They should, in fact, have

5   brightline rules so they're not making case-by-case

6   determinations about the particular storage capacity or the

7   particular nature of the device.

8         So we think because of that, all electronic devices,

9   especially now, even such things as digital cameras and so

03:58 10  forth can contain metadata in addition to a huge storage

11  capacity.  And we know as well that in United States v.

12  Whiteside, the search incident to arrest rule from Riley was

13  extended to a digital camera to require a warrant for searches

14  of that.

15        The government also argues that they have satisfied

16  the requirement of producing evidence of the government

17  interests being advanced by warrantless searches, and they

18  point to the declarations of Howe and Denton.  The portions of

19  those declarations that appear in their statement of undisputed

03:58 20  material fact that constitute mere opinion evidence do not

21  satisfy the requirements at summary judgment.  In Anderson v.

22  Liberty Lobby, the court was clear that the other side has to

23  point to specific facts.  And in this case, statements of

24  opinion that, you know, the declarants know within their

25  personal knowledge of numerous instances where searches have

1    uncovered evidence or contraband, simply do not establish the

2    kind of record that would meet the requirements of Riley.

3         So, again, when you -- if the Court were to look at

4    the statement of undisputed material facts and to look at the

5    facts in the record, the government has not disputed that they

6    do not keep track of the searches that uncover digital

7    contraband or even evidence.  They don't have that information,

8    and statements of opinion in the declaration by the defendants'

9    officers simply do not satisfy that standard.

03:59 10       And I want to also point to the analysis in Riley

11   regarding the tethering of the justifications.  In Riley, it

12   was not only a concern for remote wiping of evidence, there was

13   also a concern for officer safety and the possibility that

14   someone can find something on the device that would alert an

15   officer to a safety concern.  And nonetheless, the Supreme

16   Court said that was not a significant or prevalent problem.

17   Those were the words of the Supreme Court.  And it also noted a

18   different requirement, which is, do warrantless searches make

19   much of a difference in advancing the government's permissible

04:00 20   justifications?  And here, even when we consider the handful of

21   instances in which searches have uncovered digital contraband,

22   the record evidence does not show that the ability to conduct

23   warrantless searches would make much of a difference.  In fact,

24   the record shows that when ICE conducts device searches, they

25   almost always have reasonable suspicion.  As I mentioned in the

Footnote 6 of the defendants' motion for summary judgment, in

that citation of 34 cases, the vast majority were actually

predicated on some level of suspicion, probable cause or

reasonable suspicion.

Turning to the question of routine searches versus

non-routine searches, as this Court recognized in its motion to

dismiss opinion, the non-routine line of cases have looked at

the level of intrusiveness of a search, whereas the Riley

opinion looked at the nature of the object to be searched.  And

this is the reason that we argue that a warrant is required.

But, nonetheless, we have consistently stated in the

alternative that these searches are at least non-routine and

should be conducted on a minimum reasonable suspicion or

probable cause.

THE COURT:  On the issue of invasiveness?

MS. BHANDARI:  That is correct, your Honor.  And your

Honor noted in the motion to dismiss opinion that

strip-searches in the search incident to arrest context are

conducted on at least reasonable suspicion, and yet, cell phone

searches are conducted pursuant to a warrant based on probable

cause.  But, nonetheless, if we look at the alternative

argument of at least reasonable suspicion being required, we

have cited to United States v. Braks, and we noted that among

the factors that Braks identified was the intrusiveness or the

dignitary interests, but also the nature of the privacy

1    interests that was being invaded.  And they specifically
2    mentioned searches of a house, for example.  So even within the
3    Braks reasoning, these searches of devices are at least
4    non-routine, and we have consistently made that argument.  And
5    again, the record shows that, you know, because advance
6    searches are already done on at least reasonable suspicion and
7    because ICE always -- almost always has reasonable suspicion,
8    this should be a minimum for all electronic device searches.

9         And lastly, I just want to note of the appellate
04:02 10   decisions that the government cites, but for the 11th Circuit,
11   none of those appellate decisions have foreclosed the
12   possibility of a warrant requirement.  In fact, the 4th Circuit
13   in United States v. Kolsuz explicitly left open the possibility
14   that a warrant might be required.  What it did say is that
15   heightened suspicion, individualized suspicion is required.

16        So, in conclusion, we believe that a warrant is the
17   appropriate standard and have always argued, of course, that at
18   a minimum, electronic device searches are non-routine searches
19   requiring individualized suspicion.

04:03 20        THE COURT:  Thank you.

21        Counsel, did the government want an opportunity
22   briefly to reply?

23        MR. DREZNER:  Briefly, your Honor.

24        I think I'll just address two points plaintiffs made.

25        I think first, as to their assertion they have

1    consistently made this argument that these searches are

2    non-routine, I don't recall that being in their motion.  To the

3    extent that it is before this court properly, I did not hear

4    plaintiffs to say that every search of every electronic device

5    is just as intrusive or as invasive as a strip-search.  I think

6    it's clear why they cannot make that argument.

7         To their point that while this Court could try and

8    carve out some sort of regime of some devices with some level

9    of suspicion, in general, yes, of course this Court has broad

04:04 10   equitable powers.  What plaintiffs have deliberately chosen to

11   do is bring a facial claim before your Honor.  And so in the

12   Patel decision, the court wasn't concerned whether, you know,

13   some information from some hotel owners might be

14   constitutional, it was a question of whether this entire regime

15   was unconstitutional.  That's a facial challenge.  Plaintiffs,

16   again, are not shying away from this.  They're saying, Yes,

17   indeed, we are trying to show that every single search of every

18   electronic device, from a voice recorder to a CD to a tablet

19   computer, all require probable cause and a warrant in a regime

04:04 20   where a search of a traveler's home does not even require

21   reasonable suspicion.

22         I think for that reason the Court simply can't try and

23   decide which devices are worthy of which degree of protection.

24   I think, as Judge Wilkinson in the 4th Circuit pointed out, as

25   the 11th Circuit pointed out, those types of fine-grain

1    distinctions are quite readily made by the legislature.

2    Indeed, there have been multiple bills proposed over the last

3    few years that would govern this.  But, indeed, a sort of

4    broad, sweeping constitutional declaration would, in fact,

5    preempt Congress' ability to make those types of fine-grain

6    distinctions.

7         But we don't need to worry about that here, because,

8    again, plaintiffs brought a simple and broad, sweeping

9    challenge to every search of every device at the border.

04:05 10      I think to the extent plaintiffs argue that this Court

11   can't somehow find the government has sufficiently advanced its

12   interests here, again, they don't dispute that there have been

13   over 30 federal court decisions published not just involving

14   these types of issues but explicitly discussing them.  So I

15   think there's a fair inference there's far more of those cases

16   out there, and indeed, we point out there.  Why the Court could

17   not credit declarants saying that they are personally aware of

18   numerous instances which certain things have been uncovered is

19   not clear to me.  Indeed, they have explained precisely what

04:06 20   those instances were, evidence of serious federal crimes,

21   evidence of threats to national security, again, being

22   uncovered at the border.

23        So I think for all these reasons we strongly urge this

24   Court to follow the consistent holdings of every court to have

25   considered this issue, find that a warrant is not required at

1   the border, to deny plaintiffs' motion and grant the

2   government's cross-motion.

3           THE COURT:  Thank you.

4           Counsel, I appreciate the arguments on either side.

5   Obviously, once again, you've given me a lot to think about and

6   I will, and I will take the matter under advisement and issue

7   my ruling.

8           Thank you.

9           THE CLERK:  All rise.

04:06 10          (Court adjourned at 4:06 p.m.)

11              - - - - - - - - - - - -

12                      CERTIFICATION

13          I certify that the foregoing is a correct transcript

14   of the record of proceedings in the above-entitled matter to

15   the best of my skill and ability.

16

17

18

19   /s/Debra M. Joyce_____          August 21, 2019_____
     Debra M. Joyce, RMR, CRR, FCRR     Date
20   Official Court Reporter

21

22

23

24

25